IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 06-601 C
Filed: August 23, 2006

| | | |
|---|---|---|
| THEODORE WHITNEY and HIGH RESOLUTION OPTICS CORPORATION, | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 06-601 C |
| THE UNITED STATES, | ) | Chief Judge Edward J. Damich |
| Defendant, | ) | |
| and | ) | |
| RAYTHEON COMPANY, | ) | |
| Third-Party Defendant. | ) | |

**PLAINTIFFS' OPENING BRIEF ON CLAIM CONSTRUCTION**

# TABLE OF CONTENTS

TABLE OF CONTENTS ..... ii

TABLE OF AUTHORITIES ..... iv

I. STATEMENT OF THE QUESTIONS TO BE ADDRESSED BY THE COURT ..... 1

II. CONCISE STATEMENT OF THE CASE ..... 1

III. BACKGROUND OF THE '319 PATENT ..... 1

IV. ASSERTED CLAIMS AND CONTESTED TERMS ..... 5

A. Asserted Claims – 33, 34, 36, 37 and 42 ..... 5

B. Claim Terms at Issue ..... 6

V. APPLICABLE LAW ON CLAIM CONSTRUCTION ..... 7

A. Introduction ..... 7

B. General Claim Construction Principles ..... 8

C. Intrinsic Evidence ..... 8

1. Claims and Specification are Most Relevant Sources ..... 8

2. It is Improper to Import Limitations from the Specification ..... 9

3. The Court Must Examine the Prosecution History to Assess Any Impact on Claim Construction ..... 10

D. Extrinsic Evidence ..... 10

VI ARGUMENT ..... 11

A. "Plate" ..... 11

B. "Plurality of Concentric Patterns" ..... 13

C. "Introduce an Aspheric Function" ..... 15

D. "Aberration" ..... 17

E. "The Aspheric Function" ..... 19

F. "Lens" ..... 19

G. "A Number of Refractive Elements Arranged as a Lens System" ..........................21

H. "Phase Plate"..........................................................................................23

I. "Phase Plate Comprising a Holographic Element"..................................................24

J. "Bragg Regime"........................................................................................26

K. "Functioning as an Asphere" ......................................................................28

L. "Negative Chromatic Dispersion" ...............................................................30

VII. CONCLUSION..........................................................................................33

SIGNATURE...................................................................................................33

CERTIFICATE OF SERVICE ..........................................................................34

# TABLE OF AUTHORITIES

## Cases

*Abtox, Inc. v. Exitron Corp.*,
122 F.3d 1019 (Fed. Cir. 1997)....................22

*Autobytel, Inc. v. Dealix Corp.*,
No. 2:04-CV-338, 2006 U.S. Dist. LEXIS 3381 (E.D. Tex. Jan. 18, 2006)....................11

*Baldwin Graphic Sys. v. Siebert, Inc.*,
No. 2007-1262, slip op. at 7, 2008 U.S. App. LEXIS 783
(Fed. Cir. Jan. 15, 2008) ....................22

*Brassica Protection Products LLC v. Sunrise Farms*,
301 F.3d 1343 (Fed. Cir. 2002)....................14

*Charles Greiner & Co. v. Mari-Med Mfg., Inc.*,
962 F.2d 1031 (Fed. Cir. 1992)....................8

*Comark Communications v. Harris Corp.*,
156 F.3d 1182 (Fed. Cir. 1998)....................24

*Curtiss-Wright Flow Control Corp. v. Velan, Inc.*,
438 F.3d 1374 (Fed. Cir. 2006)....................13

*CVI/Beta Ventures, Inc. v. Tura LP*,
112 F.3d 1146 (Fed. Cir. 1997)....................29

*Digital Biometrics v. Identix, Inc.*,
149 F.3d 1335 (Fed. Cir. 1998) .................... 10

*Gobeli Research Ltd. v. Apple Computer, Inc.*,
384 F. Supp. 2d 1016 (E.D. Tex. 2005).................... 9

*Interactive Gift Express, Inc. v. Compuserve, Inc.*,
256 F.3d 1323 (Fed. Cir. 2001) .................... 8, 12

*Intervet Am., Inc. v. Kee-Vet Labs., Inc.*,
887 F.2d 1050 (Fed. Cir. 1989)....................14

*Inverness Med. Switzerland GmbH v. Warner Lambert Co.*,
309 F.3d 1373 (Fed. Cir. 2002)....................9

*Laitram Corp. v. Cambridge Wire Cloth Co.*,
863 F.2d 855 (Fed. Cir. 1988), *cert. denied*, 490 U.S. 1068 (1989).................... 10

*Laitram Corp. v. Morehouse Indus., Inc.*,
143 F.3d 1456 (Fed. Cir. 1998) .......... 10

*Laitram Corp. v. Rexnord, Inc.*,
939 F.2d 1533 (Fed. Cir. 1991).......... 29

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
358 F.3d 898 (Fed. Cir. 2004).......... 9-10, 15, 29

*Markman v. Westview Instruments, Inc.*,
52 F.3d 967 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996) .......... 7, 25-26

*Merck & Co. v. Teva Pharms. USA, Inc.*,
347 F.3d 1367 (Fed. Cir. 2003).......... 24

*Nazomi Communications, Inc. v. Arm Holdings, PLC*,
403 F.3d 1364 (Fed. Cir. 2005).......... 8

*Norian Corp. v. Stryker Corp.*,
432 F.3d 1356 (Fed. Cir. 2005).......... 22

*PC Connector Solutions LLC v. SmartDisk Corp.*,
406 F.3d 1359 (Fed. Cir. 2005).......... 25-26

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005).......... 8, 11, 29

*Pitney Bowes, Inc. v. Hewlett-Packard Co.*,
182 F.3d 1298 (Fed. Cir. 1999).......... 7, 11

*Playtex Prods., Inc. v. Procter & Gamble Co.*,
400 F.3d 901 (Fed. Cir. 2005).......... 24

*Poly-America, L.P. v. GSE Lining Tech., Inc.*,
383 F.3d 1303 (Fed. Cir. 2004).......... 7

*Renishaw PLC v. Marposs Societa' per Azioni*,
158 F.3d 1243 (Fed. Cir. 1998) .......... 9

*Rexnord Corp. v. Laitram Corp.*,
274 F.3d 1336 (Fed. Cir. 2001).......... 29

*Seachange Int'l, Inc. v. C-COR Inc.*,
413 F.3d 1361 (Fed. Cir. 2005).......... 13

*Sinorgchem Co. v. ITC*,
No. 2006-1633, 2007 U.S. App. LEXIS 30348 (Fed. Cir. Dec. 21, 2007).......... 13

*Sofamor Danek Group v. Depuy-Motech*,
74 F.3d 1216 (Fed. Cir. 1996)....................10

*Springs Window Fashions LP v. Novo Indus., L.P.*,
323 F.3d 989 (Fed. Cir. 2003)....................10

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
299 F.3d 1313 (Fed. Cir. 2002)....................9

*Tivo, Inc. v. Echostar Communs. Corp.*,
No. 2006-1574, 2008 U.S. App. LEXIS 2073 (Fed. Cir. Jan. 31, 2008)....................22

*Vitronics Corp. v. Conceptronic, Inc.*,
90 F.3d 1576 (Fed. Cir. 1996).................... 8, 25-26

Pursuant to the Scheduling Order entered by the Court, Plaintiffs THEODORE WHITNEY AND HIGH RESOLUTION OPTICS CORPORATION (collectively "Plaintiffs") hereby present their proposed constructions of the disputed claim terms of the patent-in-suit, United States Patent No. 5,386,319 ("the '319 patent").

## I. STATEMENT OF THE QUESTIONS TO BE ADDRESSED BY THE COURT

The Court is being asked to determine whether Defendants are liable for infringing the asserted claims of the '319 patent. The Court is also being asked to determine the validity of the '319 patent.

## II. CONCISE STATEMENT OF THE CASE

This is a case involving allegations of patent infringement. Plaintiffs have accused Defendants of infringing claims 33, 34, 36, 37, and 42 of the '319 patent with respect to the AN/PAS-13 Thermal Weapons Sight procured by the United States from Raytheon. Defendants have asserted that the patent is invalid and that the doctrine of laches applies to bar Plaintiffs' recovery.

## III. BACKGROUND OF THE '319 PATENT

The '319 patent is directed toward systems and methods whereby specialized diffractive optical elements are used to compensate for and reduce residual aberrations inherent in an optical system. An embodiment of the invention taught in the '319 patent is explained in the context of photolithographic systems used in the semiconductor industry. The invention is claimed to have applications to any area where diffractive optics are used.

Semiconductors are built, in part, through photolithography which is a process by which light is used to create a pattern on a silicon wafer that forms an electrical circuit. The basic photolithography process involves coating a silicon wafer with photo-resist material, which is a

polymer that reacts with light to create areas that are soluble in certain solvents. Specific patterns are created on the silicon wafer by first shining light through a mask onto the photo-resist coated wafer. The areas of the photo-resist that are exposed to the light will undergo a chemical reaction making them easier to remove with solvents compared to the areas that are not exposed to the light. (*See* Figure 1 below).

In order to miniaturize the circuit patterns on a wafer, the mask image size can be reduced and projected onto the wafer using optics. This is called projection printing or projection photolithography. This technique allows the patterns on the mask to be shrunk to microscopic dimensions on the wafer surface. (*See* Figure 2). Using projection printing, the patterns produced on a wafer surface are generally smaller than one micron (1µm), which is one millionth of a meter.




**Figure 1: Basic Photolithography Process[1]**




**Figure 2: Projection Printing[2]**

[1]Unless otherwise noted, all exhibits refer to attachments to the Declaration of David C. Tobin ("Tobin Decl.") made in support of Plaintiffs' Opening Brief on Claim Construction. Tobin Decl., Ex. A (http://www.micron.com/k12/semiconductors/photo (last visited February 8, 2008)).

[2]*Id*., Ex. 2 (http://classes.engr.oregonstate.edu/cbee/fall2007/che571/Topic11.pdf (last visited February 8, 2008)).

Creating such small patterns requires extreme precision. The optical system that is used to produce these small variations must be designed to compensate for physical properties of light, and specifically the behavior of light as it passes through a lens or any other light-altering medium, which can be detrimental to the resolution of such small dimensions. The '319 patent discloses an optical system for achieving higher resolution by reducing the effects of optical aberrations. The reduction of aberrations is a key criteria in the design of all types of optical systems.

There are several types of optical aberrations. However, for the purposes of this brief, only two types will be discussed: spherical and chromatic. Spherical aberrations are caused by the curved nature of many lenses, which causes light to focus at various points as it enters and passes through different portions of a lens. **In this manner, spherical aberrations <u>cause an image that is blurry</u>.** (*See* Figure 3).




**Figure 3: Depiction of Spherical Aberration**[3]

[3]*Id.*, Ex. 3 (http://amazing-space.stsci.edu/resources/explorations//groundup/lesson/basics/g11/index.php?t=spherical_aberration_in_lenses (last visited February 8, 2008)).

On the other hand, chromatic aberration is caused by different wavelengths of light bending different amounts as they pass through a lens after entering from the same location. As a result, each wavelength of light has a different focal point. **Chromatic aberrations <u>cause colors to blur together</u>.** (*See* Fig. 4).




**Figure 4: Depiction of Chromatic Aberration**[4]

Spherical and chromatic aberrations can cause significant problems when working with optical applications that require ultimate precision. As a result, engineers who design lens systems go to great lengths to design optical systems that reduce all types of aberrations. An often-used technique is to add additional lenses and mirrors to counteract and compensate for the various aberrations and their effects caused by an original lens. This technique can be effective because the correction provided by an additional lens can be more significant than any new aberrations introduced by such lens. This requires multiple individual lenses to achieve a desired optical effect. Unfortunately, using multiple lenses increases the weight, cost and complexity of such systems. The '319 patent provides an advanced solution.

[4] *Id*., Ex. 4 (http://amazing-space.stsci.edu/resources/explorations//groundup/lesson/basics/g15/index.php (last visited February 8, 2008)); and Ex. 5 (http://en.wikipedia.org/wiki/Chromatic_aberration (last visited February 8, 2008)).

The ‘319 patent teaches a “phase plate,” which is a diffractive optical element with dispersion properties that can be designed to compensate for various optical aberrations. In its most general form, a diffractive optical element splits a light beam into multiple beams.[5] More particularly, the phase plate taught by the ‘319 patent consists of a series of concentric ring patterns, whereby each ring consists of a varying series of plateaus that compensate for aberrations in a lens system.

A phase plate designed in accordance with the ‘319 claims can be placed in an optical system to compensate for the aberrations introduced by other lens(es) without adding additional aberrations to the overall lens system that must be corrected. While such a phase plate can be particularly useful in high precision applications, the correction of aberrations is desired in all optical systems where aberrations can degrade image quality. By using this one phase plate – as opposed to multiple smooth lenses – a superior optical system is achieved and the size, weight and cost of a traditional multiple-lens system is advantageously reduced. Such advantages are highly relevant in the combat arena – the market that applies to the accused infringing product.

## IV. ASSERTED CLAIMS AND CONTESTED TERMS

### A. Asserted claims – 33, 34, 36, 37 and 42

Plaintiffs have asserted the following claims of the ‘319 patent against Defendants:

> 33. An aspheric optical element for correcting the microstructure of an areal beam disposed about a central axis comprising: a light transmissive plate having a plurality of concentric patterns thereon, the plate being disposed in the beam path and with the patterns concentric with the central axis, wherein the patterns each introduce progressively varying optical path delay in the beam between selected limits, the patterns varying in radial dimension and in radial position relative to the central axis to introduce an aspheric function in the beam.

[5] *See id.*, Ex. 22 (http://physics-animations.com/Physics/English/DG10/dg10.htm (last visited February 8, 2008)).

34. An aspheric optical element as set forth in claim 33 above, wherein the patterns each have progressively varying heights redirecting wavelet components of the beam to redistribute waves in the beam.

36. An aspheric optical element as set forth in claim 33 above, wherein one or more aspheric is used with an optical system having aberration as a system and in the elements thereof, and wherein the aspheric function compensates for system aberration and aberrations of the elements themselves.

37. An optical system comprising:

[a] a number of refractive elements arranged as a lens system and having residual aberration, and

[b] at least one phase plate comprising a holographic element operating in a Bragg regime and also functioning as an asphere to compensate for residual aberration in the refractive elements.

42. An achromatic optical system comprising:

[a] a plurality of refractive lenses having in combination a negative chromatic dispersion, and

[b] at least one correcting phase plate defining a transmission grating having a positive base power curvature opposing but substantially matching the chromatic dispersion of the refractive lenses.

## B. Claim terms at issue

The following claims terms are at issue between the parties and are presented for construction by the Court:[6]

a. Plate (Claims 33, 37 & 42)

b. Plurality of concentric patterns (Claim 33)

c. Introduce an aspheric function (Claim 33)

d. Aberration (Claims 36 & 37)

e. The aspheric function (Claim 36)

[6] During the claim construction process, the parties also agreed to the construction of certain claim terms. *See* Tobin Decl., Ex. 6 at p. A1 (Joint Claim Construction Statement filed on January 4, 2008, Docket # 34).

f. Lens (Claims 37 & 42)

g. A number of refractive elements arranged as a lens system (Claim 37)

h. Phase plate (Claims 37 & 42)

i. Phase plate comprising a holographic element (Claim 37)

j. Bragg regime (Claim 37)

k. Functioning as an asphere (Claim 37)

l. Negative chromatic dispersion (Claim 42)

Plaintiffs' proposed constructions of these terms are presented in Section VI, below. Where a claim term or phrase occurs in multiple claims, Plaintiffs contend that it should be given the same meaning in every claim in which it appears.

## V. APPLICABLE LAW ON CLAIM CONSTRUCTION

### A. Introduction.

Claim construction is a matter of law. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). Furthermore, the Federal Circuit has stated "A court may consider the specification, the prosecution history, and other relevant evidence when construing the scope of the claims." *Poly-America, L.P. v. GSE Lining Tech., Inc.*, 383 F.3d 1303, 1309 (Fed. Cir. 2004) (citing *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1309 (Fed. Cir. 1999)).[7]

A claim construction is the first of two steps in a patent infringement case. In this initial step, the asserted claims must be properly construed to determine their scope and meaning. *Markman*, 52 F.3d 976. This step is a question of law, placing the task of claim construction on the Court. *Id*. at 978-79.

[7] Plaintiffs note that Defendants have made arguments in the Joint Claim Construction Statement that additional evidence cited by Plaintiffs is untimely. *See id* at p. 2. Since claim construction is a matter of law, the Court should consider all relevant information.

In the second step, the properly construed claims are compared to the accused devices to determine whether the devices infringe the claims. *Id*. at 976. This step is a factual inquiry for the jury at trial. *See Charles Greiner & Co. v. Mari-Med Mfg., Inc*., 962 F.2d 1031, 1034 (Fed. Cir. 1992).

**B. General Claim Construction Principles.**

The Federal Circuit has established guidelines for the courts to follow in performing the claim construction analysis. "It is well-settled that, in interpreting an asserted claim, the court should look first to the intrinsic evidence of record, *i.e.*, the patent itself, including the claims, the specification and, if in evidence, the prosecution history." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996); *see Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005). Claim construction is complete if the Court is able to ascertain an unambiguous meaning for the claim term from an examination of the intrinsic evidence only. *Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1332 (Fed. Cir. 2001).

**C. Intrinsic Evidence.**

**1. The Claims and Specification are Most Relevant Sources.**

The Court looks first to the patent, *i.e.*, the claims and specification, to determine the meaning of words in the claims. *See Nazomi Communications, Inc. v. Arm Holdings, PLC*, 403 F.3d 1364, 1368 (Fed. Cir. 2005). "It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips*, 415 F.3d at 1312. "[T]he claims themselves provide substantial guidance as to the meaning of particular claim terms." *Id*. at 1314. "Other claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term." *Id*.

The specification is also relevant. "The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998); *see also Gobeli Research Ltd. v. Apple Computer, Inc.*, 384 F. Supp. 2d 1016, 1021 (E.D. Tex. 2005).

**2. It Is Improper To Import Limitations from the Specification.**

While the Court must review the patent specification, it must review the specification only for the purpose of interpreting the claim's stated terms, and not to incorporate particular features exhibited in the specification into the claim. *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004).

As noted by the Federal Circuit, the respective roles of the claim language and the specification during the claim construction process are defined by two canons which sometimes appear in tension: "(a) one may not read a limitation into a claim from the written description, but (b) one may look to the written description to define a term already in a claim limitation." *Renishaw*, 158 F.3d at 1248. The Federal Circuit, nevertheless, has repeatedly held that courts may not import limitations from embodiments disclosed in the specification in order to limit or otherwise vary the meaning of the claim language. *Liebel-Flarsheim*, 358 F.3d at 906 ("[T]his court has expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment"); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1327-28 (Fed. Cir. 2002); *Inverness Med. Switzerland GmbH v. Warner Lambert Co.*, 309 F.3d 1373, 1379 (Fed. Cir. 2002) ("It is improper to limit the claim based on a preferred embodiment of the invention") (emphasis added). "Even when the specification describes only a single

embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using 'words or expressions of manifest exclusion or restriction.'" *Liebel-Flarsheim*, 358 F.3d at 906.

In summary, while the specification can act as a type of dictionary for the terms in the claims where it *defines* those terms, courts do not incorporate additional features into the claims merely because those features are *discussed or illustrated* in the specification. *See, e.g., Laitram Corp. v. Cambridge Wire Cloth Co.*, 863 F.2d 855, 865 (Fed. Cir. 1988), *cert. denied*, 490 U.S. 1068 (1989). The claim itself <u>must</u> recite the feature as a limitation. *See id.*

#### 3. The Court Must Examine the Prosecution History To Assess Any Impact on Claim Construction.

Similarly, "[t]he prosecution history is relevant because it may contain contemporaneous exchanges between the patent applicant and the PTO about what the claims mean." *Digital Biometrics v. Identix, Inc.*, 149 F.3d 1335, 13544 (Fed. Cir. 1998). The prosecution history is the record of the proceedings in the PTO that involved the examination and ultimate issuance of the subject patent. "[A]rguments made during prosecution shed light on what the applicant meant by its various terms." *Laitram Corp. v. Morehouse Indus., Inc.*, 143 F.3d 1456, 1462 (Fed. Cir. 1998); *Springs Window Fashions LP v. Novo Indus., L.P.*, 323 F.3d 989, 995 (Fed. Cir. 2003) (same). Even so, is also improper to import limitations from the file history. *See Sofamor Danek Group v. Depuy-Motech*, 74 F.3d 1216, 1220 (Fed. Cir. 1996) ("this search caused the trial court to improperly import limitations from the prosecution history").

### D. Extrinsic Evidence.

Extrinsic evidence such as technical dictionary definitions, treatises, and witness testimony may also aid the court in determining the meaning of claims; though it is "less

significant than the intrinsic record in determining the legally operative meaning of claim language." *Autobytel, Inc. v. Dealix Corp.*, No. 2:04-CV-338, 2006 U.S. Dist. LEXIS 3381, at * 5 (E.D. Tex. Jan. 18, 2006) (citing *Phillips*, 415 F.3d at 1317). Extrinsic evidence may "help educate the court regarding the field of the invention and can help the court determine what a person of ordinary skill in the art would understand claim terms to mean" but such evidence should be considered in the context of the intrinsic evidence. *Phillips*, 415 F.3d at 1319; *see also Autobytel*, 2006 U.S. Dist. LEXIS 3381, at *6.

In the current case, neither party has identified any testimony regarding claim construction to be submitted to the Court, nor will such testimony be presented absent the Court's Order for such testimony.

## VI. ARGUMENT

Plaintiffs make the following arguments with respect to their proposed constructions for the disputed claim terms:

### A. "Plate"

> Plaintiffs' Proposed Construction**:** A surface that can alter a beam of light.
>
> Defendants' Proposed Construction**:** A substantially flat optical element.

Defendants' attempt to read extraneous limitations into this claim term should be rejected, and Plaintiffs' proposed construction should be adopted. Claim 33 is the only asserted claim in which the term "plate" alone is used.[8] The starting point for analyzing the meaning of this term is claim language itself. *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999) ("The starting point for any claim construction must be the claims themselves.").

[8] The term "phase plate" is used in other asserted claims but the term "phase plate" has been specifically construed by the parties as well, see below.

Claim 33 describes "an aspheric optical element for correcting the microstructure of an areal beam disposed about a central axis" and expressly calls for

> a light transmissive plate having a plurality of concentric ring patterns thereon, the plate being disposed in the beam path and with the patterns concentric with the central axis, wherein the patterns each introduce progressively varying optical path delay in the beam between selected limits….[9]

From the claim language, it is specified that the plate must allow some light to be transmitted through it. In addition, the plate has certain patterns which have the ability to change the "optical path delay" of the light beam (*i.e.* alter the light beam). Since the claim itself defines the properties of the plate, consultation with the specification is only appropriate to determine if the patentee intended a contrary meaning, which, as shown below, is not the case. *See Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001) ("if the claim language is clear on its face, then [a court's] consideration of the rest of the intrinsic evidence is restricted to determining if a deviation from the clear language of the claims is specified.").

Defendants contend that the plate must be "substantially flat." This construction must be rejected because it impermissibly reads in an extraneous limitation. Defendants' "substantially flat" limitation is not found in Claim 33 nor is that phrase found anywhere in the specification. The only time the term "substantially flat" is used in the patent is in Claims 1 and 10. In those claims, the preamble specifically describes a "plate for use in an optical system….comprising: a substantially flat, light transmissive, substrate…"[10] However, Claim 33 describes something different: "an aspheric optical element for correcting the microstructure of an areal beam disposed about a central axis."[11] Claim 33 does not specify a "flat" element in any manner.

---

[9] '319 Col. 28 lns. 36-48.

[10] *Id*., Col. 24 ln. 67 – Col. 25 ln. 5, Col. 25 lns. 50-56.

[11] *Id*., Col. 28 lns. 36-38.

Under the doctrine of claim differentiation, each claim is presumed to have a different scope. *See Sinorgchem Co. v. ITC*, No. 2006-1633, 2007 U.S. App. LEXIS 30348 (Fed. Cir. Dec. 21, 2007) ("We have characterized the doctrine of claim differentiation generally as the 'presumption that each claim in a patent has a different scope.'") (quoting *Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1380 (Fed. Cir. 2006)). With this analysis as a guide, the "optical element" described in Claim 33 is presumed to have a different scope than the "plate" described in the preamble of Claims 1 and 10, and it is inappropriate to impose characteristics from one onto the other.

Further, there is no basis to import the "substantially flat" requirement into Claim 33 from the specification or the claim language and, more importantly, such a construction would impermissibly limit the scope of Claim 33. This is a tactic that the Federal Circuit has repeatedly rejected. *See Seachange Int'l, Inc. v. C-COR Inc.*, 413 F.3d 1361, 1376 (Fed. Cir. 2005) ("it is improper to import a limitation into a claim where the limitation has no basis in the intrinsic record").

**B. "Plurality of concentric patterns"**

> <u>Plaintiffs' Proposed Construction</u>: More than one concentric ring.
>
> <u>Defendants' Proposed Construction</u>: Concentric rings with a selected number of plateaus formed through a process other than mechanical cutting.

Both parties appear to agree that more than a single ring is required as evidenced by Plaintiffs' proposed construction of "more than one" and Defendants use of the plural word "rings" in their proposed constructions. This is confirmed by the claim language which uses the <u>plural</u> word "patterns." The only remaining difference is Defendants' addition of "with a

selected number of plateaus formed through a process other than mechanical cutting" to their proposed construction.

As discussed in Section VI(A), above, Claim 33 describes an "aspheric optical element." The claim language expressly provides that Claim 33's "optical element" be comprised of "concentric patterns." In particular, the patterns must (1) "introduce progressively varying optical path delay in the beam," and (2) "vary[] in radial dimension and in radial position relative to the central axis."[12] Claim 33 does not require that the "optical element" include "plateaus formed through a process other than mechanical cutting" as Defendants propose. To do so would be to read limitations directly into the claims, which is a clear violation of black letter patent law. *See Brassica Protection Products LLC v. Sunrise Farms*, 301 F.3d 1343, 1348 (Fed. Cir. 2002) ("limitations appearing in the specification will not be read into claims, and . . . interpreting what is meant by a word in a claim 'is not to be confused with adding an extraneous limitation appearing in the specification, which is improper.'") (quoting *Intervet Am., Inc. v. Kee-Vet Labs., Inc.*, 887 F.2d 1050, 1053 (Fed. Cir. 1989)).

Defendants' proposed construction would also violate the doctrine of claim differentiation. Specifically, dependent Claim 34 states that the rings must have "progressively varying heights…," while Defendants' construction of this element in Claim 33 recites a "number of plateaus."[13] In doing so, Defendants are impermissibly attempting to incorporate language similar to that of Claim 34 into the meaning of Claim 33 in violation of the doctrine of claim differentiation.

The doctrine of claim differentiation was discussed in conjunction with the disputed term "plate" in Section VI(A). The strongest case for applying the doctrine of claim differentiation is

---

[12] '319 Col. 28 lns. 39-48.

[13] *Id*., Col. 28 lns. 49-52.

a scenario where there is a dependent claim that adds a particular limitation that is not found in the corresponding independent claim. *See Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004). Since the requirement of patterns with "varying heights" is first introduced in dependent Claim 34, there is a strong presumption that this limitation is not present in Claim 33 because Claim 33 is deemed to have a broader scope than Claim 34. Therefore, the "concentric patterns" of Claim 33 must be broader in scope than the patterns recited in Claim 34. Claim 33 is not limited to patterns of "varying heights" which are explicitly recited in dependent Claim 34. The "varying heights" limitation of Claim 34 cannot be properly read into independent Claim 33. This is just another attempt by Defendants to read extraneous limitations into the claim language. It is as impermissible here as it is everywhere else, and it must be rejected.

### C. "Introduce an aspheric function"

> Plaintiffs' Proposed Construction: Introduce the ability to alter aberrations.
>
> Defendants' Proposed Construction: Correcting at least spherical aberrations.

Plaintiffs' proposed construction is supported by the specification. Whereas, Defendants' construction seeks to require that the aspheric function always corrects spherical aberrations in contravention of the claim language and the specification, which do not have this requirement. In fact, the specification states:

> As a consequence of the aspheric characteristics, the residual spherical aberration that is permitted within the refractive optics design is compensated by needed fractional amounts throughout the entire wavefront, at the same time that the other geometrical aberrations and the **chromatic** aberration are also cancelled.[14]

[14] '319 Col. 13 lns. 39-44 (emphasis added).

It is clear that while an aspheric function has the ability to compensate for spherical aberrations, it also has the ability to compensate for other types of aberrations, such as chromatic aberrations, as well. Further support for this notion is found in the "summary of the invention" section of the specification where the patentee states:

> **In an optical imaging system the compensation is <u>not only</u> for predetermined <u>spherical</u> aberration <u>but also</u> predetermined <u>chromatism</u> in the refractive optics;**[15]
>
> The refractive optics used in the system not only require substantially fewer elements but the design procedure can accommodate greater tolerance for specific characteristics, <u>such as spherical aberration and chromaticity;</u>[16]
>
> In a microscope system, for example, light directed from an illuminator system onto an object under examination is imaged with higher resolution than heretofore by using a phase plate which is at the aperture stop and <u>compensates for aberrations of refractive elements</u> in the system, <u>as well as spherical aberrations</u> introduced by a transparent cover plate over the specimen under examination;[17] and
>
> The three lenses in the collimating group 58 cumulatively and in combination with the phase plate are substantially responsible for <u>eliminating coma and astigmatic aberrations</u> of the system.[18]

The patent teaches that an aspheric function can correct several types of aberrations. The extent to which a particular type of aberration needs to be corrected will depend on the particular optical system. Restricting the construction of this term to require that spherical aberrations are always corrected would be improper as there is no such requirement in the claim language or the specification.

Plaintiffs' proposed construction is further bolstered by definitions from a scientific dictionary contemporaneous with the filing of the application which defines an aspheric surface

---

[15] *Id*., Col. 4 lns. 17-21 (emphasis added).

[16] *Id*., Col. 4 ln. 66 – Col 5 ln. 2 (emphasis added).

[17] *Id*., Col. 5 lns. 39-47 (emphasis added).

[18] *Id*., Col. 12 lns. 4-7 (emphasis added).

as "a lens or mirror surface which is altered slightly from a spherical surface in order to reduce aberrations."[19] There is no requirement in this definition that spherical aberrations must be corrected by an aspheric surface and there should likewise be no such requirement in the element "introduce an aspheric function."

### D. "Aberration"

> Plaintiffs' Proposed Construction: Departure from a true image.
>
> Defendants' Proposed Construction: Deviation from perfect image formation, including at least spherical aberration.

When light passes through a spherically shaped lens or mirror, the light rays passing through the central region are focused at a point farther from the lens than light rays passing through the edges of the lens. This difference in focal points results in an image that is blurry. This effect is known as **spherical aberration.** (*See* Fig. 3).

Likewise, as light passes through different media (such as from air to glass to air) the speed of the light rays changes. The result is that longer wavelengths of light (such as red) come into focus farther away than shorter wavelengths (such as blue). This is known as **chromatic aberration** and results in colors blurring together. (*See* Fig. 4).

What is common between both types of aberrations is that they represent departures from the true image, which is why Plaintiffs have proposed that "aberration" be construed to mean "a departure from a true image." This construction is supported by the Chambers Science and Technical Dictionary, which defines "aberration" as:

> *(Phys.).* In an image-forming system e.g., an optical or electronic lens, failure to produce a true image i.e. a point object as a point image etc. Five geometrical

[19] Tobin Decl., Ex. 7 at p. 132 (McGraw-Hill Dictionary of Scientific and Technical Terms - definition of "Aspheric Surface").

> aberrations are recognized by von Seidel, viz., spherical aberration, coma, astigmatism, curvature of the field and distortion. See also chromatic aberration.[20]

By proposing that the disputed term means "deviation from a perfect image, including at least spherical aberration," Defendants appear to agree with Plaintiffs in part. The real disagreement between the parties appears to be with Defendants' additional phrase: "including at least spherical aberration." As shown above in Plaintiffs' dictionary definition, spherical aberration is one of several types of aberration which can lead to an imperfect image. Defendants are wrong when they try to focus the claim language on one type – spherical aberration.

Defendants' position is even more confusing when the Court considers that Defendants' cited evidence is nearly identical to Plaintiffs':

> Optical aberration: Deviation from perfect image formation by an optical system; examples are <u>spherical aberration</u>, coma, astigmatism, curvature of the field, distortion, and <u>chromatic aberration</u>[21]

There is nothing in this definition to suggest focusing the disputed term on spherical aberrations as Defendants propose.

To summarize, the invention embodied in the '319 patent is designed to correct both chromatic and spherical aberrations as demonstrated by the summary of the invention where the patentee states "in an optical imaging system the compensation is <u>not only</u> for predetermined <u>spherical</u> aberration <u>but also</u> predetermined <u>chromatism</u> in the refractive optics."[22] Given the statements in the specification and the extrinsic evidence, Defendants' injection of "spherical aberration" into its proposed construction of this term is improper. Spherical aberration is

---

[20] *See* Tobin Decl., Ex. 8 (Definition of "Aberration" from Chambers Science and Technology Dictionary, 1988) (emphasis added).

[21] *See* Tobin Decl., Ex. 6 at p. B8 (emphasis added).

[22] '319 Col. 4 lns. 17-20 (emphasis added).

merely one specific type of aberration, and it should not be imported into the more general term "aberration."

**E. "The aspheric function"**

Plaintiffs' Proposed Construction: The ability to alter aberrations.

Defendants' Proposed Construction: The aspheric function of Claim 33.

Plaintiffs contend that the construction of this term is fully encompassed within the term "introduce an aspheric function," which has already been discussed above. Plaintiffs contend that the addition of the word "the" in the current disputed term does not add anything significant. Therefore, the discussion presented above in Section VI(C) in connection with "introduce an aspheric function" is equally applicable to the current term and is thereby incorporated herein. Plaintiffs contend "aspheric function" should be construed to be mean "the ability to alter aberrations."

**F. "Lens"**

Plaintiffs' Proposed Construction: A piece of material that is transparent to some or all of the light rays passing through it by means of which the light rays may be altered.

Defendants' Proposed Construction: A piece of transparent material with opposite regular surfaces either or both of which are curved, by means of which light rays are focused to form an image.

Both parties agree that the lens must be made of a transparent material. Both parties also principally agree that when the light rays pass through the transparent material the path of the light rays is altered. This is a fundamental physical property of light, because as light passes between one medium to another, the light rays bend as a consequence of slowing down or speeding up. The change in speed of light rays is a function of the change in density between the

media.[23] Therefore, any time light passes between air and the transparent medium comprising the lens, the light rays will be altered.

Defendants, however, try to go further and contend that this alteration must be for the purpose of focusing light rays to form an image. While this is one function of a lens, it is not necessarily the sole purpose. For example, divergent lenses cause light rays to diverge once they pass through the lens.[24] (*See Fig. 5*). In addition, reference number 58 in Figure 1 of the '319 patent shows a collimating lens group.[25] One of the lenses depicted in that group is a diverging lens. This is an example of a lens that does not focus light rays to form an image. In fact, it does the opposite. Defendants' proposed "focusing" construction is incorrect.



**Figure 5: Depiction of a Divergent or Negative Lens[26]**

This leaves the other difference of whether or not the lens must have "opposite regular surfaces either or both of which are curved" as Defendants further propose. Although lenses are often curved, it is not a requirement. The claims should be construed according to the functionality they recite rather than unmentioned physical characteristics. The textbook *Optics* by Francis Sears defines lenses as follows: "[a] lens is an optical system bounded by two or more

[23] This property is commonly referred to as the "Index of Refraction. *See* Tobin Decl., Ex. 7 at p. 951.

[24] *See* Tobin Decl., Ex. 9 (http://www.photonics.com/directory/dictionary/lookup.asp?url=lookup&entrynum=1436&letter=d (last visited February 8, 2008)); *see also* Ex. 10 (http://www.lhup.edu/~dsimanek/scenario/lenses.htm (last visited on February 8, 2008).

[25] '319 Col. 11 lns. 36-39; *see also* Tobin Decl., Ex. 23 at p. 32-33 (Alexander Gleichen, *The Theory of Modern Optical Instruments*, 2nd ed., 1921); *see also* Tobin Decl., Ex. 24 at p. 575 (E. Percival Lewis, *Physics for Students of Science and Engineering*, 7th ed., 1932).

[26] Tobin Decl., Ex. 9.

refracting surfaces having a common axis."[27] This definition corroborates that there is no curvature requirement for an element to be labeled as a "lens."

**G. "A number of refractive elements arranged as a lens system"**

> Plaintiffs' Proposed Construction: One or more elements that each operate to alter a light wave by changing its velocity when it passes from one medium into another of different index of refraction.[28]
>
> Defendants' Proposed Construction: Two or more lenses (as construed herein) that each operate to alter a light wave by changing its velocity when it passes from one medium into another of different index of refraction.

The term "refractive element" is not specifically defined by the patent but its meaning can be derived from relevant, extrinsic resources. Dictionary definitions contemporaneous with the filing of the patent define "refraction" as follows:

> [T]he bending of a ray of light or heat or sound at the boundary between two mediums of dissimilar nature,[29]

or

> The change of direction of propagation of any wave, such as an electromagnetic [*e.g.* light] or sound wave, when it passes from one medium to another in which the wave velocity is different, or when there is a spatial variation in a medium's wave velocity.[30]

Each of these definitions fundamentally involves bending (*i.e.*, altering) light rays at the border of two media with dissimilar indices of refraction (for example, from air to glass).[31]

---

[27] *Id.*, Ex. 11 at p. 86 (*Optics* by Francis Weston Sears, 1949).

[28] Plaintiffs have altered their construction to align with Defendants' as much as possible to streamline the issues before the Court.

[29] Tobin Decl., Ex. 12 at p. 566 (Definition of "refraction" from the Oxford American Dictionary).

[30] *Id.*, Ex. 7 at p. 1588.

[31] *See id.* at p. 951 "Index of Refraction."

The parties disagree as to whether the construction should be “one or more **elements**…” or “two or more **lenses**…” The patentee was well aware of the word “lens” as demonstrated by its use throughout the specification and in certain claims. However, in drafting Claim 37, the patentee specifically selected the word “element,” which indicates that the patentee meant something other than “lens.” Defendants’ proposed construction seeks to confine the scope of the claims by substituting “lens” whenever the patentee chose the word “element.” The law does not support, and the Court should not permit, such substitution in order to redraft the claims.

The remaining difference between the parties with respect to this element is whether the term “a number” means “one or more” as Plaintiffs propose, or “two or more” as Defendants propose. Plaintiffs’ proposal is correct, as shown by recent Federal Circuit precedent:

> As a general rule, the words "a" or "an" in a patent claim carry the meaning of "one or more." *Baldwin Graphic Sys. v. Siebert, Inc.*, No. 2007-1262, slip op. at 7, 2008 U.S. App. LEXIS 783, at *10 (Fed. Cir. Jan. 15, 2008). That is particularly true when those words are used in combination with the open-ended antecedent "comprising." *See, e.g., Abtox, Inc. v. Exitron Corp.*, 122 F.3d 1019, 1023 (Fed. Cir. 1997). However, **the question whether "a" or "an" is treated as singular or plural depends heavily on the context of its use**. *See Norian Corp. v. Stryker Corp.*, 432 F.3d 1356, 1359 (Fed. Cir. 2005). The general rule does not apply when the context clearly evidences that the usage is limited to the singular. *Baldwin Graphic,* slip op. at 10, 2008 U.S. App. LEXIS 783, at *11.

*Tivo, Inc. v. Echostar Communs. Corp.*, No. 2006-1574, 2008 U.S. App. LEXIS 2073, at *29-30 (Fed. Cir. Jan. 31, 2008) (emphasis added).

Further, when the term “a number” is considered in the proper context here, it should mean “one or more.” Consistent with *Tivo,* Plaintiffs’ construction is supported by the fact that the disputed term, which appears in Claim 37, follows the open-ended antecedent “comprising.”[32]

[32] ‘319 Col. 28 ln. 62.

Plaintiffs' proposed construction is also supported when the term is considered within the context of the claim. Claim 37 is directed toward inserting a phase plate into an existing lens system that exhibits residual aberration(s). The phase plate compensates for such aberration(s).[33] There is nothing in the claim language that indicates the plural form is required. To the contrary, the disputed phrase states as follows: "a number of refractive elements arranged as a lens system and having residual aberration…."[34] Since it is possible for a single lens to induce spherical or chromatic aberration, the existing lens system is operable with only a single lens and a phase plate designed to compensate for the aberrations of such lens. Plaintiffs' proposed "one or more" is the correct meaning of "a number."

**H. "Phase plate"**

> Plaintiffs' Proposed Construction: A transparent plate that changes the relative phase of the incident light.
>
> Defendants' Proposed Construction: A plate (as construed herein) formed through a process other than mechanical cutting to include concentric rings with a selected number of plateaus that change the phase of a beam.

Both parties agree that the phase plate functions in a manner to change the phase of a light beam. The difference in the proposed constructions involves whether or not Defendants' proposed limitation concerning the concentric rings and plateaus should be grafted onto the disputed term.

The term "phase plate" is found in Claim 37:

> [A]t least one phase plate comprising a holographic element operating in a Bragg regime and also functioning as an asphere to compensate for residual aberration in the refractive elements.[35]

---

[33] *Id.*, Col. 28 lns. 62-68.

[34] *Id.*, Col. 28 lns. 63-64.

[35] *Id.*, Col. 62-68 (emphasis added).

As such, the claim language itself defines what the phase plate must contain. Specifically, the only element the phase plate must contain is a holographic element which operates in the Bragg regime. There is no requirement that the phase plate contain "concentric rings with a selected number of plateaus" as proposed by Defendants.

The idea of concentric ring patterns as taught by the specification is claimed in Claim 1 and 33, among others, which specifically call for these elements. It is inappropriate to graft extraneous limitations into the "phase plate" claimed in Claim 37 – as Defendants are trying to do. *See Playtex Prods., Inc. v. Procter & Gamble Co.*, 400 F.3d 901, 906 (Fed. Cir. 2005) (emphasis added):

> A fundamental rule of claim construction is that terms in a patent document are construed with the meaning with which they are presented in the patent document. Thus claims must be construed so as to be consistent with the specification, of which they are a part." *Merck & Co. v. Teva Pharms. USA, Inc.*, 347 F.3d 1367, 1370 (Fed. Cir. 2003). The court must take care in its analysis, when locating in the written description the context for a disputed term, **<u>not to import a limitation from that written description. It must use the written description for enlightenment and not to read a limitation from the specification</u>.** *Comark Communications v. Harris Corp*., 156 F.3d 1182, 1186-87 (Fed. Cir. 1998).

Defendants' proposed construction improperly seeks to import limitations into the claims. Plaintiffs' proposed construction does not and should be adopted.

### I. "Phase plate comprising a holographic element"

<u>Plaintiffs' Proposed Construction</u>: An optical plate whose optical thickness or index of refraction varies to change the phase of a beam.

<u>Defendants' Proposed Construction</u>: A phase plate (as construed herein) formed using a photo-fabrication technique.

The term "phase plate" has already been construed by the parties earlier in Section VI(H). The arguments made in that section are equally applicable herein and are therefore incorporated

herein by reference. This means that the phrase "comprising a holographic element" is the only portion remaining to be construed.

While it is a well-known axiom that a patentee can be his own lexicographer, the intrinsic record does not provide any special meanings for the term "holographic." *See Vitronics*, 90 F.3d at 1582 ("[a]lthough words in a claim are generally given their ordinary and customary meaning, a patentee may choose to be his own lexicographer and use terms in a manner other than their ordinary meaning, as long as the special definition of the term is clearly stated in the patent specification or file history."). Thus, the Court must construe the term as it would be understood by one of ordinary skill in the art. Since "[a] claim cannot have different meanings at different times; its meaning must be interpreted as of its effective filing date." *PC Connector Solutions LLC v. SmartDisk Corp.*, 406 F.3d 1359, 1363 (Fed. Cir. 2005). In order to determine the proper meaning, the Federal Circuit has directed that district courts apply "the objective test of what one of ordinary skill in the art at the time of the invention would have understood the term to mean" is to be employed. *Markman,* 52 F.3d at 986. To do this, the Court should look to contemporaneous references to see how a person skilled in the art would understand the phrase.

The paper, *Optical Performance of Holographic Kinoforms*, by Dale Buralli *et al.* states that a "phase hologram" is a "phase modulation [that] is introduced by a surface relief profile."[36] The phrase "surface relief profile" relates to changes in thickness. Such thickness changes can be seen in Figure 3 of the '319 patent. Furthermore, the '319 patent also discusses a "holographic areally distributed transmissive grating element…"[37] This "grating element" also suggests changes in thickness.

---

[36] Tobin Decl., Ex. 21.

[37] '319 Col. 4 lns. 6-7.

Defendants' construction completely ignores the "holographic element" portion of the disputed phrase. Defendants' construction essentially takes the definition of "phase plate," defined above, and grafts on a requirement that it be formed using a specific technique. This is obviously improper.

The disputed phrase describes a phase plate with a "holographic element." The disputed term is not a "phase plate constructed by photolithography" or some other particular technique as suggested by Defendants. It is axiomatic that the incorporation of a particular manufacturing technique is not appropriate, especially here where the disputed term does not call for or suggest any such technique. This attempt by Defendants to read extraneous limitations into the claims is again improper and must be rejected.

**J. "Bragg regime"**

> Plaintiffs' Proposed Construction: Diffraction of electromagnetic waves (*e.g.*, light) into primarily a single order.
>
> Defendants' Proposed Construction: A condition in a thick grating built to satisfy Kogelnik's equation where almost all of the incident power is transmitted into a single order.

Both parties fundamentally agree that "Bragg Regime" involves the diffraction of light waves into a single order. Defendants contend that such diffraction satisfies Kogelnik's equation, while Plaintiffs do not.

Similar to the discussion of "holographic element" in the preceding section, the patentee did not act as his own lexicographer and provide any special meaning for the term "Bragg Regime" in the specification. Thus, the Court should look to references contemporaneous with the filing of the patent application to determine how a person or ordinary skill in the art would have understood this term. *See Vitronics*, 90 F.3d at 1582; *PC Connector Solutions*, 406 F.3d at 1363; *Markman*, 52 F.3d at 986.

In their 1979 paper, *Criteria for Bragg Regime Diffraction by Phase Grating*, Moharam et al. states:

> The concept of Bragg regime diffraction is well established in grating diffraction theory.... It is usually taken as being synonymous with "thick" grating diffraction or the presence of only a single diffracted wave (beam) and a single transmitted wave (beam).[38]

Nowhere does the paper suggest or describe the Bragg Regime in terms of satisfying Kogelnik's equation as proposed by Defendants.

As support for their proposed construction, Defendants cite to a technical report by J. Christopher Clemens and Scott Seagroves entitled *Volume Holographic Gratings*, which states in part:

> This is the same condition that makes the Kogelnik approximation valid, so we may think of equation 2 as a prescription for making highly efficient gratings. Gratings built to satisfy equation 2 operate in what Gaylord and Moharam refer to as the "Bragg regime", where almost all of the incident power is transmitted into a single order.[39]

This paper is not dated. However, it refers to articles from 1999[40] indicating it was written well after the filing of the patent in question, which claims priority back to 1987. Since this article was not available to those skilled in the art at the time of the filing of the patent, it should be afforded little, if any weight.

Further, Kogelnik's theory is limited to: (1) monochromatic light, (2) sinusoidally modulated gratings, and (3) physically thick gratings.[41] Phase plates are not similarly restricted. Therefore, this reference is not appropriate because Kogelnik's paper, cited by Defendants in the

---

[38] Tobin Decl., Ex. 13 at p. 14 (M.G. Moharam et al., *Criteria for Bragg Regime Diffraction By Phase Gratings*) (emphasis added).

[39] *Id.*, Ex. 14 at p. 4. Equation 2 is referred to as Kogelnik's Equation.

[40] *See id.*, Ex. 14 at p. 3.

[41] *See id.*, Ex. 15 at pp. 2910-11 (Herwig Kogelnik, *Coupled Wave Theory for Thick Hologram Gratings.*).

joint claim construction statement, has many restrictions that Kogelnik placed on the particular problem he was solving. It is not cited by, and is not relevant to, the '319 patent.

### K. "Functioning as an asphere"

Plaintiffs' Proposed Construction: Functioning as a non-spherical lens.

Defendants' Proposed Construction: Correcting at least spherical aberrations.

The disputed phrase is found in asserted claim 37 which describes an optical system and comprises in part:

> At least one phase plate comprising a holographic element operating in the Bragg regime and also functioning as an asphere to compensate for residual aberration in the refractive elements.[42]

The word asphere is a synonym for "aspheric lens."[43] An aspheric lens is defined as "a lens element in which at least one face is shaped to a surface of revolution about the lens axis, including conic sections but excluding a sphere"[44] or "aspheric optical surfaces are those whose shapes are not constrained to be spherical (or flat)."[45] Thus, in order to function as an asphere, the element must operate in a manner consistent with the properties of a surface which is not spherical.

Defendants' proposed construction should be rejected because the claim language states that the type of aberrations that is "compensated for" is the "residual aberration" in the refractive elements of the optical system. Aspheres have complex surface profiles which can eliminate

---

[42] '319 Col 28 Ins. 62-68 (emphasis added).

[43] Tobin Decl., Ex. 16 (http://en.wikipedia.org/wiki/Aspheric_lens (last visited February 8, 2008)).

[44] *Id*., Ex. 17 (http://www.photonics.com/directory//dictionary/lookup.asp?url=lookup&entrynum=270&letter=a (last visited February 8, 2008)).

[45] *Id*., Ex. 18 (http://www.kreischer.com/aspheric%20primer.htm (last visited February 8, 2008)).

spherical, as well as other forms of optical aberrations.[46] The patentee intended that the phase plate in Claim 37, which functions as an asphere, compensate for whatever "residual aberration" that may remain. He did not restrict the claim to "spherical aberrations" as proposed by Defendants. Defendants' proposed construction runs contrary to the claim language by unnecessarily restricting the corrected aberrations to spherical aberrations.

Defendants' proposed construction is also contrary to Federal Circuit precedent concerning the doctrine of claim differentiation. The Federal Circuit has stated:

> Other claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term., 90 F.3d at 1582. Because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims. *See Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001); *CVI/Beta Ventures, Inc. v. Tura LP*, 112 F.3d 1146, 1159 (Fed. Cir. 1997). Differences among claims can also be a useful guide in understanding the meaning of particular claim terms. *See Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1538 (Fed. Cir. 1991). For example, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim. *See Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004).

*Phillips*, 415 F.3d at 1314-1315.

Claim 39 depends from Claim 38 which in turn depends from Claim 37. Claim 39 reads:

> A system as set forth in claim 38 above, wherein at least one phase plate comprises means for defining an areally distributed transmissive element compensating for <u>spherical-type aberration and non-spherical aberrations</u>.[47]

Further, dependent Claim 40 reads: "A system as set forth in claim 39 above, wherein the non-spherical aberrations comprise chromatic aberration."[48] An examination of Claim 37 and the

---

[46] *Id*., Ex. 16.

[47] '319 Col 29 lns. 5-9

[48] *Id*., Col 29 lns 11-13

subsequent dependent claims clearly shows that the aberrations referred to in Claim 37 are general in nature as the patentee added limitations in the subsequent dependent claims addressing specific aberrations. Thus, it would be improper to construe the disputed term as requiring correction of spherical aberrations since the patentee specifically addresses this type of aberration in dependent Claim 38.

**L. "Negative chromatic dispersion"**

> Plaintiffs' Proposed Construction: A property that causes shorter wavelengths (*e.g.*, violet or blue) to converge closer than longer wavelengths (*e.g.*, red).
>
> Defendants' Proposed Construction: A property that causes longer wavelengths (*e.g.*, red) to converge closer than shorter wavelengths (*e.g.*, violet).

Chromatic dispersion describes a property of light whereby different frequencies of light travel at different speeds through a given medium because each wavelength has a different index of refraction within the medium.[49] This effect is commonly seen in prisms where white light is split into several different colors. White light consists of all colors. When white light passes through a prism (*i.e.*, medium), some of the wavelengths (*i.e.*, colors) slow down more than others. The change in velocity among the wavelengths causes them to bend different amounts. In an optical system this means that different wavelengths will focus at different points.

The parties have proposed constructions which are diametric opposites. Plaintiffs contend that the dispersion causes shorter wavelengths to converge closer than longer wavelengths while Defendants propose the exact opposite. Plaintiff's construction is supported by several esteemed experts in the field. More importantly, as shown below, the construction proposed by Defendants violates a natural physical law and therefore cannot be correct.

[49] Tobin Decl., Ex. 4.

Chromatic dispersion in a lens is the small difference in distance along the lens axis between the intersection of the focal points of the red ray and the blue ray. It can alternatively be referred to as longitudinal chromatic aberration. The controversy with the Defendants arises because Plaintiffs refer to the chromatic dispersion of positive lenses (lenses that converge light) as "negative chromatic dispersion."

Commonly used optical algebra decrees that distances between two points which are measured from left-to-right are considered positive, and distances measured from right-to-left are considered negative. Thus, when one measures the distance from the red intersection (farther from the lens when the lens is positive) to the blue intersection (closer to the lens), the distance would be considered a negative number. (*See* Fig. 6).




**Figure 6: Depiction of Axial Chromatic Aberration in a Positive Lens**[50]

Others could employ an optical algebra in which the sense of this custom is reversed, and hence would derive an opposite answer. This is what Defendants have done.

Rudolf Kingslake's, *"Applied Optics and Optical Design"*, Volume 3, Academic Press, 1965 page 24, equation (8) shows that the chromatic aberration of a positive lens is a negative quantity:[51]

[50] Tobin Decl., Ex 25 at p. 2-18 (Walter G. Driscoll, *Handbook of Optics*, 1978).

$$\begin{array}{ll} \text{Focal power} & 1/F = 1/y_1 \sum y\phi \\ \text{Longitudinal chromatic aberration} & L'_{\text{ch}} = -\frac{1}{u_0'^2}\sum\frac{y^2\phi}{V} \\ \text{Petzval sum} & \text{Ptz} = \sum\phi/n \\ \text{Lateral color} & T'_{\text{ch}} = -\frac{1}{u_0'}\sum\frac{y y_{\text{pr}}\phi}{V} \end{array} \qquad (8)$$

It is well understood that the "minus sign" is synonymous with being negative. This is further corroborated by Drs. Max Born and Emil Wolf in their highly regarded textbook, *Principles of Optics*.[52] Equations in this text show an expression for the incremental change in axial distance of an image with an incremental change in index of refraction in a system of positive lenses.[53] This is chromatic dispersion (the same thing as Kingslake's chromatic aberration above). The Born and Wolf equation uses the same system of notation which is consistent throughout their book. It shows that when positive lens powers are added, and when the wavelength is changed an incremental amount, $\delta\lambda$, the incremental change in the ray intersection distance of the image point is considered to be negative in their coordinate system.

Both parties agree that negative chromatic dispersion is a "property" of light. And, as stated above, it is a natural physical property. From Figure 6 above, which illustrates chromatic dispersion, the shorter wavelengths (*i.e.* blue) converge closer to the lens while the longer wavelengths (*i.e.* red) converge farther away from the lens. Defendants' construction proposes the exact opposite. Because this contradicts the actual physical properties of light, it cannot be the correct construction and must be rejected.

---

[51] *See id*., Ex. 19 at p. 24 (Rudolf Kingslake, *Applied Optics and Optical Engineering*, Vol. 3, 1965).

[52] *See id.*., Ex. 20 at p. 230 (Max Born and Emil Wolf, *Principles of Optics, Electromagnetic Theory of Propagation, Interference and Diffraction of Light*, 1959).

[53] *See id.* at Equation 7.

## VII. CONCLUSION

For the foregoing reasons, Plaintiffs request that the Court adopt Plaintiffs' proposed claim constructions and reject those of Defendants.

Dated: February 13, 2008

Respectfully submitted,

/s/ Jonathan T. Suder____________________
Jonathan T. Suder
Edward E. Casto, Jr.
FRIEDMAN, SUDER & COOKE
Tindall Square Warehouse No. 1
604 East 4th Street, Suite 200
Fort Worth, Texas 76102
(817) 334-0400
(817) 334-0401 (fax)

David C. Tobin
TOBIN, O'CONNOR & EWING
5335 Wisconsin Avenue, NW, Suite 700
Washington, D.C. 20015
(202) 362-5900
(202) 362-5901 (fax)

**ATTORNEYS FOR PLAINTIFFS**

**CERTIFICATE OF SERVICE**

I hereby certify that on the 13th day of February, 2008, the foregoing Plaintiffs' Opening Brief on Claim Construction was served upon the following attorneys of record via both E-mail and First-Class Mail:

Scott David Bolden
Kirby W. Lee
Commercial Litigation Branch
U.S. DEPARTMENT OF JUSTICE
FOR FEDERAL EXPRESS DELIVERY:
100 L Street N.W., Room 11118
Washington, DC 20530
FOR FIRST CLASS MAIL DELIVERY:
Washington, DC 20530 (no street add.)
(202) 307-0262
(202) 307-0345 fax

William S. Foster, Jr.
BAKER BOTTS LLP
The Warner
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2400
(202) 639-1321
(202) 639-1185 fax

Jeff D. Baxter
Kevin J. Meek
Douglas M. Kuebehl
BAKER BOTTS LLP
2001 Ross Avenue
Dallas, TX 75201-2980
(214) 953-6680
(214) 661-4680 fax

/s/ David C. Tobin
David C. Tobin