IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| THEODORE WHITNEY and<br>HIGH RESOLUTION OPTICS CORP.,<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant.<br><br>and<br><br>RAYTHEON COMPANY,<br><br>Third-Party Defendant | ) | No. 06-601 C<br><br>Chief Judge Edward J. Damich |

**DEFENDANTS' RESPONSE BRIEF ON CLAIM CONSTRUCTION**

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JOHN J. FARGO
Director

SCOTT BOLDEN
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, DC 20530
Telephone: (202) 307-0262

OF COUNSEL:
KIRBY W. LEE
Attorney

Attorneys for Defendant the United States

William S. Foster, Jr.
BAKER BOTTS L.L.P.
The Warner
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2400
Tel.: (202) 639-1321

Kevin J. Meek
Douglas M. Kubehl
BAKER BOTTS L.L.P.
2001 Ross Avenue
Dallas, Texas 75201-2980
Tel.: (214) 953-6680

Attorneys for Third-Party Defendant
Raytheon Company

March 19, 2008

**TABLE OF CONTENTS**


TABLE OF AUTHORITIES ..... iii

TABLE OF EXHIBITS ..... v

INTRODUCTION ..... 1

COUNTERSTATEMENT OF THE QUESTION PRESENTED ..... 1

STATEMENT OF LAW ..... 1

THE PATENT IN SUIT ..... 3

ARGUMENT ..... 6

I. PHASE PLATE LIMITATIONS ..... 6

A. "plate" (Claims 33, 37, 42) ..... 6

B. "plurality of concentric patterns" (Claim 33) ..... 11

1. A pattern is a ring with a selected number of plateaus. ..... 12

2. The concentric patterns are formed through a process other than mechanical cutting. ..... 15

C. "phase plate" (Claims 37 and 42) ..... 17

1. A phase plate is formed through a process other than mechanical cutting. ..... 17

2. A phase plate includes concentric rings with a selected number of plateaus. ..... 18

D. "phase plate comprising a holographic element" (Claim 37) ..... 21

II. LENS LIMITATIONS ..... 23

A. "lens" (Claims 37 and 42) ..... 23

B. "a number of refractive elements arranged as a lens system" (Claim 37) ..... 27

1. The refractive elements of the claimed "*lens* system" are lenses. ..... 27

2. A single refractive element is not "a number of refractive elements arranged as a lens system." ..... 28

III. ASPHERIC LIMITATIONS ....................................................................................30

A. "the aspheric function" (Claim 36) ....................................................30

B. "introduce an aspheric function" (Claim 33), "functioning as an asphere" (Claim 37) ....................................................................31

IV. "NEGATIVE CHROMATIC DISPERSION" (CLAIM 42) ............................................35

V. "BRAGG REGIME" (CLAIM 37) ..............................................................................38

CONCLUSION ....................................................................................................... 40

# TABLE OF AUTHORITIES

## CASES

*Andersen Corp. v. Fiber Composites, L.L.C.*,
474 F.3d 1361 (Fed. Cir. 2007)....................10

*Curtiss-Wright Flow Control Corp. v. Velan, Inc.*,
438 F.3d 1374 (Fed. Cir. 2006)....................11, 20

*Ekchian v. Home Depot, Inc.*,
104 F.3d 1299 (Fed. Cir. 1997)....................17

*Furminator, Inc. v. Ontel Products Corp.*,
429 F. Supp. 2d 1153 (E.D. Mo. 2006)....................30, 31

*Kraft Foods, Inc. v. Int'l Trading Co.*,
203 F.3d 1362 (Fed. Cir. 2000)....................10

*MercExchange, LLC v. eBay, Inc.*,
401 F.3d 1323 (Fed. Cir. 2005).................... 30

*Multiform Desiccants v. Medzam*,
133 F.3d 1473 (Fed. Cir. 1998)....................2, 11

*NTP, Inc. v. Research In Motion, Ltd.*,
418 F.3d 1282 (Fed. Cir. 2005)....................30, 31

*Nystrom v. Trex Company, Inc.*,
374 F.3d 1105 (Fed. Cir. 2004)....................2

*Nystrom v. Trex Company, Inc.*,
424 F.3d 1136 (Fed. Cir. 2005)....................2, 3

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005)....................1, 2, 3

*Standard Oil Co. v. Am. Cyanamid Co.*
774 F.2d 448 (Fed. Cir. 1985)....................2

*SRAM Corp. v. AD-II Eng'g, Inc.*,
465 F.3d 1351 (Fed. Cir. 2006)....................14

*Seachange Int'l, Inc. v. C-COR, Inc.*,
413 F.3d 1361 (Fed. Cir. 2005)....................15

*Telemac Cellular Corp. v. Topp Telecom, Inc.*,
247 F.3d 1316 (Fed. Cir. 2001)....................14

*Tivo, Inc. v. Echostar Communications Corp.*,
No. 2006-1574, --- 3d -- 2008 WL 249155 (Fed. Cir. Jan. 31, 2008) ....................28

*Tronzo v. Biomet, Inc.*,
156 F.3d 1154 (Fed. Cir. 1998)....................16

*Vitronics Corp. v. Conceptronic, Inc.*
90 F.3d 1576 (Fed. Cir. 1996)....................2

## TABLE OF EXHIBITS



| Exhibit | Document | Appendix Page |
|---|---|---|
| A | U.S. Patent No. 5,386,319 | A1 |
| B | Webster's Third New International Dictionary (1981) | A27 |
| C | American Heritage College Dictionary (1997) | A34 |
| D | McGraw-Hill Dictionary of Scientific and Technical Terms (4th ed. 1989) | A39 |
| E | U.S. Patent No. 4,690,506 (Kita) | A47 |
| G | U.S. Patent No. 4,895,790 (Swanson) | A65 |
| H | U.S. Patent No. 5,161,059 (Swanson) | A79 |
| I | Madjidi-Zolbanine et al, "Holographic Correction of Both Chromatic and Spherical Aberrations of Single Glass Lenses," Applied Optics, Vol. 18, No. 14, 15 July 1979, pp. 2385-93 | A95 |
| J | Loewen, "Grating Efficiency Theory as It Applies to Blazed and Holographic Gratings," Applied Optics, Vol. 16, No. 10, October 1977, pp. 2711-2721 | A105 |
| K | S.K. Case et al., "Multifacet Holographic Optical Elements for Wave Front Transformations," Applied Optics, Vol. 20, No. 15, 1 August 1981, pp. 2670-75 | A116 |
| L | V. Hartemann, et al., "The Chirped-Pulse Inverse Free Electron Laser: a Tabletop, High-Gradient Vacuum Laser Accelerator" (U.S. Dept. of Energy, Lawrence Livermore National Laboratory, March 5, 2001) | A122 |
| M | Dionysius Lardner, Hand-book of Natural Philosophy: Optics, pp. 337-38 (Walton and Maberly 1856) | A149 |
| N | Masataka Shirasaki, "Virtually Imaged Phased Array," Fujitsu Sci. Tech. J., pp. 113-25 (July 1999) | A154 |
| O | Draft International Standard ISO/DIS 15902 (2002) | A167 |
| P | M.G. Moharam et al., Criteria for Raman-Nath Regime Diffraction by Phase Gratings, 32 Optics Communications 19 (1980) | A187 |

| Exhibit | Document | Appendix Page |
|---|---|---|
| Q | Herwig Kogelnik, "Coupled Wave Theory for Thick Hologram Gratings," Bell Sys. Tech. J. 2909-47 (1969) | A192 |
| R | Plaintiffs' Claim Construction Statement | A227 |
| S | File History of Application No. 07/897,248 (excerpted) | A234 |
| T | File History of Application No. 07/108,435 (excerpted) and U.S. Patent No. 4,936,665 | A567 |

## INTRODUCTION

Plaintiffs' opening claim construction brief advances overly broad constructions that, in several cases, contradict the plain language of the claims. In all cases, Plaintiffs' constructions improperly disregard important statements from the specification and wholly ignore the patent's file history. Defendants' constructions, by contrast, are grounded on the plain meaning of the claim language as confirmed by the patent's specification and its file history. Accordingly, the Court should adopt Defendants' constructions of the disputed claim terms in this case.

## COUNTERSTATEMENT OF THE QUESTION PRESENTED

What is the proper claim construction of the disputed limitations of the asserted claims of U.S. Patent No. 5,386,319 ("the '319 patent")?

## STATEMENT OF LAW

In Phillips v. AWH Corp., the en banc Federal Circuit re-emphasized the primacy of the intrinsic evidence—in particular, the specification and prosecution history—in claim construction. Phillips v. AWH Corp., 415 F.3d 1303 (Fed. Cir. 2005) (en banc), cert. denied, 126 S. Ct. 1332 (2006). While the words of a claim are to be given their ordinary and customary meaning from the standpoint of one skilled in the art at the time of the invention, "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." Id. at 1313. The Federal Circuit explained that the claims "do not stand alone" but "are part of 'a fully integrated written instruction,' consisting principally of a specification that concludes with the claims." Id. at 1315 (quoting Markman v. Westview Instruments, Inc.,

52 F.3d 967, 978 (Fed. Cir. 1995)) (internal citation omitted). Thus, "claims 'must be read in view of the specification, of which they are a part.'" Id. (quoting Markman, 52 F.3d at 979).

On this basis, the Phillips Court repeatedly re-emphasized the importance of the specification in claim construction:

- "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." Id. (quoting Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996)).
- "The specification is, thus, the primary basis for construing the claims" Id. (quoting Standard Oil Co. v. Am. Cyanamid Co., 774 F.2d 448, 452 (Fed. Cir. 1985)).
- "[T]he best source for understanding a technical term is the specification from which it arose, informed, as needed, by the prosecution history." Id. (quoting Multiform Desiccants, Inc. v. Medzam, Ltd., 133 F.3d 1473, 1478 (Fed. Cir. 1998)).

The Federal Circuit demonstrated the proper application of Phillips through its reversal of opinions in Nystrom v. Trex Company, Inc., 374 F.3d 1105 (Fed. Cir. 2004) ("Nystrom I") and Nystrom v. Trex Company, Inc., 424 F.3d 1136 (Fed. Cir. 2005) ("Nystrom II"). The district court had relied on the specification of the patent in suit to construe a "board" as necessarily being "made from wood cut from a log." 374 F.3d at 1110. In Nystrom I, the Federal Circuit reversed, holding that the patentee "did not disclaim boards made from materials other than logs." Id. at 1112-13. In Nystrom II, on rehearing to consider the impact of Phillips, the Federal Circuit withdrew its previous opinion and affirmed the district court. 424 F.3d at 1145. The court held that, in light of Phillips, the term "board" should be limited according to the statements in the specification, even though they did not rise to the level of a clear disavowal of claim scope. Id. The court emphasized that the specification "frames the invention in the context of wood decking materials cut from logs" and maintains that context through consistent

use of the term. Id. at 1143-44. Thus, under Phillips and its progeny, claim terms can be limited according to statements in the specification, whether those statements constitute express definitions or clear disclaimers or simply establish meaning through context or consistent use.

**THE PATENT IN SUIT**

Plaintiffs characterize the technology claimed in the '319 Patent as using "specialized diffractive optical elements [to] compensate for and reduce residual aberrations inherent in an optical system." Pl. Op. Br. at 1. However, this concept of using diffractive optical elements to correct aberrations was not new when Whitney filed his original patent application.[1] Indeed, that broad idea has been around for more than fifty years. For example, Mr. Kenro Miyamoto described in his 1961 paper the then well-known concept of using a diffractive element to adjust the phase of a beam of light and thereby correct for aberrations in a multi-lens system. Ex. S at A563-66. Miyamoto called his diffractive element a "Phase Frensel Lens" (abbreviated "PFL"). The Miyamoto reference presented the following profile of a PFL:




[1] The '319 Patent is the last of three patents to issue from a string of three related patent applications. On October 25, 1997, Whitney filed the first application that ultimately issued as U.S. Patent No. 4,936,665 (the "Grandparent Patent"). Claiming priority to that original application, Whitney filed a second application that ultimately issued as U.S. Patent No. 5,156,943 (the "Parent Patent"). The '319 Patent issued from a third application that claims priority to these two prior applications. All three patents share the same specification and use many of the same claim terms at issue here.

As shown here, Miyamoto's diffractive element is a plate having a series of concentric rings (shown in the figure as each having a continuous sloping profile) that vary in radial width and radial dimension. This diffractive element functions as an aspheric lens. Id. at A563 ("[A] PFL can be used as an aspheric lens."). As a result, the diffractive element can compensate residual spherical aberrations and chromatic aberrations in the lens system. Id. at A564 ("the spherical aberration can be improved"); A565 ("to correct the longitudinal color aberration of the whole system").

Aware of the Miyamoto reference, Whitney knew that he could not claim as his invention the broad concept of using a diffractive optical element to adjust the phase of a light beam and thereby correct for residual aberrations. In his patent application, Whitney identified the Miyamoto reference, Ex. A at A10, 2:40-45, but represented that prior methods of manufacturing diffractive elements—in particular, mechanical cutting—were not satisfactory. E.g. id. at A10, 1:55-57; A11, 3:30 ("difficulty of fabrication"). During prosecution, Whitney further disclaimed mechanical cutting as a process for forming the diffractive elements recited in his claims. Ex. T at A609-10 ("Obviously, this could not approach the degree of resolution required since the surface aberrations in the best diamond-turned quartz element are excessive when one seeks to overcome the limitations of refractive multi-lens optical systems."). Whitney argued that he invented a new way of making diffractive elements by using lithography to deposit and etch various layers. Ex. A at A11, 4:49-52; A12, 5:65-6:1.

Whitney's method of manufacture results in a structure having concentric rings composed of a selected number of plateaus. Id. at A11, 4:49-52; A15, 12:37-39. Whitney called this structure a "phase plate," and focused his claims on this structure. Plaintiffs concede this in

their opening brief: "[T]he phase plate taught by the '319 Patent consists of a series of concentric ring patterns, whereby each ring consists of a varying series of plateaus that compensate for aberrations in the lens system." Pl. Op. Br. at 5. Figure 6 from the '319 Patent, shown below, illustrates the multi-plateau rings of Whitney's claimed "phase plate."

FIG. 6




The rings 68 in Whitney's "phase plates" are each formed of a selected number of plateaus 70 and have a stair-step profile different than the continuous sloping profile of the rings in the Miyamoto reference.

Accepting Whitney's description of the prior art and the alleged invention, the patent examiner determined that Miyamoto did not disclose Whitney's multi-plateau structure:

> Miyamoto teaches that a phase grating may be added to a lens system to compensate for aberrations produced by the lens elements. ***Miyamoto fails to teach a phase grating that includes a plurality of sets of plateaus***.

Ex. T at A582.

Whether phrased as "multiple-plateaus," "concentric patterns," or a "phase plate," Whitney relied on the multi-plateau rings formed by lithography to obtain his patent. Now, Plaintiffs seek to ignore these limitations. Tellingly, Plaintiffs' opening brief largely ignores the '319 Patent's specification and fails to offer the prosecution history as an exhibit. On the other

hand, Defendants' constructions are fully supported by the intrinsic evidence in this case. The Court should adopt Defendants' constructions and reject Plaintiffs' attempt to rewrite the claims in total contradiction of the specification and prosecution history.

## ARGUMENT

### I. PHASE PLATE LIMITATIONS

#### A. "plate" (Claims 33, 37, 42)[2]

| | |
|---|---|
| *Plaintiffs:* A surface that can alter a beam of light. | *Defendants:* A substantially flat optical element. |

Both sides agree that the term "plate" has meaning apart from the other claim limitations describing the functions or properties of the plate. Plaintiffs contend that a "plate" is a "surface" of any imaginable shape. Defendants contend that a "plate" is an object or component, not just one of its surfaces. Defendants further contend that a "plate" is substantially flat.

Defendants' proposed construction is consistent with the plain and ordinary meaning of "plate." For example, the dictionary that Whitney relied upon during prosecution to establish the ordinary meaning of his claim terms defines a "plate" as "a flat thin smooth piece (as of metal) on or from which something is or is to be embossed, molded, engraved, grained, deposited, or written." Ex. B at A32.[3] Similarly, the American Heritage College Dictionary defines a "plate" as "a smooth, flat, thin, rigid body of uniform thickness." Ex. C at A37. According to both

---

[2] Plaintiffs incorrectly state that Claim 33 is the only claim using the term "plate." Pl. Op. Br. at 11. Claims 37 and 42 also use the term "plate." Because the term has the same meaning in all three claims, the Court's construction should apply to all three claims.

[3] During prosecution, Whitney relied on Webster's Third New International Dictionary. See, e.g., Ex. S at A545.

definitions, a "plate" is flat, and a "plate" is a component as opposed to just a surface of a component as Plaintiffs contend.

Consistent with these definitions, Whitney used the term "plate" in his specification and prosecution history to identify flat optical elements as opposed to mere surfaces having any shape. For example, with respect to Figure 1, the specification describes an optical system 56 including a phase plate 60 and lens groups 58 and 62. Ex. A at A15, 11:33-42. The plate 60 is a separate component of the system—not just the surface of a component.[4] Furthermore, as shown in Figure 1, plate 60 is substantially flat as compared to the lenses in lens groups 58 and 62, which each include one or more curved surfaces.




[4] Similarly, Figures 3, 4, and 6 show a side view of phase plate 60 and identify the plate 60 as the entire component as opposed to just a surface of the component.

Similarly, each of the "plates" in Figures 12, 14, 15, and 16 (including a phase plate 60, aperture plates 230 and 238, and phase plates 272 and 282) is shown as a separate component, not a mere surface. Id. at A21, 23:2-40. And all of these "plates" are substantially flat, in contrast to lenses 240, 242, 244, 252, 274, 276, and 288, which each include one or more curved surfaces.






FIG. 14



FIG. 15



FIG. 16

During prosecution of the Grandparent Patent, Whitney recognized that the term "plate" limits his claimed invention to the substantially flat structure shown throughout his specification.

The examiner suggested that Whitney rewrite his claims to use a single term in place of "plate," "grating structure," "transmission grating" and other alternative language found in different claims. Ex. T. at A581. Whitney refused, explaining his reluctance to expressly limit all claims to the specific "plate" structure. Id. at A608. In particular, he stated, "Even though the primary example shown is of a plate, it is not at all clear that the principles of the invention may not be utilized in some other version . . . ." Id. Thus, when Whitney used the term "plate" in his later patent applications, he knew that the term limited the claims to the "primary example" shown in the specification and did not broadly cover all structures, whatever their shape. Consistent with his understanding of "plate," Whitney later claimed a "plate" as comprising a "substantially flat" substrate. Ex. A at A21, 24:67-A22, 25:3; A22, 25:50-54.

During prosecution, Whitney repeatedly represented that a "phase plate" is a substantially flat element. Whitney submitted a declaration to the PTO as proof that he conceived Application Claims 123-126 (which issued as Claims 33-36) before the date of a prior art patent that had been issued to Mr. Gary Swanson. Ex. S at A547. In his declaration, Whitney specifically directed the examiner's attention to the discussion of "phase plate" in a document entitled "P-10165, Rev. H Achievement of Ultraviolet Resolution in the Wafer Stepper Through the Use of a Phase Lens Projection System." Id. at A403. In that document, Whitney stated that the phase plate "comprises a flat quartz plate," Id. at A483, and "looks very much like a compact disc," Id. at A428. With respect to designing a phase plate, Whitney stated, "We are interested in a ***plane*** base and will consequently specify a nearly ***zero curvature***." Id. at A451 (emphasis added). And just as Whitney had done in the specification of the '319 Patent, Whitney here distinguished the phase plate from a lens in that a phase plate is flat, whereas a lens is curved: Whitney stated

that "[a] normal lens has its . . . power located in an arc of surface," and that the phase plate has "[a]ll its power . . . located in an average plane." Id. at A453.[5]

Plaintiffs have not identified any intrinsic evidence supporting their construction that a "plate" is a surface of a component having any shape. Instead, Plaintiffs rely solely on the doctrine of claim differentiation. In particular, Plaintiffs contend that Defendants' construction somehow would result in Claim 33 having the same scope as Claims 1 and 10. Pl. Op. Br. at 13. That is wrong: Claims 1 and 10 have a different scope than Claims 33, 37, and 41 under either sides' construction of "plate." For example, both Claim 1 and 10 require that "the rings have a minimum radial width of the order of 10 microns," a limitation not found in Claims 33, 37, or 41. Because Claims 1 and 10 are different from Claims 33, 37, and 41, the doctrine of claim differentiation does not apply. In any event, in cases like this one, where the ordinary meaning of the term, the specification, and prosecution history all confirm the meaning of a claim term, the Federal Circuit has held that "the written description and prosecution history overcome any presumption arising from the doctrine of claim differentiation." Andersen Corp. v. Fiber Composites, L.L.C., 474 F.3d 1361, 1370 (Fed. Cir. 2007) (quoting Kraft Foods, Inc. v. Int'l Trading Co., 203 F.3d 1362, 1368 (Fed. Cir. 2000)).

Furthermore, contrary to Plaintiffs' protestation, Defendants are not reading any "substantially flat" requirement into Claims 33, 37, and 41. In the context of Claims 1 and 10, Whitney specified that the "substrate" is "substantially flat" because that characteristic is not inherent in the meaning of the term "substrate." In contrast, Whitney did not need to specify that

[5] Even when Whitney discussed other kinds of plates, he identified them as flat optical elements. Ex. S at A460 ("scatter plate" in Figure 3.3.1-2); A458, A460 ("photomask plate"); A476 ("zone plate"); A489 (defining a "glass plate" as "a piece of flat glass").

the "plate" in the body of Claim 33 is substantially flat because that limitation is inherent in the plain and ordinary meaning of "plate," as demonstrated by the dictionary definitions, specification, and prosecution history discussed above. See Curtiss-Wright Flow Control Corp. v. Velan, Inc., 438 F.3d 1374, 1380 (Fed. Cir. 2006) (recognizing that "claim drafters can . . . use different terms to define the exact same subject matter"); Multiform Desiccants, 133 F.3d at 1480 ("Claims that are written in different words may ultimately cover substantially the same subject matter.").

The Court should reject Whitney's proposed definition because it contradicts the ordinary meaning of the term "plate" and all of the intrinsic evidence. Instead, the Court should construe "plate" consistent with its ordinary meaning in view of the specification and prosecution history: a substantially flat optical element.

### B. "plurality of concentric patterns" (Claim 33)

| | |
|---|---|
| *Plaintiffs:* More than one concentric ring. | *Defendants:* Concentric rings with a selected number of plateaus formed through a process other than mechanical cutting. |

The parties' constructions present two separate and distinct disputes. First, while both sides agree that the claim term "pattern" corresponds to a structure called a "ring" in the specification, the parties disagree as to whether these rings include a selected number of plateaus. Second, the parties disagree as to whether the claimed "concentric patterns" may be formed by mechanical cutting.[6]

[6] Although this dispute is presented here with respect to Claim 33, this second dispute also impacts the construction of "phase plate" in Claims 37 and 42.

### 1. A pattern is a ring with a selected number of plateaus.

Plaintiff's opening brief unequivocally states: "[T]he phase plate taught by the '319 Patent consists of a ***series of concentric ring patterns, whereby each ring consists of a varying series of plateaus*** that compensate for aberrations in the lens system." Pl. Op. Br. at 5 (emphasis added). A ring of a single, uniform height would not constitute a "pattern" as recited in Claim 33. To form a "pattern," each ring includes a selected number of plateaus, as described in specification and prosecution history. Figure 6 from the patent, reproduced below, shows that each ring 68 is a pattern of plateaus 70.

FIG. 6




The specification confirms that the claimed "patterns" are the multiple plateau rings shown here. Ex. A at A20, 22:51-54 ("[t]he tracks defining individual plateaus in the multi-plateau patterns"). In particular, the Summary of the Invention describes the process of forming a selected number of plateaus "to define ring patterns." <u>Id.</u> at A12, 5:65 - 6:12.

The specification of the '319 Patent repeatedly emphasizes the structure of the multi-plateau rings. For example, the Abstract describes "rings of low bending power defined by multiple plateaus." <u>Id.</u> at A1, Abstract. The Summary of the Invention states that a phase plate has "a plurality of concentric rings, each having multiple plateaus varying by incremental

wavelength fractions." Id. at A11, 4:38-40. The Summary of the Invention further states, "The phase plate is fabricated by microlithographic techniques so as to provide rings of varying radii with successive plateau levels within each ring." Id. at A11, 4:49-52. In the Detailed Description of the Invention, the specification states that rings 68 "each compris[e] minute multiple plateaus or tracks 70 of deposited $SiO_2$ of precisely defined incremental heights." Id. at A15, 12:37-39; see also id. at A17, 15:63-66 ("[T]he phase plate 60 includes a plurality of separate concentric transmissive multi-plateau rings 88.").

The context of the phrase "plurality of concentric patterns" within Claim 33 further confirms that the "patterns" are multi-plateau rings. For example, Claim 33 requires that "the patterns each introduce progressively varying optical path delay in the beam between selected limits." Id. at A23, 28:43-45. As described in the specification, the selected number of plateaus are the structures that introduce the progressively varying optical path delay:

> The interposition of the multi-plateau phase plate 60, with its finely divided rings 68 and minutely divided plateaus 70, adds incremental, wavelength related, lengths of optical path as a function of aperture radius in a spatially distributed manner across the wavefront.

Id. at A16, 13:17-21.

Similarly, Claim 33 further requires "the patterns varying in radial dimension and in radial position relative to the central axis to introduce an aspheric function in the beam." Id. at A23, 28:45-48. As described in the specification, the plateaus vary in width and position relative a central axis to introduce phase delays in the beam:

> The slopes and widths of the plateaus vary non-linearly relative to the central optical axis of a cylindrical lens set 286, 288 which is in the same optical path. Compensation by phase retardation for

> aberrations in the cylindrical lens set 286, 288 is introduced throughout the phase plate 282, in accordance with position relative to the optical axis.

Id. at A21, 24:45-51; see also id. at A11, 4:52-56 ("By changing the step relationship of plateaus in different ring groupings the phase relationship of waves passing through different subdivisions of the phase plate is selectively reversed to provide a number of pupils.").

Defendants' construction of this phrase is further confirmed by the patent's prosecution history. For example, in arguing for patentability in the Grandparent Patent application, Whitney distinguished his invention from the PFL disclosed in the prior art Miyamoto reference (which is described above on pages 3-4 of this brief). The same patent examiner who later allowed the '319 Patent claims concluded that the selected number of plateaus was the only feature of Whitney's invention not disclosed by Miyamoto:

> Miyamoto teaches that a phase grating may be added to a lens system to compensate for aberrations produced by the lens elements. ***Miyamoto fails to teach a phase grating that includes a plurality of sets of plateaus***.

Ex. T at A582 (emphasis added).

Plaintiffs' only argument against Defendants' claim construction relies on another misapplication of the doctrine of claim differentiation, this time between Claims 33 and 34. The doctrine of claim differentiation does not apply, however, where as here the claims at issue differ in scope and the claim construction at issue does not render one of the claims superfluous. SRAM Corp. v. AD-II Eng'g, Inc., 465 F.3d 1351, 1358 (Fed. Cir. 2006); Telemac Cellular Corp. v. Topp Telecom, Inc., 247 F.3d 1316, 1325-26 (Fed. Cir. 2001). Dependent Claim 34 further narrows Claim 33 by requiring that the each "pattern" (or multi-plateau ring) of Claim 33

have, among other features, "progressively varying heights redirecting wavelet components of the beam to redistribute waves in the beam." Ex. A at A23, 28:50-52 (emphasis added). Defendants' construction of Claim 33 requires that the rings have a selected number of plateaus but does not further require that they have "progressively varying heights redirecting wavelet components of the beam to redistribute waves in the beam," as stated in Claim 34. In any event, the doctrine of claim differentiation is "not a hard and fast rule and will be overcome by a contrary construction dictated by the written description or prosecution history." Seachange Int'l, Inc. v. C-COR, Inc., 413 F.3d 1361, 1369 (Fed. Cir. 2005).

Based on the claim language, specification, and prosecution history, a "pattern" is a ring with a selected number of plateaus.

**2. The concentric patterns are formed through a process other than mechanical cutting.**

The second disputed issue is whether the claimed "concentric patterns" may be formed by mechanical cutting. In both the specification and prosecution history of his patent, Whitney disclaimed diffractive elements formed by mechanical cutting. As a result, the claimed "concentric patterns" must be formed through a process other than mechanical cutting.

In the specification, Whitney disparages mechanical cutting techniques for forming diffractive elements. For example, in the Background of the Invention, Whitney stated that "the best diamond turning procedures still leave optical surfaces too rough for operation at short wavelengths (e.g. ultraviolet)." Ex. A at A10, 1:55-57. Thus, Whitney repeatedly emphasized that a "phase plate" in accordance with his invention is formed by deposition and etching:

- "Phase plates in accordance with the invention are fabricated by preparing photomasks or direct writing to define ring patterns of desired character for each

of a succession of deposition or etching steps, preferably arranged in binary progression." Id. at A12, 5:65 - 6:1.

- "Referring again to FIGS. 2 and 5, the phase plate 60 includes, outside the blazed transmission grating area defined by the rings 68, a plurality of separate concentric transmissive multi-plateau rings 88. These rings 88 are also of $SiO_2$ and formed by deposition or by etching of the surface of the substrate defining the phase lens 60." Id. at A17, 15:63-68.

During prosecution of the Grandparent Patent, Whitney further disclaimed diffractive elements formed by mechanical cutting. Whitney distinguished prior art diffractive elements made "by a 'material cutting technology,' such as a 'computer-controlled lathe.'" Ex. T at A609-10. Whitney explained, "Obviously, this could not approach the degree of resolution required since the surface aberrations in the best diamond-turned quartz element are excessive when one seeks to overcome the limitations of refractive multi-lens optical systems." Id. at A610.

Whitney again disclaimed mechanical cutting processes in the declaration that he submitted to the PTO as proof that he conceived Application Claims 123-126 (issued Claims 33-36) before the date of another prior art patent. Ex. S at A403-538. In Exhibit A to the declaration, Whitney stated, "Because of its complexity and accuracy requirements, [the phase plate] cannot be produced by conventional optical methods, but it can be made . . . by the common techniques of microlithography and thin film technology." Id. at A430.

Whitney cannot, during prosecution, disclaim diffractive elements formed by mechanical cutting to avoid prior art and then, after his patent issues, recapture coverage for those elements formed by mechanical cutting. See, e.g., Tronzo v. Biomet, Inc., 156 F.3d 1154, 1159 (Fed. Cir. 1998) (noting that, because specification distinguished prior art as inferior and touted advantages

of a conical shaped cup for use in an artificial hip device, "[s]uch statements make clear that the ′589 patent discloses only conical shaped cups and nothing further"); Ekchian v. Home Depot, Inc., 104 F.3d 1299, 1304 (Fed. Cir. 1997) ("[S]ince, by distinguishing the claimed invention over the prior art, an applicant is indicating what the claims do not cover, he is by implication surrendering such protection."). The public is entitled to rely on Whitney's characterization of his invention in the specification and during prosecution. Accordingly, the claimed "concentric patterns" must be formed through a process other than mechanical cutting.

### C. "phase plate" (Claims 37 and 42)

| | |
|---|---|
| *Plaintiffs:* A transparent plate that changes the relative phase of the incident light. | *Defendants:* A plate (as construed herein) formed through a process other than mechanical cutting to include concentric rings with a selected number of plateaus that change the phase of a beam. |

The parties' constructions present two main disputes. First, the two sides dispute whether the claimed "phase plate" may be formed by mechanical cutting. Second, the two sides dispute whether a "phase plate" includes concentric rings with a selected number of plateaus.

#### 1. A phase plate is formed through a process other than mechanical cutting.

As described above with reference to the construction of "plurality of concentric patterns" in Claim 33, Whitney disclaimed diffractive elements formed by mechanical cutting in both the specification and prosecution history of his patent. As a result, the claimed "phase plate" must be formed through a process other than mechanical cutting.

### 2. A phase plate includes concentric rings with a selected number of plateaus.

The intrinsic evidence, including the specification and prosecution history of the '319 Patent, establishes that a "phase plate" includes concentric rings with a selected number of plateaus.

As discussed above, throughout the specification and the prosecution history, Whitney described his invention as a diffractive element having concentric rings with a selected number of plateaus, which operate to change the relative phase of a beam of light. And throughout the specification and the prosecution history, Whitney used the term "phase plate" as a shorthand reference to this exact structure. For example, in the Summary of the Invention, Whitney stated:

> The phase plate in this instance comprises a light transmissive element having a plurality of concentric rings, each having multiple plateaus varying by incremental wavelength fractions, the plateaus of a ring together providing low angle bending of the local wavefront. . . . The phase plate is fabricated by microlithographic techniques so as to provide rings of varying radii with successive plateau levels within each ring. By changing the step relationship of plateaus in different ring groupings the phase relationship of waves passing through different subdivisions of the phase plate is selectively reversed to provide a number of pupils.

Ex. A at A11, 4:37-56.

The multi-plateau rings are not mere preferred embodiments of a "phase plate" as defined by Whitney; they are the only embodiments of a "phase plate" disclosed in the specification, and they are the only structures disclosed to change the phase of a beam of light. Whitney even stated that "phase plates" in accordance with his "invention" are the multi-plateau ring structures formed by the disclosed photolithographic process. In the Summary of the Invention, Whitney stated, "Phase plates in accordance with the invention are fabricated by preparing photomasks or

direct writing to define ring patterns of desired character for each of a succession of deposition or etching steps, preferably arranged in binary progression." Id. at A12, 5:65-6:1.

During prosecution of the '319 Patent, Whitney explicitly equated his "phase plate" to structures having multi-plateau rings on a substrate. On July 21, 1993, the PTO identified groups of claims directed to distinct inventions and requested that Whitney restrict the pending application to one group of claims. Ex. S at A383. In response, Whitney argued that the PTO should combine two of the groups, Groups II and V, because the two groups of claims cover the same subject matter. Group II included Claims 66-85, which each included a limitation directed to a substrate with multi-plateau, concentric rings that change the phase of a beam:

> Claim 66: a "substrate having a plurality of light bending rings thereon defining a base spherical bending characteristic, each of the rings being defined by a succession of plateaus relative to a nominal surface of the substrate, the plateaus varying in height by increments related to a wavelength of optical delay of monochromatic light incident thereon . . . ." Id. at A307.
>
> Claim 77: "a base of light transmissive material having a plurality of multi-plateau rings of varying widths, the plateaus varying with the rings in progressive sequences to provide fractional amounts of wave retardation at the wavelength of the monochromatic beam" Id. at A310.
>
> Claim 81: a "substrate . . . comprising a first plurality of rings each defined by a succession of plateaus of incrementally varying heights for selectively delaying the phase of local wavefronts of monochromatic wave energy of a first wavelength passing there through" Id. at A311.

Whitney argued that these claims, which explicitly recite multi-plateau rings, necessarily encompass Claims 127-35 of Group V, which use the term "phase plate" to denote the same structure:

> [C]laims 127-135 use the term 'phase plate.' The mere characterization of the element with different but appropriate terminology does not change the field of search or entail a different

> analysis. In other words, the search for subject matter of Group II should ***inherently cover*** the subject matter of Group V as well.

Id. at A383 (emphasis added). Thus, Whitney represented that a "phase plate" "inherently" has concentric rings with a selected number of plateaus to change the phase of a beam.

Furthermore, the examiner must have accepted Whitney's representation that the term "phase plate" includes the multi-plateau structure because the examiner allowed the claims over the prior art Miyamoto reference and, as described above, the multi-plateau structure was the only feature that the examiner previously determined was not disclosed by Miyamoto**.**

Contrary to Plaintiffs' assertion, Defendants are not "grafting" limitations into the term "phase plate." The Federal Circuit has recognized that "claim drafters can . . . use different terms to define the exact same subject matter." Curtiss-Wright, 438 F.3d at 1380. Here, Whitney simply used the term "phase plate" in Claims 37 and 42 to encompass subject matter claimed differently in other claims, such as Claims 1 and 33. Claim 1 recites a "substrate" and specifies that the "substrate" has "light bending rings . . . defined by a succession of plateaus." In Claim 1, Whitney had to specifically recite the multi-plateau ring structure because the more generic term "substrate" is not limited to that structure. In contrast, the more particular term "phase plate" in Claims 37 and 42 already embodies that structure, as confirmed in both the specification and prosecution history.

**D. "phase plate comprising a holographic element" (Claim 37)**

| | |
|---|---|
| *Plaintiffs:* An optical plate whose optical thickness or index of refraction varies to change the phase of a beam. | *Defendants:* A phase plate (as construed herein) formed using a photo-fabrication technique. |

The parties' main dispute relates the meaning of "holographic element." Defendants contend that the term "holographic" relates to the method by which the element is made—namely, using a photo-fabrication technique. Plaintiffs' proposed construction attempts to read "holographic element" out of the claim.

In this case, technical references demonstrate that a person skilled in the art would have understood that the term "holographic element" refers to an element formed using a photo-fabrication technique (photolithography or laser writing):

> U.S. Patent Nos. 4,895,790 and 5,161,059: "***optical recording of holographic optical elements***." Ex. G. at A75, 3:29-30; Ex. H at A89, 3:60-61.
>
> "Grating Efficiency Theory as it Applies to Blazed and Holographic Gratings": "***Holographic gratings generated by exposing photoresist*** in interference fringe fields . . ." Ex. J at A110.
>
> U.S. Patent No. 4,690,506: "The aberration-corrected concave diffraction gratings have heretofore been ***produced by a method which is based upon the holography technology*** and by a mechanical method." Ex. E at A50, 1:32-35 (emphasis added).
>
> "Holographic Correction of Both Chromatic and Spherical Aberrations of Single Glass Lenses": "[M]aking the zoned grating should be a simple operation: ***photographic recording*** of the circular interference fields . . . ." Ex. I at A98.[7]
>
> "Multifacet Holographic Optical Elements for Wave Front Transformations": "***The optical element is recorded by subdividing a volume hologram film***

[7] In his IDS, Whitney described this article on "holographic correction" as discussing "the use of photographically prepared zoned grating on holographs to correct chromatism and third-order spherical aberrations." Ex. T at A568.

> ***surface into numerous small areas (facets), each of which is individually exposed***." Ex. K at A116, Abstract.

The specification further supports Defendants' construction. The Summary of Invention states, "The phase plate is fabricated by microlithographic techniques so as to provide rings of varying radii with successive plateau levels within each ring." Ex. A at A11, 4:49-52. Moreover, the specification states, "Phase plates in accordance with the invention are fabricated by preparing photomasks or direct writing to define ring patterns of desired character for each of a succession of deposition or etching steps, preferably arranged in binary progression." Id. at A12, 5:65 - 6:1.

Plaintiffs rely on an article entitled "Optical Performance of Holographic Kinoforms," by Dale Buralli et al., but the article discusses the wrong term.[8] Plaintiffs mischaracterize the quoted language from the article. According to Plaintiffs, the article states "a 'phase hologram' is a 'phase modulation [that] is introduced by a surface relief profile.'" Pl. Op. Br. at 25. However, the full sentence actually reads, "The kinoform is a phase hologram in which the phase modulation is introduced by a surface relief profile." Moreover, the relevant issue is the meaning of a different term "holographic element."

[8] Plaintiffs did not identify this article in either Plaintiffs' Proposed Claim Construction Statement or the Joint Claim Construction Statement, as required by the Court's Special Procedures Order. As a result, Defendants object to this new evidence and request that it be excluded.

## II. LENS LIMITATIONS

### A. "lens" (Claims 37 and 42)

| | |
|---|---|
| *Plaintiffs:* A piece of material that is transparent to some or all of the light rays passing through it by means of which the light rays may be altered. | *Defendants:* A piece of transparent material with opposite regular surfaces either or both of which are curved, by means of which light rays are focused to form an image. |

Both sides now agree that a "lens" includes opposite regular surfaces. Plaintiffs' opening brief concedes that a lens must include opposite regular surfaces. For example, on page 21, Plaintiffs quote a definition of "lens" as being "an optical system bounded by ***two or more refracting surfaces having a common axis.***" Pl. Op. Br. at 20-21 (quoting Francis Weston Sears, Optics 1949). And on page 5, Plaintiffs characterize lens surfaces as "smooth." Id. at 5.[9]

The remaining disputes with respect to this claim term, therefore, are (1) whether at least one of these opposing regular surfaces of a lens is curved; and (2) whether a lens serves the purpose of focusing light.

According its plain and ordinary meaning, a "lens" includes opposite regular surfaces, as the parties have already agreed, and, in addition, at least one of these opposing regular surfaces of a lens is curved and focuses light. During prosecution of the '319 Patent, Whitney relied upon Webster's Third New International Dictionary to establish ordinary meanings of various claim terms. Ex. S at A545. That dictionary defines "lens" as:

---

[9] Plaintiffs' construction, which does not explicitly incorporate the now agreed requirement that a "lens" have opposite, regular surfaces, is clearly overbroad because, under Plaintiffs' construction, any transparent material would qualify as a "lens." For example, a chunk of quartz, however irregularly shaped, would qualify as a "lens" under Plaintiffs' construction, because it would be "transparent to some or all of the light rays passing through it by means of which the light rays may be altered."

> lens: "1. a piece of glass or other transparent substance that has ***two opposite regular surfaces either both curved or one curved*** and the other plane and that is commonly used in an optical instrument (as a camera, microscope, eyeglasses) ***to form an image by focusing rays of light***." Ex. B at A30 (emphasis added).

Other dictionaries similarly define "lens" as having opposing curved surfaces and operating to focus light:

> lens: "A ground or molded piece of glass, plastic, or other transparent material with ***opposite surfaces either or both of which are curved***, by means of which ***light rays are focused to form an image***." Ex. C at A36 (American Heritage College Dictionary) (emphasis added).

> lens: "A ***curved*** piece of ground and polished or molded material, usually glass, used for the refraction of light, its ***two surfaces having the same axis***; or two or more such surfaces cemented together." Ex. D at A42 (McGraw-Hill Dictionary of Scientific and Technical Terms) (emphasis added).

Consistent with these dictionary definitions,, the patent's specification consistently and repeatedly confirms that a "lens" has at least one curved surface and operates to focus light. For example, the optical system 56 of Figure 1 includes a collimating lens group 58 of three lenses and an objective lens group 62 of four lenses. Ex. A at A15, 11:33-42. As shown in Figure 1, each of these seven lenses includes two opposite regular surfaces, either or both of which are curved. The specification explicitly describes these lens surfaces curved surfaces: "The lens assembly comprises ***spherical*** quartz elements." Id. at A15, 11:50-51 (emphasis added); see also id. at A17, 15:18-19 ("spherical quartz lens elements"). All of the figures in the '319



Patent that illustrate a lens, show the lens as having two opposite regular surfaces, either or both of which are curved. Id. at A2, Fig. 1 (collimating lens group 58 and objective lens group 62); A5, Fig. 7 (lenses 95); A6, Fig. 8 (lens 156, eyepiece 162, lens 164, and lens 192); A8, Fig. 12A (first lens element 234), Fig. 12B (first lens element 234 and second lens element 240), and Fig. 12C (lens elements 234 240, 242, 244, and 248 and image reduction lens set 252); A9, Fig. 14 (spherical lens 274), Figs. 15 and 16 (cylindrical lens set 286, 288).

During prosecution, Whitney confirmed that a lens has a curved surface as depicted in the patent specification. As described above with reference to "plate," Whitney distinguished the shapes of lenses and plates in the exhibit to his declaration. He stated that "[a] normal lens has its . . . power located in an ***arc of surface***," and that the phase plate has "[a]ll its power . . . located in an average ***plane***." Ex. S at A453 (emphasis added); see also id. at A479 (describing the tight "curvature" tolerances of the lenses), A492 ("Each lens element comprises two spherical surfaces."), A517 (describing the "curvatures" of the lenses).

Moreover, consistent with Defendants' construction, all of the lenses illustrated in Plaintiffs' opening brief have opposite regular surfaces, either or both of which are curved. Pl. Op. Br. at 2, 3, 4, 20, 31. Likewise, Plaintiffs' Exhibits 3, 4, 5, 10, 18, 19, 23, 24 illustrate lenses with opposite regular surfaces, either or both of which are curved. Plaintiffs' Exhibits 23 and 24 further provide definitions of a lens supporting Defendants' construction: Pl. Ex. 23 ("A medium bounded by two (centered) spherical surfaces is called a **lens**."); Pl. Ex. 24 ("Lenses are transparent bodies, generally with spherical surfaces, which form images by changing the curvature of light waves.").

Plaintiffs do not provide any evidence that all surfaces of a lens may be flat. Instead, Plaintiffs quote a single statement from a 1949 Optics book—extrinsic evidence—that is, at best, silent as to whether the surfaces of lens may be curved or flat. Pl. Br. at 20-21. Plaintiffs wrongly assume that this silence means that both surfaces may be flat. However, on the same page quoted by Plaintiffs, the book defines variables $R_1$ and $R_2$ of a lens as “the radii of curvature of its first and second surfaces,” indicating that the author contemplated curved, as opposed to flat, surfaces. Pl. Ex. 11 at 86.

Plaintiffs erroneously assert that the “focusing” requirement of Defendants’ construction excludes divergent lenses. Pl. Op. Br. at 20. Divergent lenses, however, may “focus light beams to form an image.” The specification of the ‘319 Patent describes lens group 58 (which includes a divergent lens) as operating to “focus” the light beam traveling through the system. Ex. A at A17, 16:45. The reference Plaintiffs cite on page 20 of their brief states that a divergent lens has a “negative” focus. Defendants’ proposed definition of “lens” is not limited to lenses that impart a positive focus or those that impart a negative focus.

Consistent with its plain and ordinary meaning and its use in the specification and prosecution history, the term “lens” should be construed as piece of transparent material with opposite regular surfaces (Plaintiffs concede this portion) either or both of which are curved, by means of which light rays are focused to form an image.

### B. "a number of refractive elements arranged as a lens system" (Claim 37)

| | |
|---|---|
| *Plaintiffs:* One or more elements that bend light at the boundary to some or all the light rays passing through it by means of which the light rays may be altered. | *Defendants:* Two or more lenses (as construed herein) that each operate to alter a light wave by changing its velocity when it passes from one medium into another of different index of refraction. |

The parties' constructions present two main disputes. First, Defendants contend that the "refractive elements" of the claimed "lens system" are lenses. Plaintiffs offer no construction for the term "element," other than to state that it means "something other than 'lens.'" Pl. Op. Br. at 22. Plaintiffs give no guidance as to what that "something other than 'lens'" might be. The second disputed issue is whether a single refractive element qualifies as "a number of refractive elements arranged as a lens system," as Plaintiffs contend, or whether "a number of refractive elements arranged as a lens system" must include two or more refractive elements (i.e., lenses), as Defendants contend.

#### 1. The refractive elements of the claimed "*lens* system" are lenses.

Claim 37 specifies that the "refractive elements [are] arranged as a lens system." By the plain language of this claim, a "lens system" is a system of lenses. Plaintiffs provide no explanation as to how elements other than lenses could be "arranged as a lens system."

The specification confirms that the "refractive elements" are lenses. For example, in describing Figure 1, the specification refers to the lenses in optical system 56 as "refractive elements":

> The optical system 56 comprises a combination of refractive elements and a holographic wavefront adjusting means embodying a number of features in accordance with the invention. In the arrangement illustrated the system comprises one set of three

> refractive lens elements forming a collimating lens group 58, a multi-plateau phase plate 60 disposed at the aperture stop of the lens system, and an objective lens group 62 of four lenses projecting an image reduced by 5X toward the wafer plane 50.

Ex. A at A15, 11:33-42. In addition, the specification states that a "lens designer" chooses "the refractive elements of the system." Id. at A16, 14:59-64. Similarly, in describing Figure 14, the specification refers to a lens as a "refractive element": "In accordance with the invention, however, the axicon effect can be achieved utilizing an illuminator 270 in conjunction with a phase plate 272 and a spherical lens 274 (more than one refractive element can be utilized if desired)." Id. at A21, 24:23-27. The specification does not disclose any refractive elements, other than lenses, and Plaintiffs' brief does not identify any refractive element that is not a lens.

Based on the claim language and specification, the refractive elements of the claimed lens system are lenses.

**2. A single refractive element is not "a number of refractive elements arranged as a lens system."**

Plaintiffs wrongly contend that a single refractive element is "a *number* of refractive elements arranged as a lens *system*." Both the claim language and specification establish that "a number of refractive elements arranged as a lens system" must include two or more refractive elements and, in particular, two or more lenses.

The claim language supports Defendants' construction. First, Claim 37 requires refractive element**s** (plural) to be "arranged as a lens system" and that the phase plate "compensate for residual aberration in the refractive element**s**." Ex. A at A23, 28:63-68. A single element cannot constitute the required "element**s**," and a single element cannot be "arranged as a lens system." It takes two or more components to be arranged as a system.

Moreover, the recited element**s** have a "residual aberration." Residual aberration refers to remaining or leftover aberrations after considering the effects of more than one optical element. For example, the specification states, "The task of the lens designer is to choose the refractive elements of the system so that the remaining comatic type terms and astigmatic type terms are reduced to the point where they balance each other and where their ***residual*** balances the radially varying delay introduced by the phase plate." Id. at A16, 14:59-64 (emphasis added). Thus, the concept of "residual aberration" contemplates two or more elements, whose individual aberrations are combined, resulting in a "residual" aberration.

Plaintiffs ignore the above relevant claim language and, instead, focus on the article "a." Plaintiffs, however, misapply Tivo, Inc. v. Echostar Communications Corp., No. 2006-1574, --- F.3d ---, 2008 WL 249155 (Fed. Cir. Jan. 31, 2008). In Tivo, the Federal Circuit held that the phrase "an MPEG stream" is limited to one MPEG stream as opposed to meaning one or more MPEG streams. The court did not address any dispute regarding whether a limitation requires two or more elements as opposed to just one. In addition, the disputed limitation in Tivo did not require a ***number*** of element**s** arranged as a ***system***.

Furthermore, the meaning of "a" is not relevant to the parties' dispute, because Whitney did not claim "a refractive element." If Whitney had claimed "a refractive element," the limitation would have meant "one or more refractive elements." But that is not what Whitney claimed. Whitney claimed "a number of refractive elements arranged as a lens system." Thus, the article "a" does not apply to the term "refractive element" in Claim 37.

## III. ASPHERIC LIMITATIONS

### A. "the aspheric function" (Claim 36)

| | |
|---|---|
| *Plaintiffs:* The ability to alter aberrations. | *Defendants:* The aspheric function of Claim 33. |

The parties' dispute relates to the relationship between the "aspheric function" term in Claims 33 and 36. Defendants contend that the "aspheric function" term in Claims 33 and 36 refers to the same function. Plaintiffs contend that Claim 33 refers to a first "aspheric function" and Claim 36 refers to a second, unrelated "aspheric function."

Through use of the definite article "the," Claim 36 uses the phrase "the aspheric function" to refer to the previous recitation of "an aspheric function" in Claim 33. In a claim, each new element must be introduced by an indefinite article (e.g., "a" or "an"). Once an element has been introduced, that element may be referred to using a definite article (e.g., "the"). MercExchange, LLC v. eBay, Inc., 401 F.3d 1323, 1338 (Fed. Cir. 2005), vacated on other grounds, 547 U.S. 388 (2006) (noting that use of the definite article "the" in conjunction with a claim term indicates a reference to the same, previously-introduced element); Furminator, Inc. v. Ontel Products Corp., 429 F. Supp. 2d 1153, 1171 (E.D. Mo. 2006) ("[I]ndefinite and definite articles are used in patent claim drafting in order to define precisely when the second or third or tenth reference to a particular thing (as in 'the handle axis') is the same thing that is being referred to in the first use of that noun ('a handle axis')"). An element that has not been introduced by an indefinite article is said to lack antecedent basis and is not permitted. See NTP, Inc. v. Research In Motion, Ltd., 418 F.3d 1282, 1306 (Fed. Cir. 2005) (construing claim term employing definite article "the" as requiring an antecedent basis).

In the context of dependent Claim 36, the definite article "the" before "aspheric function" indicates that the antecedent basis for the limitation must be "an aspheric function" of independent Claim 33. See id.; Furminator, 429 F. Supp. 2d at 1169 ("This use of indefinite and definite articles in a patent claim indicates simply that *the handle axis* referred to in the second clause is the same thing as *a handle axis* referred to in the first clause, according to a universally recognized requirement for precise language in the drafting of patent claims.") (italics in original, emphasis in original removed). Accordingly, the proper construction of "the aspheric function" in dependent Claim 36 should be "the aspheric function of Claim 33."

**B. "introduce an aspheric function" (Claim 33), "functioning as an asphere" (Claim 37)**

| "introduce an aspheric function" (Claim 33) | |
|---|---|
| *Plaintiffs:* Introduce the ability to alter aberrations. | *Defendants:* Correcting at least spherical aberrations. |

| "functioning as an asphere" (Claim 37) | |
|---|---|
| *Plaintiffs:* Functioning as a non-spherical lens. | *Defendants:* Correcting at least spherical aberrations. |

The parties' constructions of these two limitations present the same disputed issue, whether the claimed phase plates correct at least spherical aberrations. Defendants contend that these limitations require that the claimed phase plates correct at least spherical aberrations.[10]

[10] In the interest of reducing the number of disputed constructions to be resolved by the Court, Defendants accept Plaintiffs' construction of "aberration." The Court's construction of "introduce an aspheric function" in Claim 33 and "functioning as an asphere" in Claim 37 will resolve the parties' main dispute as to whether the claimed phase plates correct at least spherical aberrations, and thus, a separate construction of "aberration" is unnecessary.

The plain and ordinary meaning of the claim language supports Defendants' constructions. The term "asphere" and "aspheric" function mean relating to spherical aberrations. See, e.g., Ex. B at A29 ("aspheric: 2. free from spherical aberration"). Thus, in a lens system, an asphere or "aspheric" function corrects at least spherical aberrations.

Consistent with this plain and ordinary meaning, the specification of the '319 Patent uses the terms "asphere" and "aspheric" to describe the way that the phase plate compensates at least spherical aberrations:

> The phase plate 60 more specifically functions . . . as an ***asphere*** in cooperative fashion with the refractive elements. ***As a consequence of the aspheric characteristic, the residual spherical aberration that is permitted within the refractive optics design is compensated*** by needed fractional amounts throughout the entire wavefront, at the same time that the other geometrical aberrations and the chromatic aberration are also cancelled.

Ex. A at A16, 13:36-44 (emphasis added). The specification repeatedly describes the aspheric function as correcting at least spherical aberrations:

> [T]he phase plate adds an optical path delay to every ray which is a predetermined function. . . . [T]he proper amount of phase delay . . . can completely correct all orders of spherical aberration.

Id. at A16, 14:48-56.

> [H]igher order aspherics can be prescribed and precisely constructed not only to the design requirements, but to compensate for the small but real departures from ideal of the spherical elements themselves.

Id. at A17, 15:58-61; see also id. at A15, 11:57-68 ("Spherical aberration . . . is entirely corrected by the radially varying phase lag of the phase plate."); A16, 14:57-64 ("All the spherical-type aberration terms in the expansion of the polynomial are treated symmetrically by the phase

plate."); A21, 23:60-62 ("The phase plate 262 design corrects spherical aberration in the refractive elements of the optical system.").

During prosecution, Whitney represented that the phase plate corrects for spherical aberrations. In his declaration submitted to establish his alleged prior date of invention, Whitney specifically directed the examiner to several documents describing "a phase plate functioning as an asphere, which is inherently an aspect or refinement of the phase plate." Ex. S at A403. In Exhibit A to the declaration, Whitney stated that "[t]he phase plate is in the optical system solely to remove spherical aberration." Ex. S at A453. Moreover, Whitney stated that the "aspheric" phase plate completely corrects or eliminates spherical aberrations:

> The premise of our design concept to this point is that we will allow spherical aberration . . . in the performance of the spherical lens system, and that we will ***eliminate this residual spherical*** [aberration] in the ***aspheric*** phase plate located at the critical aperture.

Id. at A449-50 (emphasis added); see also id. at A436 ("[A]ll orders of spherical aberration are removed, all at once, by the addition of a phase correcting plate."); A441 ("[The phase plate] can with proper contouring completely correct the spherical aberration function . . . ."); A443 ("[A]ll of the residual spherical aberration is gathered up and corrected by the microcontour which applied to the phase plate."); A444 (depicting the correction of spherical aberration by the addition of the phase plate); A503 ("[A]ll orders of spherical aberration . . . are completely eliminated by a properly designed phase plate.").

Similarly, in the invention disclosure submitted as Exhibit E to his declaration, Whitney recognized that an "aspheric" corrects spherical aberrations:

> As we started consideration of the phase plate program we were aware of the advantages of placing an ***aspheric*** Fresnel phase lens at the critical aperture of the system ***in order to cancel entirely the spherical aberration of the system***.

Ex. S at A530 (emphasis added).

Plaintiffs cite various passages from the specification indicating that the phase plate may correct, in addition to spherical aberrations, various other types of aberrations. These passages are consistent with Defendants' constructions which require that the phase plate correct ***at least*** spherical aberrations. Plaintiffs have not cited any support for the proposition that the phase plate may correct other types of aberration ***without*** correcting spherical aberrations.

Plaintiffs' argument based on comparing Claims 39 and 40 to Claim 37 similarly is misplaced. The term "functioning as an asphere" in Claim 37 requires correcting *at least* spherical aberration. Dependent Claim 39 adds the additional requirement that the phase plate must *also* correct for non-spherical aberrations. And Dependent Claim 40 further requires that these non-spherical aberrations must be a chromatic aberration. All of these claims are entirely consistent with a construction of "functioning as an asphere" as "correcting *at least* spherical aberration." This construction allows for, but does not require correcting for non-spherical aberrations. Dependent Claims 39 and 40 go on to add that specific additional requirement.

The Court should reject Plaintiffs' overly-broad construction of "introduce an aspheric function" as meaning "introduce the ability to alter aberration," because it reads the term "aspheric" out of the claim. Plaintiff's definition would apply equally to claim language reciting "introduce a function." Similarly, the Court should reject Plaintiffs' construction of "functioning as an asphere," because it does not further understanding of the disputed limitation. Plaintiffs'

construction, "functioning as a non-spherical lens," simply raises the question, what does it mean to "function[] as an non-spherical lens?" Defendants' construction answers that question: correcting for at least spherical aberrations.

## IV. "NEGATIVE CHROMATIC DISPERSION" (CLAIM 42)

| | |
|---|---|
| *Plaintiffs:* A property that causes shorter wavelengths (e.g., violet) to converge closer than longer wavelengths (e.g., red). | *Defendants:* A property that causes longer wavelengths (e.g., red) to converge closer than shorter wavelengths (e.g., violet). |

Both sides agree that "chromatic dispersion" describes a property that causes light of different wavelengths to converge at different distances. The terms "positive" and "negative" simply relate to the exact focal relationship of the different wavelengths of light. One type of chromatic dispersion ("positive") describes a property that causes ***shorter*** wavelengths (e.g., violet) to converge at a ***shorter*** distance than longer wavelengths (e.g., red). The other type of chromatic dispersion ("negative") describes a property that causes ***longer*** wavelengths (e.g., red) to converge at a ***shorter*** distance than shorter wavelengths (e.g., violet). This is Defendants' construction of "negative chromatic dispersion," and this is precisely how those skilled in the art use that claim term.

Those skilled in the art use the term "negative chromatic dispersion" to refer to a property of an optical element that causes ***longer*** wavelengths of light (e.g., red light) to converge at a ***shorter*** distance to the element than shorter wavelengths (e.g., violet light):

- "Negative dispersion focusing optics can be used to produce a chromatic line focus, where long wavelengths are focused first, while the shorter wavelengths . . . are focused further along the interaction region." Ex. L at A127.

- "[T]he overall distance . . . becomes shorter for a longer wavelength and longer for a shorter wavelength. This is a negative chromatic dispersion . . . ." Ex. N at A163.

These technical references confirm Defendants' construction of the exact claim phrase "negative chromatic dispersion."

Plaintiffs oppose this construction without citing any evidence addressing this claim term. First, Plaintiffs aver that their construction "is supported by several esteemed experts in the field." But Plaintiffs fail to provide any evidence from these alleged experts or even identify these "esteemed experts." Second, the only documents cited by Plaintiffs on this issue do not even mention the claim term "negative chromatic dispersion." For example, the figure on page 31 of Plaintiffs' brief depicts "axial chromatic aberration"—not "negative chromatic dispersion."[11] Similarly, Plaintiffs present formulas relating to "longitudinal chromatic aberration" as opposed to "negative chromatic dispersion." In addition, Plaintiffs do not provide any context, identification of the variables, or explanation of how the formulas relate to "negative chromatic dispersion."

The following technical reference discusses the phrase Plaintiffs address in their brief, "chromatic aberration," and confirms that even if this phrase did refer to the same claimed concept, Defendants' definition is correct: "negative chromatic dispersion" refers to the condition where ***longer*** wavelengths converge at ***shorter*** distances than do shorter wavelengths:

> The chromatic aberration produced by a simple converging lens, in which the violet [shorter wavelength] image is nearest to the lens,

[11] Plaintiffs did not identify Pl. Ex. 25 in either Plaintiffs' Proposed Claim Construction Statement or the Joint Claim Construction Statement, as required by the Court's Special Procedures Order. As a result, Defendants object to this new evidence and request that it be excluded.

> and the red [longer wavelength] most distant from it, being designated positive chromatic aberration, that of a compound converging lens . . . in which . . . the red [longer wavelength] image is nearest to, and the violet [shorter wavelength] is most distant from, the lens, is called negative chromatic aberration."

Ex. M at A150 (emphasis omitted).

Plaintiffs' final argument is that "negative chromatic dispersion is a 'property' of light" and that Defendants' construction "contradicts the actual physical properties of light." Pl. Op. Br. at 32. Contrary to Plaintiffs' argument, the patent describes chromatic dispersion as a property of a lens or grating as opposed to a property of light. Ex. A at A15, 12:7-8 ("The spherical quartz lenses . . . have a negative chromatic dispersion[.]"); A15, 12:13 ("chromatic dispersion of the grating"); and A24, 30:1-2 ("a plurality of refractive lenses having in combination a negative chromatic dispersion").

Moreover, Plaintiffs do not provide any evidence that it is physically impossible for light to have either type of chromatic dispersion. As explained in the technical paper cited above, the technical literature describes lenses that have positive chromatic aberration as well as lenses that have negative chromatic aberration. Ex. M at A150. Furthermore, Whitney claimed both refractive lenses that exhibit negative chromatic dispersion ***and*** refractive lenses that exhibit positive chromatic dispersion. Compare Claim 42 of the '319 Patent (Ex. A at A24, 30:1-2) ("a plurality of refractive lenses having in combination a ***negative*** chromatic dispersion") with Claim 27 of the '665 Patent (Ex. T at A638, 27:64-67) ("a series of refractive lens elements [with] the cumulative chromatic dispersion being ***positive***.").

Given the express definitions quoted above, a person skilled in the art would have interpreted "negative chromatic dispersion" to mean a property of an optical element that causes

longer wavelengths (e.g., red light) to converge closer to the element than shorter wavelengths (e.g., violet light). Accordingly, the Court should adopt Defendants' construction.

## V. "BRAGG REGIME" (CLAIM 37)

| | |
|---|---|
| *Plaintiffs:* Diffraction of electromagnetic waves (e.g., light) into primarily a single order. | *Defendants:* A condition in a thick grating built to satisfy Kogelnik's equation where almost all of the incident power is transmitted into a single order. |

The parties' main dispute is whether a "Bragg regime" must satisfy Kogelnik's equation.

The ordinary meaning of "Bragg regime," as understood by a person with ordinary skill in the art, is a condition in a thick grating built to satisfy Kogelnik's equation. In a technical article entitled "Volume Holographic Gratings," J. Christopher Clemens and Scott Seagroves provide the following definition of Bragg regime:

> Gratings built to satisfy equation 2 [Kogelnik's equation] operate in what Gaylord and Moharam refer to as the "Bragg regime," which almost all of the incident power is transmitted into a single order.

Pl. Ex. 14 at p. 4 ("the Clemens paper"). This paper was one of only two papers that Plaintiffs identified as relevant evidence to the construction of "Bragg regime" in Plaintiffs' Claim Construction Statement. Ex. R at A229. After realizing that this paper supports Defendants' construction, Plaintiffs tried to walk away from it. Two days before the parties had to file the Joint Claim Construction Statement, Plaintiffs deleted the Clemens reference (and another reference) and inserted a previously unidentified paper by Moharam et al. ("the first Moharam paper"). As stated in the Joint Claim Construction Statement, these modifications were

untimely. Accordingly, the Court should exclude Plaintiffs' new evidence and reject Plaintiffs' argument that the Clemens paper "should be afforded little, if any weight." Pl. Op. Br. at 27.

Nevertheless, Plaintiffs' new evidence, the first Moharam paper, supports Defendants' construction. The first Moharam paper cites to Kogelnik's paper three times and acknowledges Kogelnik as the source for "[t]wo-wave thick grating diffraction theory" and "the well-known coupled-wave theory." Pl. Ex. 13 at 14, 17-18. Several of the equations in the first Moharam paper are directly derived from equations in the Kogelnik paper.[12]

Furthermore, in a second paper published in the same journal and immediately following the first Moharam paper, Moharam explicitly defined a Bragg regime as a condition in a "thick" grating built to satisfy Kogelnik's equation ("the second Moharam paper"). Ex. P at A187-91. Moharam identified three regimes of diffraction by planar phase gratings: Raman-Nath, intermediate (or transition), and Bragg regime. Id. at A187. Figure 1 graphically depicts the three regimes in terms of the thickness and modulation parameters of a phase plate, and indicates that a Bragg regime is a condition in a "thick" grating as defined by the boundary of Kogelnik's equation. Id. at A188.

[12] In the first equation, Moharam defines a thick grating in terms of a scientific equation – an equation that is mathematically identical to Kogelnik's equation. Compare Pl. Ex. 13 at 14 (Moharam equation 1); with Pl. Ex. 15 at 2942 (Kogelnik equation 75). Similarly, the second equations in the Moharam paper are derived from a different equation in Kogelnik. Compare Pl. Ex. 13 at 14 (Moharam equation 2), with Pl. Ex. 15 at 2924 (Kogelnik equation 45). Equation 2 in Clemens is a further refinement of equations 1 and 3 in Moharam. Compare Pl. Ex. 14 at 3-4 (Clemens) with Pl. Ex. 13 at 14 (Moharam).



Fig. 1. Approximate Raman-Nath, intermediate, and Bragg regime locations in $Q'$ and $\gamma$.

Other extrinsic references use the same definition provided by Kogelnik for "Bragg regime." For example, the International Organization for Standardization circulated a draft standard defining the Bragg condition in terms of a grating equation derived from Kogelnik. See Ex. O at A180.

All of the available extrinsic evidence—including the sole reference cited by Plaintiffs—demonstrates that the ordinary meaning of "Bragg regime" is a condition in a thick grating built to satisfy Kogelnik's equation.

## CONCLUSION

The disputed claim terms of the '319 Patent should be construed as set forth above and by Defendants in the Joint Claim Construction Statement.

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JOHN J. FARGO
Director

s/ Scott Bolden_________________

SCOTT BOLDEN
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, DC 20530
Telephone: (202) 307-0262
Facsimile: (202) 307-0345

Counsel for the United States

OF COUNSEL:
KIRBY W. LEE
Attorney

Dated: March 19, 2008

Respectfully submitted,

Dated: March 19, 2008

William S. Foster, Jr.
BAKER BOTTS L.L.P.
The Warner
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2400
Tel.: (202) 639-1321
Fax: (202) 639-1185

Kevin J. Meek
Douglas M. Kubehl
BAKER BOTTS L.L.P.
2001 Ross Avenue
Dallas, Texas 75201-2980
Tel.: (214) 953-6680
Fax: (214) 661-4680

Counsel for Raytheon Company