IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 06-601 C
Filed: August 23, 2006

| | |
|---|---|
| THEODORE WHITNEY and HIGH RESOLUTION OPTICS CORPORATION, | ) |
| Plaintiffs, | ) |
| v. | ) No. 06-601 C |
| | ) Chief Judge Edward J. Damich |
| THE UNITED STATES, | ) |
| Defendant, | ) |
| and | ) |
| RAYTHEON COMPANY, | ) |
| Third-Party Defendant. | ) |

**PLAINTIFFS' REPLY BRIEF ON CLAIM CONSTRUCTION**

# TABLE OF CONTENTS

I. INTRODUCTION ........................................ 1

II. DISPUTED TERMS ........................................ 3

a. Plate ........................................ 3

b. Plurality of concentric rings ........................................ 4

i. Pattern ........................................ 4

ii. Mechanical cutting ........................................ 5

c. Phase plate ........................................ 8

d. Phase plate comprising a holographic element ........................................ 9

e. Lens ........................................ 11

f. A number of refractive elements arranged as a lens system ........................................ 12

g. The aspheric function ........................................ 14

h. Introduce an aspheric function ........................................ 14

i. Functioning as an asphere ........................................ 15

j. Negative chromatic dispersion ........................................ 16

k. Bragg regime ........................................ 17

III. CONCLUSION ........................................ 19

SIGNATURE ........................................ 20

CERTIFICATE OF SERVICE ........................................ 21

# TABLE OF AUTHORITIES

**Cases**

*Abtox, Inc. v. Exitron Corp.*,
122 F.3d 1019 (Fed. Cir. 1997)....................2, 12

*ACTV, Inc. v. Walt Disney Co.*,
346 F.3d 1082 (Fed. Cir. 2003)....................1

*Acumed LLC v. Stryker Corp.*
483 F.3d 800 (Fed. Cir. 2007)....................2

*Baldwin Graphic Sys. v. Siebert, Inc.*,
No. 2007-1262, slip op. at 7, 2008 U.S. App. LEXIS 783
(Fed. Cir. Jan. 15, 2008) ....................12

*Comark Communications v. Harris Corp.*,
156 F.3d 1182 (Fed. Cir. 1998)....................1

*Elbex Video, Ltd. v. Sensormatic Elecs. Corp.*,
508 F.3d 1366 (Fed. Cir. 2007)....................6, 9

*Free Motion Fitness, Inc. v. Cybex Int'l*,
423 F.3d 1343 (Fed. Cir. 2005)....................13

*Home Diagnostics, Inc. v. LifeScan, Inc.*,
381 F.3d 1352 (Fed. Cir. 2004)....................2

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys.*,
381 F.3d 1111 (Fed. Cir. 2004)....................12, 14

*Interactive Gift Express, Inc. v. Compuserve, Inc.*,
256 F.3d 1323 (Fed. Cir. 2001) .................... 9

*Intervet Am., Inc. v. Kee-Vet Labs., Inc.*,
887 F.2d 1050 (Fed. Cir. 1989)....................1, 7

*Laitram Corp. v. NEC Corp.*,
163 F.3d 1342 (Fed. Cir. 1998)....................1, 7

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
358 F.3d 898 (Fed. Cir. 2004)....................2

*Markman v. Westview Instruments, Inc.*,
52 F.3d 967 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996) ....................17

*Norian Corp. v. Stryker Corp.*,
432 F.3d 1356 (Fed. Cir. 2005)....................12

*Omega Eng'g, Inc. v. Raytek Corp.*,
334 F.3d 1314 (Fed. Cir. 2003)....................5

*PC Connector Solutions LLC v. SmartDisk Corp.*,
406 F.3d 1359 (Fed. Cir. 2005)....................17

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005)....................1, 2, 3, 4, 9, 11, 16, 17

*Renishaw PLC v. Marposs Societa' per Azioni*,
158 F.3d 1243 (Fed. Cir. 1998)....................1, 10, 16

*Tandon Corp. v. United States Int'l Trade Comm'n*,
831 F.2d 1017 (Fed. Cir. 1987)....................15

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
299 F.3d 1313 (Fed. Cir. 2002)....................2

*Tivo, Inc. v. Echostar Communs. Corp.*,
No. 2006-1574, 2008 U.S. App. LEXIS 2073 (Fed. Cir. Jan. 31, 2008)....................13

*U.S. v. Telectronics, Inc.*,
857 F.2d 778 (Fed. Cir. 1988)....................15

*Watts v. XL Sys.*,
232 F.3d 877 (Fed. Cir. 2000)....................1

Pursuant to the Scheduling Order entered by the Court, Plaintiffs THEODORE WHITNEY and HIGH RESOLUTION OPTICS CORPORATION (collectively "Plaintiffs") hereby present their Reply Brief on Claim Construction and respectfully show the Court the following:

## I. INTRODUCTION

A common problem throughout Defendants' brief is impermissibly ignoring the language of the claims and importing extraneous limitations from the specification. This runs afoul of Federal Circuit precedent, which states: "Quite apart from the written description and the prosecution history, the claims themselves provide substantial guidance as to the meaning of particular claim terms" and "'the context of the surrounding words of the claim also must be considered in determining the ordinary and customary meaning of those terms.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (quoting *ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1088 (Fed. Cir. 2003) (emphasis added)).

Interpreting the meaning of a claim term "is not to be confused with adding an extraneous limitation appearing in the specification, which is improper." *Laitram Corp. v. NEC Corp.*, 163 F.3d 1342, 1348 (Fed. Cir. 1998) (quoting *Intervet Am., Inc. v. Kee-Vet Lab., Inc.*, 887 F.2d 1050, 1053 (Fed. Cir. 1989)). There is a fine line between reading a claim in light of the specification and reading a limitation from the specification into the claim. *See Watts v. XL Sys.*, 232 F.3d 877, 882 (Fed. Cir. 2000); *Comark Communs. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998). As noted by the Federal Circuit, the respective roles of the claim language and the specification during the claim construction process are defined by two canons which sometimes appear in tension: "(a) one may not read a limitation into a claim from the written description, but (b) one may look to the written description to define a term already in a claim limitation." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed.

Cir. 1998). The Federal Circuit, nevertheless, has repeatedly held that courts may not import limitations from embodiments disclosed in the specification in order to limit or otherwise vary the meaning of the claim language. *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) ("[T]his court has expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment"); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1327-28 (Fed. Cir. 2002). "Even when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using 'words or expressions of manifest exclusion or restriction.'" *Liebel-Flarsheim*, 358 F.3d at 906.

In summary, while the specification can act as a type of dictionary for the terms already in the claims where the specification *defines* those terms, courts do not incorporate additional features into the claims merely because those features are *discussed or illustrated* in the specification. *See Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 805 (Fed. Cir. 2007) ("[A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments.") (quoting *Phillips*, 415 F.3d at 1323). The claim itself <u>must</u> recite the feature as a limitation. *Home Diagnostics, Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1355 (Fed. Cir. 2004) ("the claim language itself governs the meaning of the claim"); *see also AbTox Inc. v. Exitron Corp.*, 122 F.3d 1019, 1023 (Fed. Cir. 1997) (while "additional sources provide a context to illuminate the meaning of claim terms…Nonetheless, throughout the interpretation process, the focus remains on the meaning of claim language.").

## II. DISPUTED TERMS

### a. Plate

Defendants spend a great deal of time culling out pieces from the specification and the prosecution history of the "Grandparent Patent" to justify importing a limitation that the plate be "substantially flat." However, as indicated by claims 1 and 10 of the patent-in-suit (each of which describe a "plate for use in an optical system"), the patentee clearly knew how to claim a "substantially flat" limitation. In contrast, in the asserted claims (nos. 33-34, 36-37, and 42), the patentee chose not to claim a plate as being "substantially flat." The patentee's deliberate choice of claiming the "substantially flat" limitation in some claims, but not in the asserted claims, cannot be disregarded:

> Other claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term. Because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims.

*Phillips*, 415 F.3d at 1314 (internal citations omitted). Construing this term to require a "substantially flat" limitation would be impermissible because it would import an extraneous limitation against the patentee's original language.

As a result, Defendants' proposed construction must be rejected. The Court should instead adopt Plaintiffs' proposed construction, which stays true to the language of the claims and the teachings of the patent. "Plate" should be construed to mean "a surface that can alter a beam of light" as proposed by Plaintiffs.

**b. Plurality of concentric rings**

**i. Pattern**

Defendants improperly equate the word "pattern" with "plateau." Defendants' argument, however, appears to be premised on a misreading of Figure 6 in the '319 patent which represents a "fragmentary side sectional view of a phase plate" not a "pattern."[1] The term "pattern," as used in the patent, describes the spacing and grouping of various concentric rings with respect to one another.[2] The "plateaus" are part of the structure of an individual ring – not the "pattern," or particular arrangement, those rings form.[3]

The common usage of the word "pattern" does not mean "plateau."[4] Nor did the patentee show any intention to specifically define the word "pattern" to have this meaning (nor have Defendants pointed to any such evidence). To the contrary, a review of the other claims directly contradicts such a meaning. *Phillips*, 415 F.3d at 1314 ("'the context of the surrounding words of the claim also <u>must be considered</u> in determining the ordinary and customary meaning of those terms.'"). For instance, Claim 8 reads:

> The invention as set forth in claim 1 above, wherein the substrate includes a first annular reference pattern outside the transmissive ring pattern and a second annular reference pattern inside the transmissive ring pattern.

These "patterns" do not refer to "plateaus," but rather to differences in spacing and grouping of the concentric rings as seen in Figure 2.[5] Additional support is found in Claim 35 which claims: "An aspheric optical element as set forth in Claim 33 above, wherein the patterns are defined by tracks of incrementally varying heights." The "incrementally varying heights" is

---

[1] '319, 7:54:56.
[2] *Id*. at Fig. 2.
[3] *Id*. at Fig. 5, Col. 7 lns. 51-53.
[4] Tobin Decl., Exh. 26 at p. 1423 (Definition of "Pattern" from Random House Webster's Unabridged Dictionary, 2nd ed., 2001). Unless noted otherwise, all Exhibits refer to the attachments to the Declaration of David C. Tobin made in support of Plaintiffs' Opening brief on Claim Construction (Exhs. 1-25) or the Declaration of David C. Tobin in support of Plaintiffs' Reply Brief on Claim Construction (Exhs. 26-29).
[5] '319, Fig. 2.

a description of the tracks. This claim demonstrates that any plateaus would be part of the structure of the "tracks" – not the "patterns." This is further bolstered by the specification which, in describing Figure 4, provides "in each ring 68, the plateau typically vary progressively from a zero height…."[6] The "patterns" concern the way the rings are grouped – not their structure.

**ii. Mechanical cutting**

Defendants argue that the rings are formed by a means other than mechanical cutting.[7] To support their proposed construction, Defendants cite several excerpts from the prosecution history of the Grandfather Patent and the specification, which Defendants state "disparages mechanical cutting techniques."[8] The citations by Defendants, however, do not represent a clear disavowal. The citations merely question the accuracy of mechanical cutting for a specific application or embodiment.

Defendants cite a single statement made during the prosecution history of the Grandfather Patent in order to make a prosecution history disclaimer argument. Plaintiffs acknowledge that a disclaimer made in a parent application attaches to that application's progeny. *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1335 (Fed. Cir. 2003) ("[I]t is settled that prosecution disclaimer attaches to progeny continuation in part applications where the same claim limitation is at issue."). The patentee, however, did not make such a disclaimer. The law requires that the disclaimer be explicit. *Id*. at 1325-26 ("for prosecution disclaimer to attach, our precedent requires that the alleged disavowing actions or statements made during prosecution be both clear and unmistakable."). The statement cited by Defendants does not meet this criterion as the patentee merely referenced the mechanical cutting capabilities *at the time* to point out that there would not have been any motivation to combine the Freeman and Miyamoto references. There is

---

[6] '319, 12:46-48.
[7] Def. Br. at pp. 15-17.
[8] *Id*. at p. 15.

no “explicit” and “unmistakable” disclaimer of mechanical cutting means, especially present day mechanical cutting techniques which far exceed those at the time of the application.

Defendants also cite one statement made by the patentee in an invention disclosure statement that the patentee submitted to establish an earlier conception date. It is not part of the specification, and therefore should not be relied upon. *Elbex Video, Ltd. v. Sensormatic Elecs. Corp.*, 508 F.3d 1366, 1372 (Fed. Cir. 2007) (“because the prosecution history represents an ongoing negotiation between the PTO and the applicant . . . it often lacks the clarity of the specification and thus is less useful for claim construction purposes.”).

Regardless, the invention disclosure statement cited by Defendants is not a disavowal of mechanical cutting. At most, it noted that the accuracy of diamond turning, as it existed at the time of the filing of the application, was not well suited for certain applications. For example, the patentee stated: “the best diamond turning procedures still leave optical surfaces too rough for operation at short wavelengths (e.g. ultraviolet).”[9] The residual roughness left by diamond turning methods at the time of the filing of the application would have a much greater impact on smaller wavelengths, such as UV (wavelengths from 400nm-10nm) as opposed to larger wavelengths such as infrared (wavelengths from 1mm to 750nm).[10] However, the patentee did not say that rings could not be generated by mechanical cutting. The patentee merely pointed out that certain mechanical techniques had undesired side effects because of their lack of precision, but this did not disclaim mechanical cutting techniques. To the extent the efficacy of mechanical cutting at the time was discussed, it was to highlight the state of the art with respect to manufacturing techniques at the time of the application and not to disavow an entire manufacturing process and the advancements made thereto. It is impermissible to limit a claim

[9] ‘319, 1:55-57.
[10] *See* Tobin Decl., Exh. 29 (http://hyperphysics.phy-astr.gsu.edu/hbase/ems3.html#c3 (last visited on March 30, 2008)).

to manufacturing methods or techniques existing at the time of the application in an effort to escape infringement merely because manufacturing techniques have changed or improved. The claim at issue is *not* a claim addressed to a method of manufacture. Rather, it is an apparatus claim not limited by any particular method of manufacture. Defendants' reliance on a statement made during prosecution to change the form of the claim and impart manufacturing restrictions should be rejected.

Indeed, the patent specification discusses creating diffractive and reflective rings which "are defined by scribing during rotation or by photo-etch techniques."[11] Scribing means "to mark or score (wood or the like) with a pointed instrument as a guide to cutting or assembling."[12] As such, scribing is a mechanical process. Therefore, while the specification focuses on photo-lithographic techniques as a preferred embodiment of practicing the invention, the invention is not limited to such techniques. Defendants' attempt to import such a limitation is improper.

> This court has consistently adhered to the proposition that courts cannot alter what the patentee has chosen to claim as his invention, that limitations appearing in the specification will not be read into claims, and that interpreting what is meant by a word in a claim 'is not to be confused with adding an extraneous limitation appearing in the specification, which is improper.'

*Laitram Corp*., 163 F.3d at 1348 (emphasis added) (quoting *Intervet Am., Inc. v. Kee-Vet Lab.*, Inc., 887 F.2d 1050, 1053 (Fed. Cir. 1989)).

Since the word "pattern" does not mean "plateau" in the context of the '319 patent and because the patent does not exclude mechanical cutting, there can be no manufacturing requirement implicitly added to the claim language. Thus, Defendants' proposed construction must be rejected. The Court should instead adopt Plaintiffs' construction and find that "plurality

[11] Col. 6 lns. 6:37-39.
[12] Tobin Decl., Exh. 26 at p. 1722 (Defining of "Scribe" from Random House Webster's Unabridged Dictionary).

of concentric patterns" means "more than one concentric ring." This construction stays true to the language of the claims and the teachings of the patent.

**c. Phase plate**

The impropriety of importing a manufacturing method limitation to the subject claim language has been discussed above. Since Defendants are trying to impose this extraneous limitation into the construction of the term "phase plate," these arguments are equally applicable here.

The primary evidence offered by Defendants to show that the Phase plate must "include concentric rings with a selected number of plateaus" is part of the prosecution history where the examiner forced the patentee to make a restriction.[13] A restriction request is made by an examiner "[i]f two or more independent and distinct inventions are claimed in one application, the Director may require the application to be restricted to one of the inventions." 35 U.S.C. § 121. For an examiner to make a restriction rejection there must be at least two distinct inventions and the examination of the application must create a "serious burden on the examiner if restriction is not required." *See* MPEP § 803.

In response, the patentee stated that what was similar between the two groups of claims proposed by the examiner was that "phase shift functions are incorporated in both Groups II and V."[14] It is the "phase shift functions" that are inherently covered by the two groups. This does not mean "that a 'phase plate' 'inherently' has concentric rings with a selected number of plateaus" as Defendants contend.[15] Further, the Federal Circuit has repeatedly found that the negotiation that occurs between the patentee and the patent office is not the best indicator of a claim's meaning "because the prosecution history represents an ongoing negotiation between the

[13] Def. Br. at p. 19.
[14] Def. Br., App. at A383.
[15] Def. Br., at p. 20.

PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Phillips*, 415 F.3d at 1317; *see also Elbex Vide*o, 508 F.3d at 1372.

Most importantly, the Federal Circuit has stated that the focus in claim construction must remain on the claim language during the claim construction process: "In construing claims, the analytical focus must begin and remain centered on the language of the claims themselves, for it is that language that the patentee chose to use to particularly point[] out and distinctly claim[] the subject matter which the patentee regards as his invention." *Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001). The claim language used by the patentee in the asserted claims does not require that the "phase plate" include "concentric rings with a selected number of plateaus" as Defendants suggest. Defendants' construction reads an artificial limitation into the claims and must be rejected. As discussed in Plaintiffs' opening brief, the proper meaning of the term "phase plate" is "a transparent plate that can change the relative phase of the incident beam."

**d. Phase plate comprising a holographic element**

Defendants state that the specification supports their proposed construction. Defendants are wrong. There is nothing in the specification to support the notion that the patentee intended to equate the word "holographic" with a "photo-fabrication techniques." Defendants' proposed construction arbitrarily (and improperly) imports this limitation into the claims.

Defendants cite two lines from the specification to support their construction.[16] Noticeably absent from those cited provisions is the word "holographic." More importantly, where the term holographic appears in the specification, the specification does not indicate, much less mandate, Defendants' "photo-fabrication" limitation:

[16] Def. Br. at p. 22.

> Systems and methods in accordance with the invention dispose at least one holographic areally distributed transmissive grating element in the optical train of a refractive optical system[17]
>
> The optical system comprises a combination of refractive elements and a holographic wavefront adjusting means embodying a number of features in accordance with the invention.[18]
>
> The phase plate 60 more specifically functions both as a holographic element operating in a Bragg regime and as an asphere in cooperative fashion with the refractive elements.[19]
>
> Using successive light bursts from an excimer laser, uniformly distributed light appears to the holographic phase plate element, over the interval of a total exposure, as a multiplicity of sources.[20]
>
> at least one phase plate comprising a holographic element operating in a Bragg regime…[21]

There is simply nothing in the specification to support Defendants' construction.

Further, Defendants cite several third party patents and articles and summarily conclude that a person of skill in the art would divine that the term "holographic element" is something formed via "photo-fabrication" from these references. Defendants, however, do not offer a shred of evidence or authority to support this leap. It must be rejected.

Defendants' proposed construction lacks the necessary support. On the other hand, Plaintiffs have offered a construction that is derived from the claim language. *See Renishaw*, 158 F.3d at 1250 ("The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction."). The Court should adopt Plaintiffs' construction and find that a "phase plate comprising a holographic element" means "an optical plate whose optical thickness or index of refraction varies to change the phase of a beam."

---

[17] '319, 4:5-8 (emphasis added).
[18] *Id.*, 11:33-36 (emphasis added).
[19] *Id.*, 13:36-39 (emphasis added).
[20] *Id.*, 15:10-13 (emphasis added).
[21] *Id.*, 28:65-66 (emphasis added).

**e. Lens**

Defendants cite Webster's Third New International Dictionary to justify their construction because it was used in the prosecution history. Defendants fail to mention that this dictionary was not used in connection with this particular term.

Defendants also cite several other general purpose dictionaries to support their proposed construction. However, the Federal Circuit has taken a cautionary tone with respect to using general purpose dictionaries for claim construction stating "general purpose dictionaries may be helpful." *Phillips,* 415 F.3d at 1314 (emphasis added). The *Phillips* Court went on to say:

> Because the meaning of a claim term as understood by persons of skill in the art is often not immediately apparent, and because patentees frequently use terms idiosyncratically, the court looks to those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean. Those sources include the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art.

*Id*. (internal citations and quotations omitted). Therefore, the excerpt from the ***scientific textbook***[22] that Plaintiffs submitted is more probative of what a person of skill in the art would understand the term "lens" to mean since it is geared toward the optics field. In fact, such textbooks are a prime vehicle by which specialized knowledge is passed along.

This textbook defines lens as follows: "[a] lens is an optical system bounded by two or more refracting surfaces having a common axis."[23] This definition corroborates that there is no curvature requirement for an element to be labeled as a "lens." Thus, the Court should reject Defendants' attempts to impose a "curvature" requirement into this construction. The Court should instead find that a "lens" is a "a piece of material that is transparent to some or all of the

---

[22] *See* Tobin Decl., Exh. 25 (Optics Textbook submitted in Opening Brief).
[23] *Id.*, Exh. 11 at p. 86 (*Optics* by Francis Weston Sears, 1949).

light rays passing through it by means of which the light rays may be altered" as proposed by Plaintiffs.

**f. A number of refractive elements arranged as a lens system**

Defendants argue that "elements" within the claimed "lens system" must be "lenses." Defendants fail to consider that the Federal Circuit has stated that each word within a claim has meaning. *Innova/Pure Water, Inc. v. Safari Water Filtration Sys.*, 381 F.3d 1111, 1119 (Fed. Cir. 2004) ("While not an absolute rule, all claim terms are presumed to have meaning in a claim."). Thus, since this claim term has the terms "element" and "lens," it follows that "element" must have a different meaning than "lens."

In addition, a system is "an assemblage or combination of things or parts forming a complex or unitary whole."[24] In a lens "system" there can be other parts or things that are not necessarily lenses. Waveguides, prisms and liquids are other examples of refractive elements that are well known in the art.[25] Thus, the "elements" in Claim 37 should not be confined to only lenses and it would be improper to import such a limitation.

The claim language also does not require two or more refractive elements as Defendants contend. As stated in Plaintiffs' opening brief, the Federal Circuit articulated a general rule:

> As a general rule, the words "a" or "an" in a patent claim carry the meaning of "***one or more***." *Baldwin Graphic Sys. v. Siebert, Inc*., No. 2007-1262, slip op. at 7, 2008 U.S. App. LEXIS 783, at *10 (Fed. Cir. Jan. 15, 2008). That is particularly true when those words are used in combination with the open-ended antecedent "***comprising***." *See, e.g., Abtox, Inc. v. Exitron Corp*., 122 F.3d 1019, 1023 (Fed. Cir. 1997). However, the question whether "a" or "an" is treated as singular or plural depends heavily on the context of its use. *See Norian Corp. v. Stryker Corp*., 432 F.3d 1356, 1359 (Fed. Cir. 2005). The general rule does not apply when the context clearly evidences that the usage is limited to the singular. *Baldwin Graphic*, slip op. at 10, 2008 U.S. App. LEXIS 783, at *11.

[24] Tobin Decl., Exh. 26 at p. 1930 (Definition of "system.").

[25] *See* Tobin Decl., Exh. 27 (U.S. Patent No. 5,346,766 Col. 1 lns 11-15 ("so as to confine a liquid refractive element therebetween.")); Exh. 28 (S. Griesing et al., *Fabrication and SNOM characterization of plasmon-optical elements,* Journal of Physics (2007) at Abstract ( "Refractive elements like lenses and prisms…")).

*Tivo, Inc. v. Echostar Communs. Corp.*, No. 2006-1574, 2008 U.S. App. LEXIS 2073, at *29-30 (Fed. Cir. Jan. 31, 2008) (emphasis added); *see also Free Motion Fitness, Inc. v. Cybex Int'l,* 423 F.3d 1343, 1350 (Fed. Cir. 2005) (emphasis added) ("'[A]' or 'an' in patent parlance carries the meaning of ***'one or more'*** in open-ended claims containing the transitional phrase '***comprising***.'" This convention is overcome only when "the claim is specific as to the number of elements" or "when the patentee evinces a clear intent to . . . limit the article.").

The claim language at issue uses the open ended antecedent "comprising." Thus, there is a presumption that "a number of refractive elements" means "one or more refractive elements." This is bolstered by the fact that there is no evidence that the phrase is to be limited to the singular. Instead, the basis for Defendants' argument is that the phrase uses the word "elements." If the patentee had intended there to be two or more elements, the claim language would have stated "…comprising: refractive elements arranged…" The use of the phrase "a number of refractive elements" supports a system that has one or more components.

For instance, in *Free Motion,* the Court held the term "a cable linking" means "one or more cables." *Id*. In that case the court did not limit the phrase to the singular or plural based on how the claim term was written. The court rejected arguments that the specification described the cable as a "single cable" and should have therefore limited the claim language because there was no "clear intent by the patentee to limit the article to the singular." *Id*. Likewise, no such intent is found in the '319 patent specification and the claims should not be impermissibly narrowed as Defendants propose.

The Court should adopt Plaintiffs' proposed construction that "a number of refractive elements arranged as a lens system" means "one or more elements that bend light at the

boundary to some or all of the light rays passing through it by means of which the light rays may be altered."

**g. The aspheric function**

Plaintiffs agree that the term "the aspheric function" in Claim 36 refers to Claim 33's "introduce an aspheric function." However, Claim 36, as a dependent claim, adds an additional limitation and is narrower in scope by further requiring the aspheric function "compensate[] for system aberration and aberrations of the elements themselves."[26] *See Innova/Pure Water*, 381 F.3d at 1123 ("we note that dependent claims are typically narrower…"). Therefore, Plaintiffs do not concede that the "aspheric function" necessarily has the same scope in both Claims 33 and 36.

Plaintiffs have addressed the construction of this term in their opening brief and the following section in connection with the term "introduce an <u>aspheric function</u>."

**h. Introduce an aspheric function**

Defendants argue that an "aspheric function" must correct "at least" spherical aberrations. This argument, however, is improperly based on reading limitations from the specification into the claims. Even in situations where a specification only describes a single embodiment, the Federal Circuit has expressly rejected this approach stating: "the law does not require the court, where an applicant describes only a single embodiment, to construe the claims as limited to that one embodiment." *Innova/Pure Water*, 381 F.3d at 1122.

Plaintiffs cited several excerpts from the specification in their opening brief where the patentee clearly contemplated that the invention could be used to correct other types of aberrations, and not just spherical aberrations.[27] A few examples are:

---

[26] '319, 28:59-61.
[27] Opening Br. at pp. 15-16.

> In an optical imaging system the compensation is not only for predetermined spherical aberration but also predetermined chromatism in the refractive optics;[28] and
>
> The refractive optics used in the system not only require substantially fewer elements but the design procedure can accommodate greater tolerance for specific characteristics, such as spherical aberration and chromaticity.[29]

There are other excerpts quoted in Plaintiffs' opening brief. Defendants' attempts to limit the claim language to require the correction of at least spherical aberrations is incorrect, and it should be rejected.

Since the specification contemplates that different types of aberrations can be corrected with the invention, Plaintiffs' proposed construction should be adopted by the Court. The term "introduce an aspheric function" should be construed to mean "introduce the ability to alter aberrations."

**i. Functioning as an asphere**

Defendants' only remarks concerning this term are that they do not understand what it means to function as a non-spherical lens. Defendants then conclude that this term should be given the exact, same meaning as the term "introduce an aspheric function." As a threshold matter, this is wrong because it ignores Federal Circuit precedent stating that each term or phrase in the claims must have meaning. *See U.S. v. Telectronics, Inc.*, 857 F.2d 778, 783-84 (Fed. Cir. 1988) (quoting *Tandon Corp. v. United States Int'l Trade Comm'n*, 831 F.2d 1017, 1023 (Fed. Cir. 1987) ("There is presumed to be a difference in meaning and scope when different words or phrases are used in separate claims."). It is improper for Defendants to summarily prescribe the same meaning to different claim terms.

---

[28] '319, Col. 4 lns. 17-21 (emphasis added).
[29] *Id*., Col. 4 ln. 66 – Col. 5 ln. 2 (emphasis added).

In any event, as explained in Plaintiffs' opening brief, it is the characteristics of a spherical lens that tend to cause chromatic, spherical and other aberrations.[30] Thus, functioning as a non-spherical lens means not having the characteristics of automatically adding aberrations. In addition, "aspheric optical surfaces are those whose shapes are <u>not</u> constrained to be <u>spherical</u> (or flat)."[31] This is why "functioning as an asphere" should mean "functioning as a non-spherical lens" as proposed by Plaintiffs. This proposed meaning stays true to the original claim language, and it should be adopted by the Court. *See Renishaw*, 158 F.3d at 1250.

**j. Negative chromatic dispersion**

As explained in Plaintiffs' opening brief, the use of the term "negative chromatic dispersion" is a matter of convention among optics professional, and several authoritative references were offered to support Plaintiff's use of the term."[32] The physical properties of light do not vary – humans' explanation of that behavior is what varies and has varied. When this claim term is read in the context of the specification and the claims, the term must conform to Plaintiffs' definition or else the invention would be rendered inoperative because it would require the violation of a physical law of nature.

Plaintiffs' proposed construction should be adopted because it preserves the operability of the claim; whereas Defendants' construction would render it inoperable. *See Phillips*, 415 F.3d at 1327 ("claims should be so construed, if possible, as to sustain their validity"). The Court should find that "negative chromatic dispersion" means "a property of light causes shorter wavelengths (e.g., violet) to converge closer than longer wavelengths (e.g., red)" as proposed by Plaintiffs.

---

[30] *See* Opening Br. at pp. 3-5, Figs. 3-4.
[31] Tobin Decl., Exh. 18 (http://www.kreischer.com/aspheric%20primer.htm (last visited February 8, 2008)).
[32] *See* Opening Br. at pp. 30-32.

**k. Bragg regime**

Defendants incorrectly argue that Plaintiffs "walked away" from Defendants' primary support, the Clemens paper, because it hurts Plaintiffs' position.[33] To the contrary, as stated in Plaintiffs' opening brief, the date of this paper is unknown, but the four corners of the document show that it was not published until after the patent application was filed. As such, the paper reflects knowledge and understanding in the art obtained well after the filing of the application and thus is less probative of how one skilled in the art in 1987 would have understood the term "Bragg regime." *See Phillips*, 415 F.3d 1313 ("We have made clear, moreover, that the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application."); *PC Connector Solutions LLC v. SmartDisk Corp*., 406 F.3d 1359, 1363 (Fed. Cir. 2005) ("A claim cannot have different meanings at different times; its meaning must be interpreted as of its effective filing date"); *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 986 (Fed. Cir. 1995) *aff'd*, 517 U.S. 370 (1996). ("The focus is on the objective test of what one of ordinary skill in the art at the time of the invention would have understood the term to mean."). The Clemens paper is untimely.

Further, the Clemens paper states: "the approximate theory of Kogelnik (1969) is extremely useful for developing intuition about how gratings with different parameters behave."[34] This is hardly a definitive statement and supports Plaintiffs' argument that Kogelnik's equations are not unassailable.

Defendants also mischaracterize the Moharam paper, *Criteria for Bragg Regime Diffraction by Phase Gratings*, cited by Plaintiffs. Contrary to Defendants' assertions, the paper

[33] Def. Br. at p. 38.
[34] Tobin Decl., Exh. 14 at p. 3.

does not acknowledge "Kogelnik as the source for 'two-wave thick grating diffraction theory.'"[35] The first case discussed by the Moharam paper, called the Diffracted Beam Criteria, contains equations attributed to Kogelnik. However, the paper goes on to state these equations "represent two possible criteria for defining the Bragg regime."[36] Thus, the Kogelnik equations are not necessarily the exclusive consensus on expressing the Bragg regime. In addition, as discussed in Plaintiffs' opening brief, Kogelnik placed many restrictions on the problem he was trying to solve and therefore his theory is confined by those limitations.[37]

More importantly, the second case, called the TwoWave Criterion for Bragg regime diffraction, is the case that is applicable to the '319 patent because it addresses transmitted and diffracted light waves:

> The Bragg regime may alternatively be defined as the diffraction situation where, to within some error limit, only two waves (the transmitted and diffracted waves) are present. This may be referred to as the *TwoWave Criterion* for Bragg regime diffraction. This would be important in applications such as scanning where having no more than one diffracted beam is important. This criterion would equivalently be defined by the sum of all higher-order waves being less than some specified value.[38]

That being the case, it is improper to require the construction of "Bragg regime" to include satisfaction of the Kogelnik equations.

In addition, as stated in the Introduction section of the Moharam paper:

> The concept of Bragg regime diffraction is well established in grating diffraction theory.... It is usually taken as being synonymous with "thick" grating diffraction or the presence of only a single diffracted wave (beam) and a single transmitted wave (beam).[39]

---

[35] Def. Br. at p. 39 (emphasis added).
[36] Tobin Decl., Exh. 13 at p. 14 (emphasis added).
[37] Opening Br. at p. 27.
[38] *Id*. at p. 15 (emphasis added).
[39] Tobin Decl., Ex. 13 at p. 14 (M.G. Moharam et al., *Criteria for Bragg Regime Diffraction By Phase Gratings*) (emphasis added).

This general concept supports Plaintiffs' construction of "diffraction of electromagnetic waves (e.g., light) into primarily a <u>single</u> order." In addition, this concept is supported mathematically by the Coupled Wave Equation given in equation 6 of the Moharam paper which is applicable to the situations described in the '319 patent.[40]

Finally, Defendants cite an ISO draft specification to support their position.[41] There are numerous problems with this reference. First, it is a draft – not a final product.[42] Second, it does not mention Kogelnik, which supports Plaintiffs' contention that those skilled in the art would not define the term Bragg regime based on Kogelnik's equations. Third, and most importantly, it states that "the condition under which the Bragg diffraction occurs, the Bragg condition, <u>may</u> be expressed in terms of its grating equation.…"[43]

Defendants have failed to demonstrate that Bragg regime must be governed exclusively by Kogelnik's equation. The Court should not inject such an arbitrary limitation into the construction of Bragg Regime, especially since Kogelnik is not mentioned in the specification or prosecution history of the patent-in-suit. The Court should instead adopt Plaintiffs' construction, which is supported by the 1979 Moharam paper. "Bragg regime" should be construed to mean "diffraction of electromagnetic waves (e.g., light) into primarily a single order."

## III. CONCLUSION

For the foregoing reasons, Plaintiffs request that the Court adopt Plaintiffs' proposed claim constructions and reject those of Defendants.

---

[40] *Id*. at p. 16.
[41] Def. Br. at p. 40.
[42] *See* Def. Br., Exh. O at pp. A167-68.
[43] *Id*. at p. A180 (emphasis added).

Dated: April 14, 2008

Respectfully submitted,

/s/ Edward E. Casto, Jr.___________________

Edward E. Casto, Jr.
NELSON BUMGARDNER CASTO, P.C.
5601 Bridge Street, Suite 300
Fort Worth, TX 76112
(817) 377-9111
Fax (817) 377-3494

Jonathan T. Suder
FRIEDMAN, SUDER & COOKE
Tindall Square Warehouse No. 1
604 East 4th Street, Suite 200
Fort Worth, Texas 76102
(817) 334-0400
(817) 334-0401 (fax)

David C. Tobin
TOBIN, O'CONNOR & EWING
5335 Wisconsin Avenue, NW, Suite 700
Washington, D.C. 20015
(202) 362-5900
(202) 362-5901 (fax)

**ATTORNEYS FOR PLAINTIFFS**

**CERTIFICATE OF SERVICE**

I hereby certify that on the 14th day of April, 2008 the foregoing claim construction statement was served upon the following attorneys of record via both E-mail and First-Class Mail:

Scott David Bolden
Kirby W. Lee
Commercial Litigation Branch
U.S. DEPARTMENT OF JUSTICE
FOR FEDERAL EXPRESS DELIVERY:
100 L Street N.W., Room 11118
Washington, DC 20530
FOR FIRST CLASS MAIL DELIVERY:
Washington, DC 20530 (no street add.)
(202) 307-0262
(202) 307-0345 fax

William S. Foster, Jr.
BAKER BOTTS LLP
The Warner
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2400
(202) 639-1321
(202) 639-1185 fax

Jeff D. Baxter
Kevin J. Meek
Douglas M. Kuebehl
BAKER BOTTS LLP
2001 Ross Avenue
Dallas, TX 75201-2980
(214) 953-6680
(214) 661-4680 fax

/s/ David C. Tobin
David C. Tobin