IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 06-601 C
Filed: August 23, 2006

| | | |
|---|---|---|
| THEODORE WHITNEY and HIGH RESOLUTION OPTICS CORPORATION, Plaintiffs, | ) | |
| v. | ) | No. 06-601 C |
| THE UNITED STATES, Defendant, | ) | Chief Judge Edward J. Damich |
| and | ) | |
| RAYTHEON COMPANY, Third-Party Defendant. | ) | |

**PLAINTIFFS' SUPPLEMENTAL BRIEF ON CLAIM CONSTRUCTION**

## Table of Contents

**Question 1:** Explain the circumstances under which an argument based on a method of manufacturing, made during the prosecution history of a patent, can limit the scope of an apparatus claim in the subsequently-issued patent. ....................................................... 1

**Question 2:** In defining the term "Bragg Regime" in claim 37, both parties used a variation of the phrase "into a single order." Explain the meaning of the phrase "into a single order." ........................................................................................................ 11

**Question 3:** Under Plaintiffs' proposed construction of the term "lens," can a lens diffract light? ........................................................................................................ 13

**Question 4:** Under Defendants' proposed construction of the term "lens," can a lens diffract light? ........................................................................................................ 15

**Question 5:** Can a lens that diffracts light be used to form an image? ........................... 16

**Question 6:** Can a lens with a "negative focus" be used to form an image? .................. 18

**Question 7:** Does the term "holographic element" refer to an element formed by a certain process, or an element possessing certain properties affecting the behavior of light? Explain both possible interpretations. ..................................................................... 19

**Question 8:** Are there multiple ways to manufacture "holographic elements?" I.e., is photo-fabrication the only method for creating "holographic elements?" ........................ 22

**Question 9:** Does the "phase plate comprising a holographic element" operate to change light in the same way that a "phase plate" does, as construed by Defendants? ................ 24

**Question 10:** In Plaintiffs' proposed construction of "holographic element," is there any limitation as to how the "holographic element" is manufactured? .................................. 26

**Question 11:** Define the term "asphere" (not "aspheric," "aspheric surface," "spherical," "spherical aberration," etc.). Give an example of something that is an asphere.............. 28

Plaintiffs hereby submit the following briefing concerning the issues and questions raised in the Court's July 18, 2008 Order:

1. **Explain the circumstances under which an argument based on a method of manufacturing, made during the prosecution history of a patent, can limit the scope of an apparatus claim in the subsequently-issued patent.**

The Federal Circuit has specifically stated that a "method of manufacture, even when cited as advantageous, does not of itself convert product claims into claims limited to a particular process.... A novel product that meets the criteria of patentability is not limited to the process by which it was made." *Vanguard Prods. Corp. v. Parker Hannifin Corp.*, 234 F.3d 1370, 1372 (Fed. Cir. 2000) (emphasis added). As discussed below, a method of manufacturing can be included to limit the scope of an apparatus claim in only a few, limited circumstances: (1) when a specific manufacturing process is necessary to convey essential physical properties to the claimed apparatus; (2) when the patentee has expressly relied on a particular manufacturing method to overcome prior art or Examiner rejections during prosecution; or (3) when the patentee makes clear and unmistakable statements or arguments disclaiming a particular manufacturing method. None of these circumstances are present in this case.

a. **The claimed inventions in the '319 patent do not have any essential physical properties related to a specific method of manufacture.**

In the first instance, a manufacturing limitation may be appropriate where critical physical properties can be imparted to the apparatus/product only by a specific manufacturing process. For example, in *Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361 (Fed. Cir. 2007), the Federal Circuit upheld a district courts' claim construction in which the claim term "composite compositions" was narrowly construed

and limited to products made by a specific "pelletization" process described in the patent's specification and the parent patent's prosecution history. The Andersen patents taught that polymer and wood fiber could be mixed together to form a composite composition material. This composite composition material could them be "remelted and re-extruded to produce desired structural members." *Id.* at 1366. The patents were broken up into two groups: Group I patents covered intermediate composites capable of being extruded into structural members and Group II patents were directed toward the extruded structural members themselves. *Id.* at 1364. The Group I patents contained claims directed toward "compositions in the form of a pellet, claims to compositions in the form of a linear extrudate, and claims to a 'composite composition' without a specific form limitation." *Id.* at 1365.

The "composite composition" term was the only one at issue in *Andersen*. *Id.* The district court construed it to require a "solid pellet or a solid linear extrudate, which may be subsequently remelted and extruded to make a structural member." *Id.* at 1365. This construction further required that the composition be formed through the pelletization process discussed in the patents' specification. The Federal Circuit agreed with the district court's construction saying that "[w]hile nothing on the face of the asserted claims states that the term 'composite composition' is limited to a mixture that is pellet or linear extrudate form…," specific references in the specification and prosecution history compelled the district court's construction. *Id.* at 1366.

The Andersen patents specifically taught that the claimed "composite composition" had certain properties to ensure that it would be suitable for subsequent forming into structural elements. *Id.* at 1366. These properties were achieved through an

"intimate mixing" process whereby polyvinyl chloride and wood fiber composite were extruded through an "extrusion die resulting in a linear extrudate that can be cut into pellets." *Id.* This pelletization process provided both high pressure and high temperature to ensure that the desired properties for the pellets were achieved. *Id.*

The Federal Circuit noted that the specification provided that "the step of extruding the composite in pellet or linear extrudate form was 'require[d]' in order for the composite composition to be capable of extrusion into a structural member having the claimed physical properties." *Id.* at 1367. The Court also observed numerous places in the specification where the pelletization process for making the "composite composition" was described not as a preferred embodiment, but rather as a "critical element in the process that produces those properties." *Id.* at 1367; *see also id.* ("the specification repeatedly states that the steps of linear extrusion or pelletization are not merely embodiments, but are essential features of the claimed composite composition."). In addition, the Court noted that in the prosecution history of the parent application, the patentee made similar statements: "The moisture control combined with the intimate contact and wetting between the components in the pelletizing process and other pellet characteristics ensures high quality physical properties in the extruded composite material after manufacture…" *Id.* at 1369 (emphasis added). The patentees also stated that the "manufacture of the thermoplastic pellet is important in obtaining the final structural properties of the composite member." *Id.* These statements, in both the specification and prosecution history, convinced the Federal Circuit that that the pelletization process was vital to ensuring that the composition would have the necessary properties for subsequent

extrusion into the desired structural members and the Court allowed the composition claims to be limited to the pelletization manufacturing process.

In the present case, however, there is no indication in either the specification or the prosecution history of the '319 patent, that the photo-fabrication technique imparts any essential properties to the claimed invention or that mechanical cutting precludes any essential properties and thereby warrants its exclusion as argued by Defendants. Nor is it taught anywhere that a specific manufacturing method is a critical factor in achieving vital properties in the optical elements taught by the claims at issue before the Court. To the contrary, all of the "manufacturing" claims were withdrawn by the patentee due to the Examiner's restriction requirement. There simply are no necessary manufacturing methods involved in the claimed invention, and it would be improper to adopt a construction that requires any specific manufacturing method.

**b. The patentee did not rely on any specific manufacturing methods to overcome prior art rejections during the prosecution of the '319 patent.**

As discussed above, in *Andersen*, the Federal Circuit found that the prosecution history of the parent patent supported limiting the scope of "composite composition" materials to those created by the pelletization process. Specifically, the Court noted that "the applicants repeatedly distinguished the invention from the prior art by referring to the pellet form or the pelletization process as an essential part of the invention." *Id.* at 1368. The Court noted that the applicants "distinguished two prior art references by relying heavily on the role of the pelletization process in the claimed invention…" *Id.* The applicants:

> [F]urther distinguished one of the two cited references by noting that it "does not teach the pelletization of the composite material," while the claimed invention "first pelletizes the thermoplastic composite material,

> and then, manufacturers [sic] a structural member from the pelleted materials by melting and extrusing the composite. Thus, [the reference] does not teach or suggest the manufacture or composition of the thermoplastic pellet materials of the Applicant's invention.

*Id.* at 1369.

In *Vanguard* the claimed invention was a gasket and the defendant sought to limit the construction of the term "intergral therewith" to include a co-extrusion manufacturing method described in the specification. *Vanguard*, 234 F.3d at 1371. The defendants argued that "the prosecution history shows that the Vanguard inventors viewed co-extrusion as 'fundamental' to the manufacture of the claimed gasket, thereby imposing this process of manufacture upon the product claims." *Id.* at 1372. Defendants further argued that the patentees "argued the benefits of the co-extruded layers in order to overcome the prior art…" *Id.*

Importantly, in rejecting defendants' arguments, the Federal Circuit noted that during the prosecution of the patent, the inventor's arguments to overcome prior art rejections were based on the product itself, not the process of manufacture. *Id.* "The examiner did not cite any reference directed to co-extrusion or the method of manufacture." *Id.* Even extolling the "economy of manufacture and superior product made by co-extrusion" during prosecution was not a sufficient basis for limiting the claim scope to gaskets made by co-extrusion. *Id.* The Court held that even though the patentees noted that the co-extrusion process was advantageous, it was not a sufficient disclaimer to effectively limit the scope of the invention "beyond products made by co-extrusion." *Id.*

Another case, *Southwall Tech., Inc. v. Cardinal IG Corp.*, 54 F.3d 1570 (Fed Cir. 1995), involved an improved, heated mirror. This mirror was created by sputtering thin

layers of silver and metal oxide. *Id.* at 1573. The prior art taught forming certain dielectric layers by using a two step process. *Id.* at 1576. The district court construed the term "sputter-deposited dielectric" to require that the layer be formed using a "one-step reactive sputtering process and specifically not a two-step process in which a metal layer is first deposited and later oxidized." *Id.* The Federal Circuit agreed with the district court's construction noting that "the prosecution history limits the interpretation of claim terms to exclude any interpretation that was disclaimed during prosecution." *Id.* Specifically, the Court noted that the examiner rejected the claims based on the Franz patent and stated:

> Franz teaches employing alternate layers of metal/metal oxide to a transparent substrate such as glass or plastic and the use of a protective layer to make a transparent heat reflecting window . . . . The metal layer is sputter deposited and the metal oxide layer is sputter deposited as a metal and then oxidized, see col. 4, lines 25-28. It is unclear whether the "metal oxide is sputter-deposited" limitation is meant to encompass the situation where the metal oxide is sputter deposited as a metal and later oxidized. Until clarification the examiner most [sic, must] interpret the claims broadly.

*Id.* After amending the claims the patentee responded:

> As pointed out in the specification *such layers can be laid down directly* by reactive sputtering processes in which the metal is sputtered off of a metal target and *directly converted to the oxide*, compound or salt *by the presence of a suitable gaseous reactant.*

*Id.* (emphasis in original). The Federal Circuit held this response "necessarily disclaimed the examiner's interpretation of 'sputter-deposited' metal oxides as encompassing a two-step process in which metal is first deposited as a metal and then oxidized" (i.e. a two step process). *Id.* This exchange between the patentee and the examiner in overcoming the rejection over Franz was held to limit "the interpretation of 'sputter-deposited dielectric' layer to exclude any dielectric layer formed by the two-step process." *Id.*

A review of these cases demonstrates that apparatus claims may be limited based on disclosed manufacturing methods only where the patentee makes express arguments to overcome prior art rejections during prosecution. This situation, however, is not applicable to this case. Here, the patentee, Whitney, did not distinguish any of the prior art based on the photo-fabrication technique mentioned in the specification or any other manufacturing technique. Notably, Whitney did not distinguish any of the prior art based on mechanical cutting. The only mention of mechanical cutting was in connection with the prosecution of application no. 108,435 (a prior application from which the '319 patent descended) where Whitney stated there was no basis to combine two references, one of which described a contact lens manufactured via mechanical cutting.[1] Importantly, Whitney did not say that his invention was an improvement over the prior art based on an absence of mechanical cutting or any similar phrasing to indicate that mechanical cutting was to be avoided.[2]. As in *Vanguard*, all of the arguments in the '319 prosecution history were based on the invention itself. Thus, the '319 patent should not be limited to any particular manufacturing process discussed in the specification or prosecution history.

**c. The patentee did not disclaim any specific manufacturing processes during the prosecution of the '319 patent.**

The prosecution history disclaimer doctrine is very narrowly applied: "Under the doctrine..., a patentee may limit the meaning of a claim term by making a clear and unmistakable disavowal of scope during prosecution." *Purdue Pharma L.P. v. Endo Pharms., Inc.*, 438 F.3d 1123, 1136 (Fed. Cir. 2006) (emphasis added).

---

[1] *See* Docket No. 36-16 at p. A609-10.

[2] Even the examiner did not consider mechanical cutting to be a prohibited manufacturing technique as evidenced by the restriction requirement during the '319 prosecution when he stated that the Group II products, which were ultimately prosecuted by Whitney, "may be made by a materially different process, such as lathing or ion milling." *See* Docket No. 36-14 at A376.

> Prosecution disclaimer does not apply to an ambiguous disavowal. *See N. Telecom Ltd. v. Samsung Elecs. Co.*, 215 F.3d 1281, 1293-95 (Fed. Cir. 2000) (holding that prosecution disclaimer did not "support the judicial narrowing of a clear claim term" because the inventors' statements were amenable to multiple reasonable interpretations); *Pall Corp. v. PTI Techs. Inc.*, 259 F.3d 1383, 1393-94 (Fed. Cir. 2001) (remanding because the scope of disclaimer over the prior art reference was ambiguous), *vacated on other grounds*, 535 U.S. 1109, 122 S. Ct. 2324, 153 L. Ed. 2d 152 (2002). Prosecution disclaimer does not apply, for example, if the applicant simply describes features of the prior art and does not distinguish the claimed invention based on those features. *See Eolas Techs., Inc. v. Microsoft Corp.*, 399 F.3d 1325, 1337 (Fed. Cir. 2005). And if the specification expressly defines a claim term and "remarks made to distinguish claims from the prior art are broader than necessary to distinguish the prior art, the full breadth of the remark is not 'a clear and unambiguous disavowal of claim scope as required to depart from the meaning of the term provided in the written description.'" *3M Innovative Props. Co. v. Avery Dennison Corp.*, 350 F.3d 1365, 1373 (Fed. Cir. 2003) (quoting *Storage Tech. Corp. v. Cisco Sys., Inc.*, 329 F.3d 823, 833 (Fed. Cir. 2003)).

*Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1375 (Fed. Cir. 2008) (emphasis added).

In a recent decision, another district court concisely summarized the Federal Circuit's disclaimer law as follows:

> Any disavowal of claim scope during prosecution must be unambiguous and may not be amenable to many reasonable interpretations. *Omega Eng'g*, 334 F.3d at 1324. Rather, allegedly disavowing statements must be "both so clear as to show reasonable clarity and deliberateness . . . and so unmistakable as to be unambiguous evidence of disclaimer." *Id.* at 1325 (citing *Northern Telecom Ltd. v. Samsung Electronics Co.*, 215 F.3d 1281, 1294-95 (Fed. Cir. 2000) declining to apply doctrine of prosecution disclaimer because the infringer had not shown "that the patentees -- with reasonable clarity and deliberateness -- defined 'plasma etching' as excluding ion bombardment"). *See also Golight, Inc. v. Wal-Mart Stores, Inc.*, 355 F.3d 1327, 1332 (Fed. Cir. 2004) (refusing to apply prosecution history disclaimer "because statements in the prosecution history are subject to multiple reasonable interpretations, [and therefore] they do not constitute clear and unmistakable departure from the ordinary meaning of the term . . ."); *Storage Tech. Corp. v. Cisco Sys., Inc.*, 329 F.3d 823, 833 (Fed. Cir. 2003) ("We therefore do not consider the applicants' statement to be a clear and unambiguous disavowal of claim scope as required to depart from the meaning of the term provided by the written description."); *Invitrogen Corp. v. Biocrest Mfg., L.P.*, 327 F.3d 1364, 1369 (Fed. Cir. 2003) ("The prosecution history does not show any clear

> and unambiguous disavowal of steps in advance of the step of growing E. coli cells in the claimed temperature range.").

*Kinzenbaw v. Case, LLC*, 318 F. Supp. 2d 778, 785 (N.D. Iowa 2004) (emphasis added).

Furthermore, in *Northern Telecom Ltd. v. Samsung Semiconductor, Inc.*, 215 F.3d 1281, 1292 (Fed. Cir. 2000), the Federal Circuit was asked to overrule a district court's construction of the term "plasma etching." Defendants argued that "plasma etching" must be construed in a manner so as to exclude reactive ion etching, which is a dry etching technique that combines features of mechanical ion bombardment with chemical plasma etching. *Id.* at 1284. As part of their argument, defendants citied to the patent figures and noted the figure showed the patentees' preference for gas plasma etching which they argued justifies limiting "plasma etching" to exclude ion bombardment. *Id.* at 1393. The court rejected this contention stating:

> While we agree that Figure 2 makes clear that the patentees preferred gas plasma etching over ion bombardment, that fact, of course, cannot lead to the conclusion that ion bombardment was *specifically excluded* from the scope of the claims. As we noted above, the entire specification plainly expresses a preference for gas plasma etching over ion bombardment. But preferred embodiments, without more, do not limit claim terms.

*Id.* (emphasis added).

The *Northern Telecom* court also rejected defendant's arguments that the prosecution history limited the construction of "plasma etching." Specifically, the court concluded that the patentees' description of "plasma as part of the etching mechanism rather than as 'the' (or, perhaps, 'the only') etching mechanism" did not justify "its exclusion as part of the invention." *Id.* at 1294. In other words, the Federal Circuit refused to limit the scope of claim language where the prosecution history did not clearly

and explictly call for a narrower construction. *Id.*; *see also Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1458 (Fed Cir. 1998) (*en banc*).

In the present case, there has not been any "disavowal" – let alone a "clear and unmistakable disavowal" – of any manufacturing process, including mechanical cutting, to justify Defendants' proposed, limiting construction. The specification states merely that diamond turning (one of many possible mechanical methods) may leave the surface of optical devices too rough for certain UV applications.[3] Importantly, the specification does not state that using diamond turning is unacceptable for all UV applications. At most, the patentee's statements in the specification concerning diamond cutting merely indicate that other alternatives might be better suited for UV applications at the time such statements were made.

In addition, there are no arguments or statements in the prosecution history that mechanical cutting cannot or should not be used to create the phase plates taught in the patent. Whitney did not disclaim "mechanical cutting," rather he merely commented on the deficiencies of that method as it existed at the time of patenting. There simply are no statements that would rise to the "deliberateness and unmistakable" standard required for a disavowal.

[3] '319 Col. 1 lns. 53-57.

**2. In defining the term "Bragg Regime" in claim 37, both parties used a variation of the phrase "into a single order." Explain the meaning of the phrase "into a single order."**

**a. Short Answer:** "Into a single order" means "diffraction of substantially all of the beam into a single direction."

**b. Discussion:**

When an entering beam of light hits a diffraction grating, the transmitted components are broken up into a number of subsidiary beam fractions which are directed off at various angles.[4] Each of these numbered beams represents an "order" of diffraction.

One fraction of the beam, the un-diffracted portion, passes straight through and is called "the zero order". The others fractions diffract off at different angles. The first diffracted beam occurs at an angle where there is one wavelength of phase lag from the beam component from one grating opening and the next, and this is called "the first order". Other fractions of the beam combine at larger angles where there are two waves of phase lag from one grating opening to the next, called "the second order", three waves of phase lag are "the third order," and so forth.

The proportion of the light that goes to the first order, the second order, etc., can be altered by shaping the grating cross-section. For example, a grating shaped (also referred to as "blazed") like Figure 3 of the '319 patent, which has a certain thickness and blaze angle, lags the intermediate components of the beam in such a way that all of the light entering at or near a correct angle goes "into a single order."[5] Another way to state

[4] *See* Exh. 1 at p. 43, Fig. 9 (Rudolf Kingslake, Applied Optics and Optical Engineering, Vol. 3, 1965).
[5] At that point, the grating is operating within the "Bragg regime."

this is that substantially all of the diffracted beam is bent in a single direction. Thus, "into a single order" means "diffraction of substantially all of the beam into a single direction."

**3. Under Plaintiffs' proposed construction of the term "lens," can a lens diffract light?**

**a. Short Answer:** Under Plaintiffs' proposed construction a lens can diffract light.

**b. Discussion:**

Plaintiffs proposed construction of "lens" as "a piece of material that is transparent to some or all of the light rays passing through it by means of which the light rays may be altered" does allow for the possibility of diffraction. The process of alteration may comprise refraction of light rays passing through it, diffraction of the light rays, or some other process.[6]

Diffraction is defined as "the bending of light into the region of the geometrical shadow of an obstacle."[7] While Plaintiffs' proposed construction allows for the possibility of diffraction, it is not limited to diffraction; nor is diffraction necessarily certain. To ensure diffraction, the lens must be designed to selectively retard the phases of various areal parts of the beam to allow the components to recombine constructively in selected angular directions. For example, adding the "plurality of concentric patterns thereon...wherein the patterns each introduce progressively varying optical path delay in the beam" as set out in claim 33 of the '319 patent, ensures that the lens will diffract light

---

[6] Plaintiffs acknowledge that the edges of objects such as lens and apertures, as well as occlusions and objects within the beam path will cause a minute amount of light to be diffracted. This is a result of the interaction of light with the edges of objects and is a consequence of the fact that the apertures of lenses are of finite size (i.e. this is a physical manufacturing limitation). This type of diffraction is ubiquitous in any optical construction and generally involves a very small fraction of the beam energy. This type of diffraction is not an ordered diffractive effect that alters any significant portion of the beam wave front. Thus, this type of edge diffraction is not a consideration among optics practitioners when attempting to increase resolution and depth of focus of an image. Manipulation or control of that type of diffraction forms no part of the claims which are being asserted in the'319 patent and should not be a consideration in construing the disputed terms.

[7] *See* Exh. 2 at p. 489 (McGraw-Hill Encyclopedia of Science and Technology, 9th ed. 2002); Exh. 3 at p. 328 (The Harper Encyclopedia of Science, Vol. I., 1st Ed., 1963).

in a specific, orderly manner. Therefore, Plaintiffs' proposed construction does not automatically guarantee diffraction, but it does not preclude it either.

**4. Under Defendants' proposed construction of the term "lens," can a lens diffract light?**

**a. Short Answer:** Defendants' construction of "lens" precludes the diffraction of light.

**b. Discussion:**

Defendants' construction of "lens" as "a piece of transparent material with opposite regular surfaces either or both of which are curved, by means of which light rays are focused to form an image" precludes the possibility of diffracting light.[8]

Defendants' proposed construction describes one form out of many typical refractive lenses ("with opposite regular surfaces") arranged to perform one common function of a positive refractive lens, "...to form an image." Defendants' construction is not sufficient by itself to ensure that any light is diffracted because the presence of "opposite regular surfaces" precludes the subsequent addition of a diffractive property through the addition of a surface grating structure. The principal property that is required for diffraction is the presence of a means to selectively retard the phases of various areal parts of the beam to permit beam components to recombine constructively in selected angular directions. For example, claim 33 of the '319 patent claims a lens with "a plurality of concentric patterns thereon...wherein the patterns each introduce progressively varying optical path delay in the beam ..." Such a lens then diffracts light, without excluding any other property it may have, such as refraction.

[8] *See* footnote 4 from Question No. 3, above.

**5. Can a lens that diffracts light be used to form an image?**

**a. Short Answer:** Yes, a lens that diffracts light can be used to form an image.[9]

**b. Discussion:**

A lens that diffracts light generally bends light only slightly – a few degrees at most. Thus, any image formed with only a diffractive lens would have a long focal length. Therefore, diffractive lenses are generally used cooperatively with other lenses, generally refractive lenses, to form an image. The figures included below provide examples of diffractive lenses that are used to form an image. For example, Figure 1 shows a system using diffractive lenses in which:

> [t]he conclusion is drawn that the primary eyepiece (diffractive element) has yielded a better optical design from a chromatic, field curvature, and MTF *(Modulation Transfer Function)* standpoint for the set of guidelines specified. Previous work has also shown that diffractive elements can be used effectively to decrease the number of optical components required for obtaining suitable performance in the design of the eyepiece systems.[10]

Additionally, Figure 2 shows a conventional optical imaging system using a diffractive lens to form an image with reduced aberrations.

[9] *See* Exh.4 at Col. 1 lns. 12-34 (United States Patent No. 5,071,207).
[10] Exh. 5 at p. 4758 (Wayne Knapp et al., *Optical design comparison of 60° eyepieces: one with a diffractive surface and one with aspherics*, Applied Optics, July 1997).




**Fig. 2.** (a) Primary eyepiece (with diffractive surface) lens design drawing, (b) secondary eyepiece (with plastic aspherics) lens design drawing.

Figure 1: Example of diffractive optical elements being used in conjunction with other refractive elements to form an image.[11]




Figure 2: An example of a diffractive lens 10 is used to form an image.[12]

---

[11] *Id.*

[12] Exh. 6 at Fig. 1, Col. 2 lns. 65-67 (United States Patent No. 5,541,779).

**6. Can a lens with a "negative focus" be used to form an image?**

**a. Short Answer:** A lens with a "negative focus" can be used to form an image.

**b. Discussion**

There are two types of images that can be formed by a lens: *real* or *virtual*.[13] A *real* image is formed when light converges to a point.[14] A *virtual* image is one that is seen only when looking back through the lens toward the source of light.[15] However, although a *virtual* image is not capable of being projected onto a screen, "it has a definite position and size and can be 'seen' or imaged by the eye, camera, or other optical instrument."[16]

*Real* images are formed using convergent, or positive, lenses.[17] A divergent, or negative, lens can be used to form a *virtual* image of an object.[18] Further, a lens with a negative focus can be used to form a *real* image, but not by itself. It must work together in combination with another lens or lenses of greater positive power to form an optical system. Such an optical system can be designed to form a *real* image which corrects for most aberrations. Combinations of positive and negative refractive lenses and positive and negative diffractive lenses are used to form lens systems, the end object of which is usually to create a highly corrected *real* image.

---

[13] Exh. 7 (http://www.lhup.edu/~dsimanek/scenario/lenses.htm) (last visited August 5, 2008).
[14] *Id.*; *see also* Exh. 8 at Fig. 1 (http://www.physics.uq.edu.au/courses/phys1000/optics2.html) (last visited August 5, 2008).
[15] Exh. 7.
[16] Exh. 9 (http://hyperphysics.phy-astr.gsu.edu/Hbase/geoopt/image2.html) (last visited August 5, 2008).
[17] Exh. 7; *see also* Exh. 8.
[18] Exh. 9; *see also* Exh. 7; *see also* Exh. 8.

**7. Does the term "holographic element" refer to an element formed by a certain process, or an element possessing certain properties affecting the behavior of light? Explain both possible interpretations.**

**a. Short Answer:** The term "holographic element" refers to an element possessing specific properties that affect the behavior of light.

**b. Discussion:**

The term "holographic element" appears in asserted claim 37:

> At least one phase plate comprising a holographic element operating in the Bragg regime and also functioning as an asphere to compensate for residual aberration in the refractive system.[19]

Furthermore, the patent specification states:

> The phase plate 60 more specifically functions both as a holographic element operating in a Bragg regime and as an asphere in cooperative fashion with the refractive elements.[20]

The patent specification demonstrates that the "holographic element" performs a function. There are several prescribed processes for producing a hologram: photo-lithography, embossing, electron beam writing on photo resist, etc.[21] The inventions taught in the '319 patent are not limited to any one of them.

If one carries out any of several prescribed processes known to produce a hologram, he will create an element which possesses properties affecting the behavior of light which are typical of a hologram. Such an element acts like a hologram and is commonly referred to as either a hologram or a holographic element.

Holograms were invented by Dennis Gabor in 1948 and are optical elements which record the amplitude and phase distributions of light.[22] Holograms can be used to

[19] '319 Col. 28 lns. 65-68.
[20] '319 Col. 13 lns. 36-39.
[21] *See* Question No. 8, below.
[22] *See* Exh. 2 at p. 564.

create both real and virtual images and in doing so "behave[] as an optical focusing element with properties similar to those of a lens."[23] While holograms are well known for their ability to display images, they can also be used to control transmitted light beams.[24]

The holograms which are the subject of the '319 patent are known in the art as "surface relief" phase gratings.[25] They are fine patterns of rings up to one wavelength thick produced on the surface of a transmitting material which impart a desired phase characteristic (and hence a desired shape) to the transmitted wavefront. Each such surface has a range of entering and emergent angles for the light beam, where the hologram diffracts optimally, called the Bragg regime:[26]

> noticeable diffraction efficiency for thick holograms occurs only if the reconstructing beam is incident on the hologram from one of a discrete set of directions, called the Bragg angles. If the beam is not at a Bragg angle, it passes through the hologram and no diffracted beam is produced.[27]

As shown, holographic elements have properties that affect the behavior of light. Asserted claim 37 calls for a "phase plate comprising a holographic element operating in the Bragg regime" which demonstrates that in the context of claim 37 and the '319 specification, the "holographic element" must possess properties that affect light in such a manner as to cause the light to operate at or near the Bragg angle (i.e., operate in the Bragg regime).

---

[23] *Id.* at p. 566.
[24] *Id.*
[25] *See* Exh. 10 at p. 967 (Dale Buralli et al., *Optical Performance of Holographic Kinoforms*, Applied Optics, Vol. 28 No. 5, March 1989).
[26] *See* Exh. 11 at p. 15 (M.G. Moharam et al., *Criteria for Bragg Regime Diffraction By Phase Gratings*, Optics Communications, Vol. 32 No. 1, January 1980) ("The Bragg regime may alternatively be defined as the diffraction situation where, to within some error limit, only two waves (the transmitted and diffracted waves) are present. This may be referred to as the *Two Wave Criterion* for Bragg Regime diffraction. This would be important in applications such as scanning where having no more than one diffracted beam is important. ...").
[27] Exh. 22 at p. 512 (The Encyclopedia of Physical Science and Technology, Vol. 6, 1987).

A construction that defines "holographic element" in terms of how it is manufactured would improperly limit the claims, because it would insert an unwarranted limitation into the claims and completely ignore the patent's teachings that the "holographic element" must function to cause light to diffract at or near the Bragg angle.

**8. Are there multiple ways to manufacture "holographic elements?" I.e., is photo-fabrication the only method for creating "holographic elements?"**

**a. Short Answer:** Holograms, or holographic elements,[28] can be produced using several different techniques, not just photo-fabrication.

**b. Discussion:**

The first holograms were recordings of the interference patterns formed between two beams of coherent light, for example coming from a laser, one of which is reflected from an object which is to be recorded in the hologram, recombined on a light-sensitive medium such as a photographic film. The following passage describes this classical method of making a hologram:

> The light beam coming from a laser is first divided into two beams by a beamsplitter and then expanded. One beam, called the reference beam, goes directly to the photographic plate. The other beam is directed onto a three-dimensional (3D) object under observation. The scattered light waves from the object combines with the light waves from the reference beam at the photographic plate. Because of their high degree of coherence, the two sets of waves form an interference pattern on the plate. These interference fringes are recorded on the plate and form a *hologram.*[29]

While this is a general description of how holograms can be made, it is expressly acknowledged that there are other techniques:

> In addition to the holographic technique stated above, <u>many other types of holographic techniques are available</u>. This book will give the reader a more complete aspect of holographic recording techniques.[30]

Another method of making holographic elements is through computer generation whereby a computer is programmed so

---

[28] As noted in Question 7, holograms that perform certain functions are also known in the field as "holographic optical elements."
[29] Exh. 12 at p. 1 (Meng Hua Tsai et al., Three Dimensional Holographic Imaging, 2002).
[30] *Id.* (emphasis added).

> that it will compute where the fringes ultimately should be. Then artwork is produced from the computed data that contains the desired fringe pattern, this being done with a computer-controlled plotter. Finally, the resulting plot is photoreduced onto a holographic film, the reduction being such that the fringe pattern is sufficiently small to diffract light at whatever appreciable angles are required.[31]

These "computer generated holograms can also be made directly by electron beam writing on a photoresist...,"[32] by laser writing directly on photoresist, or by mechanical cutting.[33]

Embossing is another technique that can be used to create holograms.[34] Embossing involves heating an "aluminized substrate to a temperature at which it becomes plastic, and then the nickel master plate is forced against the substrate to imprint the surface relief pattern in it."[35]

As has been just described, the creation of holograms is not within the exclusive province of photo-fabrication.

---

[31] Exh. 13 at Col. 1 lns. 30-38 (United States Patent No. 4,455,061).
[32] *Id.* at Col. 1 lns. 39-41.
[33] *See* Exh. 23 at p. 140, Abstract (Max J Riedl, *Predesign of Diamond Turned Refractive/Diffractive Elements for IR Objectives*, Lens Design, January 1992).
[34] Exh. 14 at Col. 1 lns. 28-29 (United States Patent No. 5,881,444) ("Most holograms on credit cards and the like are embossed into a plastic sheet material such as Mylar."), Col. 1 lns. 50-53 ("It is also known to emboss holograms directly into the outer surface of sheet metal such as aluminum foil and aluminum beverage cans as is disclosed in U.S. Pat. Nos. 4,773,718 and 4,725,111.").
[35] Exh. 15 at Col. 1 lns. 45-48 (United States Patent No. 4,773,718).

**9. Does the "phase plate comprising a holographic element" operate to change light in the same way that a "phase plate" does, as construed by Defendants?**

**a. Short Answer:** The "phase plate comprising a holographic element" does change the light in the same manner as a "phase plate" under Defendants' construction.

**b. Discussion:**

To understand why it is the same it is important to analyze the components of Defendants' proposed construction. Defendants have advocated the following constructions:

- Defendant's definition of "plate": A substantially flat optical element.[36]
- Defendant's definition of "phase plate": [A substantially flat optical element] formed through a process other than mechanical cutting to include concentric rings with a selected number of plateaus that change the phase of the beam.

Substituting these into "phase plate comprising a holographic element" yields: [A substantially flat optical element] [formed through a process other than mechanical cutting to include concentric rings with a selected number of plateaus that change the phase of the beam] formed using a photo-fabrication technique.

Examining Defendants' construction demonstrates that the proposed construction does nothing to affect the properties or operation of the "phase plate." Rather, Defendants' construction simply grafts manufacturing limitations on how the phase plate is created. Since nothing in Defendants' construction modifies the properties of the

[36] Plaintiffs continue to object to this proposed construction because those skilled in the art of optics would not automatically assume that a" plate" is either "flat" or "substantially flat." *See* Exh. 17 at p. 1701 (W.A. Kleinhans, Aberrations of curved Zone plates and fresnel lenses, Applied Optics, June 1977) ("Zone plates and Fresnel lenses are usually prepared on flat surfaces, but this may not be the best choice. The extra degree of freedom available by curving the element can reduce aberrations, possibly eliminating the need for additional elements."). This passage demonstrates that professionals in the field of optics would not automatically assume that a plate is flat, it can be a curved surface. *See Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001) ("as a general rule, all terms in a patent claim are to be given their plain, ordinary and accustomed meaning to one of ordinary skill in the relevant art.").

"phase plate," the "phase plate with a holographic element" operates to change light in the same manner as the "phase plate" under Defendants' construction.

**10. In Plaintiffs' proposed construction of "holographic element," is there any limitation as to how the "holographic element" is manufactured?**

**a. Short Answer:** There is no restriction on how the holographic element is manufactured.

**b. Discussion:**

As discussed in connection with Question No. 1, the Federal Circuit has stated: "the method of manufacture, even when cited as advantageous, does not of itself convert product claims into claims limited to a particular process... A novel product that meets the criteria of patentability is not limited to the process by which it was made." *Vanguard,* 234 F.3d 1372. Furthermore, as discussed in the response to Question No. 1, the Federal Circuit only appears to limit an apparatus to a specific method of manufacturing disclosed in the specification or prosecution history when 1) the patentee has made it clear that the apparatus must possess certain properties and those properties are imparted by the disclosed manufacturing process; 2) when the patentee has relied on a specific manufacturing technique in overcoming prior art or a rejection by the Examiner during prosecution; or 3) if the patentee has specifically disclaimed a particular manufacturing methods by making "clear and unmistakable" statements in the specification or prosecution history.

However, neither of these situations applies to the '319 patent. The patentee did not state in the specification or the prosecution history that the "holographic element" must contain any particular property which is imparted solely as a consequence of photo-fabrication. Nor, did the patentee use any aspect of photo-fabrication to overcome any prior art or arguments from the Examiner in connection with the "holographic element."

In fact, no rejections were ever made with respect to the "holographic element" in prosecuting the '319 patent. Finally there is no statement in either the specification or prosecution history that says something to the effect of "holographic elements can and should only be produced by photo-fabrication and all other manufacturing techniques should be avoided in practicing the invention." Based on Federal Circuit precedent, there is simply no justification for importing a specific manufacturing limitation under the present circumstances.

**11. Define the term "asphere" (not "aspheric," "aspheric surface," "spherical," "spherical aberration," etc.). Give an example of something that is an asphere.**

The term "asphere" is a synonym for aspheric lens which is a refracting optical element having at least one axially centered non-spherical curved surface.[37] It is also accepted usage within the field of optics to call a diffractive element an asphere, if it produces the same optical effect as a refractive asphere. Another way of stating this is an asphere, or aspherical lens, is a lens whose curved surface does not conform to the shape of a sphere. An example of an asphere, or aspheric lens, is a refracting lens with at least one non-spherical surface. *See* Figure 1. Another example would be a phase plate bearing a ring pattern, which through diffraction, operates to change light in a manner similar to an asphere. *See* Figure 2.




Figure 1: Examples of aspheres[38]

[37] *See* Exh. 18 (http://www.tutorgig.com/ed/Aspheric_lens) (last visited August 5, 2008); Exh. 19 (http://www.mahr.com/scripts/relocateFile.php?ContentID=8798&NodeID=12471&FileID=7430&ContentDataID=23466) (last visited July 29, 2008); Exh. 20 at Abstract (United States Patent No. 6,646,718) ("At least two aspheric lens surfaces are arranged so as to be mutually adjacent. These mutually adjacently arranged lens surfaces are characterized as a double asphere.").

[38] Exh. 21 (http://www.jtoptec.com/en/pro/Asp.html) (last visited August 5, 2008).



Figure 2: Example of an Aspheric Diffractive Lens[39]

[39] Exh. 16 (http://www.memsoptical.com/techinfo/datasheets/DiffractiveAspheric_Lenses-en.pdf) (last visited August 5, 2008).

**Dated: August 8, 2008**

Respectfully submitted,

/s/ Edward E. Casto, Jr.
Edward E. Casto, Jr.
State Bar No. 24044178
Nelson Bumgardner Casto, P.C.
5601 Bridge Street, Suite 300
Fort Worth, TX 76112
(817) 377-9111
Fax (817) 377-3494
ecasto@nbclaw.net

David C. Tobin
TOBIN O'CONNOR & EWING
5335 Wisconsin Avenue, NW, Suite 700
Washington, DC 20015
(202) 362-5900
(202) 362-5901 (fax)
dctobin@tobinoconnor.com

Jonathan T. Suder
State Bar No. 19463350
FRIEDMAN, SUDER & COOKE
Tindall Square Warehouse No. 1
604 East 4th Street, Suite 200
Fort Worth, Texas 76102
(817) 334-0400
Fax (817) 334-0401
jts@fsclaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that on the 8th day of August, 2008 the foregoing claim construction statement was served upon the following attorneys of record via both E-mail and First Class Mail:

Scott David Bolden
Kirby W. Lee
Commercial Litigation Branch
U.S. DEPARTMENT OF JUSTICE
FOR FEDERAL EXPRESS DELIVERY:
100 L Street N.W., Room 11118
Washington, DC 20530
FOR FIRST CLASS MAIL DELIVERY:
Washington, DC 20530 (no street add.)
(202) 307-0262
(202) 307-0345 fax

William S. Foster, Jr.
BAKER BOTTS LLP
The Warner
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2400
(202) 639-1321
(202) 639-1185 fax

Jeff D. Baxter
Kevin J. Meek
Douglas M. Kuebehl
BAKER BOTTS LLP
2001 Ross Avenue
Dallas, TX 75201-2980
(214) 953-6680
(214) 661-4680 fax

David C. Tobin