IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| THEODORE WHITNEY and<br>HIGH RESOLUTION OPTICS CORP.,<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant.<br><br>and<br><br>RAYTHEON COMPANY,<br><br>Third-Party Defendant | ) | No. 06-601 C<br><br>Chief Judge Edward J. Damich |

**DEFENDANTS' RESPONSE TO THE COURT'S JULY 18, 2008 ORDER FOR SUPPLEMENTAL CLAIM CONSTRUCTION BRIEFING**

GREGORY G. KATSAS
Assistant Attorney General

JOHN J. FARGO
Director

SCOTT BOLDEN
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, DC 20530
Telephone: (202) 307-0262

OF COUNSEL:
KIRBY W. LEE
Attorney

Attorneys for Defendant the United States

William S. Foster, Jr.
BAKER BOTTS L.L.P.
The Warner
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2400
Tel.: (202) 639-1321

Kevin J. Meek
Douglas M. Kubehl
BAKER BOTTS L.L.P.
2001 Ross Avenue
Dallas, Texas 75201-2980
Tel.: (214) 953-6680

Attorneys for Third-Party Defendant
Raytheon Company

August 8, 2008

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ II

TABLE OF EXHIBITS ........ III

INTRODUCTION ........ 1

1. Explain the circumstances under which an argument based on a method of manufacturing, made during the prosecution history of a patent, can limit the scope of an apparatus claim in the subsequently-issued patent. ........ 1

2. In defining the term "Bragg Regime" in claim 37, both parties used a variation of the phrase "into a single order." Explain the meaning of the phrase "into a single order." ........ 10

3. Under Plaintiffs' proposed construction of the term "*lens*," can a "*lens*" diffract light? ........ 13

4. Under Defendants' proposed construction of the term "*lens*," can a "*lens*" diffract light? ........ 16

5. Can a lens that diffracts light be used to form an image? ........ 19

6. Can a lens with a "negative focus" be used to form an image? ........ 20

7. Does the term "holographic element" refer to an element formed by a certain process, or an element possessing certain properties affecting the behavior of light? Explain both possible interpretations. ........ 22

8. Are there multiple ways to manufacture "holographic elements?" I.e., is photofabrication the only method for creating "holographic elements?" ........ 27

9. Does the "phase plate comprising a holographic element" operate to change light in the same way that a "phase plate" does, as construed by Defendants? ........ 28

10. In Plaintiffs' proposed construction of "holographic element," is there any limitation as to how the "holographic element" is manufactured? ........ 30

11. Define the term "asphere" (not "aspheric," "aspheric surface," "spherical," "spherical aberration," etc.). Give an example of something that is an asphere. ........ 32

CONCLUSION ........ 35

# TABLE OF AUTHORITIES

## CASES

*Andersen Corp. v. Fiber Composites, L.L.C.*,
474 F.3d 1361 (Fed. Cir. 2007)....................1, 2, 3, 4

*Bicon, Inc. v. Straumann Co.,*
441 F.3d 945, 950 (Fed. Cir. 2006)....................31

*Chimie v., PPG Industries, Inc.*,
402 F.3d 1371 (Fed. Cir. 2005)....................1, 2, 4, 5, 6

*Kumar v. Ovonic Barrery Co.,*
351 F.3d 1364 (Fed. Cir. 2003) ....................23

*Nystrom v. Trex Company, Inc.*,
424 F.3d 1136 (Fed. Cir. 2005)....................1, 2, 7, 8

*Ormco Tech., Inc. v. Align Tech, Inc.,*
498 F.3d 1307 (Fed. Cir. 2007) ....................1, 2, 6, 7

*Unique Concepts, Inc. v. Brown,*
939 F.2d 1558, 1563 (Fed. Cir. 1991)....................31

*V-Formation, Inc. v. Benetton Broup SpA* ,
401 F.3d 1307, 1311-12 (Fed. Cir. 2005) ....................23

# TABLE OF EXHIBITS


| Exhibit | Document | Appendix Page |
|---|---|---|
| A | U.S. Patent No. 5,386,319 | A1 |
| B | Webster's Third New International Dictionary (1981) | A27 |
| C | American Heritage College Dictionary (1997) | A34 |
| D | McGraw-Hill Dictionary of Scientific and Technical Terms (4th ed. 1989) | A39 |
| E | U.S. Patent No. 4,690,506 (Kita) | A47 |
| G | U.S. Patent No. 4,895,790 (Swanson) | A65 |
| H | U.S. Patent No. 5,161,059 (Swanson) | A79 |
| I | Madjidi-Zolbanine et al, "Holographic Correction of Both Chromatic and Spherical Aberrations of Single Glass Lenses," Applied Optics, Vol. 18, No. 14, 15 July 1979, pp. 2385-93 | A95 |
| J | Loewen, "Grating Efficiency Theory as It Applies to Blazed and Holographic Gratings," Applied Optics, Vol. 16, No. 10, October 1977, pp. 2711-2721 | A105 |
| K | S.K. Case et al., "Multifacet Holographic Optical Elements for Wave Front Transformations," Applied Optics, Vol. 20, No. 15, 1 August 1981, pp. 2670-75 | A116 |
| L | V. Hartemann, et al., "The Chirped-Pulse Inverse Free Electron Laser: a Tabletop, High-Gradient Vacuum Laser Accelerator" (U.S. Dept. of Energy, Lawrence Livermore National Laboratory, March 5, 2001) | A122 |
| M | Dionysius Lardner, Hand-book of Natural Philosophy: Optics, pp. 337-38 (Walton and Maberly 1856) | A149 |
| N | Masataka Shirasaki, "Virtually Imaged Phased Array," Fujitsu Sci. Tech. J., pp. 113-25 (July 1999) | A154 |
| O | Draft International Standard ISO/DIS 15902 (2002) | A167 |
| P | M.G. Moharam et al., Criteria for Raman-Nath Regime Diffraction by Phase Gratings, 32 Optics Communications 19 (1980) | A187 |

| Exhibit | Document | Appendix Page |
|---|---|---|
| Q | Herwig Kogelnik, "Coupled Wave Theory for Thick Hologram Gratings," Bell Sys. Tech. J. 2909-47 (1969) | A192 |
| R | Plaintiffs' Claim Construction Statement | A227 |
| S | File History of Application No. 07/897,248 (excerpted) | A234 |
| T | File History of Application No. 07/108,435 (excerpted) and U.S. Patent No. 4,936,665 | A567 |
| U | Application No. 07/108,435 (as originally filed) | A640 |
| V | U.S. Patent No. 4,637,697 (Freeman) | A746 |
| W | Transcript of June 24, 2008 Claim Construction Hearing | A758 |
| X | Raymond Serway, Physics for Scientists and Engineers with Modern Physics, pp. 990-93,1072-73 (Saunders College Publishing 1992) | A918 |
| Y | John Reed, College Physics for Students in Higher Academies and Colleges, pp. 171-172 (George Wahr 1907) | A926 |
| Z | Prakash Mehta, et al., Lasers and Holography, pp. 517-18 (World Scientific 1993) | A1227 |
| AA | J. Upatnieks et al., "Correction of Lens Aberrations by Means of Holograms," Applied Optics, Vol. 5, No. 4, April 1966, pp. 589-593 | A1231 |
| AB | Wendy Horobin, How It Works: Science and Technology, p. 1226 (Marshall Cavendish Corporation 2002) | A1237 |
| AC | James Stewart, Optical Principles and Technology for Engineers, p. 49 (CRC Press 1996) | A1246 |
| AD | Hiroshi Nishihara, et al., Optical Integrated Circuits, p. 180 (McGraw-Hill Book Co. 1989) | A1249 |
| AE | M. Edward Motamedi, MOEMS: Micro-opto-electro-mechanical Systems, pp. 75-79 (SPIE Press 2005). | A1252 |
| AF | U.S. Pat. No. 5,892,597 (Iwata) | A1259 |
| AG | U.S. Pat. No. 4,392,709 (Horner et al.) | A1285 |

| Exhibit | Document | Appendix Page |
|---|---|---|
| AH | P. Hariharan, Optical Holography: Principles, Techniques and Applications, p. 1, 79-84, 145-47, 216-18 (Cambridge University Press, 1996) | A1291 |
| AI | U.S. Pat. No. 4,722,037 (Davis) | A1307 |
| AJ | U.S. Patent No. 5,892,597 (Iwata) | A1311 |
| AK | Keigo Iizuka, Elements of Photonics, p. 82-85 (Wiley-IEEE 2002) | A1337 |
| AL | Gary Waldman, Introduction to Light: The Physics of Light, Vision, and Color, pp. 107-09 (Courier Dover Publications 2002) | A1343 |
| AM | Winston E. Kock, Lasers and Holography, p. 58 (Courier Dover Publications 1981) | A1348 |
| AN | Fred M. Dickey; Laser Beam Shaping, pp. 54-60 (CRC Press, 2000) | A1351 |
| AO | U.S. Patent No. 6,891,683 (Schuster) | A1360 |
| AP | U.S. Patent No. 6,220,713 (Tadic-Galeb et al.) | A1380 |
| AQ | U.S. Patent No. 5,760,969 (Suzuki) | A1411 |
| AR | U.S. Patent No. 5,218,480 (Moskovich) | A1437 |
| AS | U.S. Patent No. 5,822,091 (Baker) | A1453 |
| AT | U.S. Patent No. 5,796,462 (Roffman) | A1479 |
| AU | Joseph Kasper, The Complete Book of Holograms, p. 116-117 ( | A1486 |
| AV | E.G. Loewen, Diffraction Gratings and Applications, pp. 25-31 (Marcel Dekker, Inc. 2007) | A1490 |
| AW | Edmund Optics Catalog | A1496 |
| AX | CVI Catalog | A1499 |
| AY | U.S. Patent No. 3,967,884 (DeJager) | A1500 |
| AZ | U.S. Patent No. 4,105,308 (Owen) | A1504 |

## INTRODUCTION

Defendant the United States and Third-Party Defendant Raytheon Company jointly present the following responses to the Court's July 18, 2008 Order for supplemental claim construction briefing. As directed by the Court, Defendants present their response to each of the Court's eleven (11) questions beginning on a separate page.

**1. Explain the circumstances under which an argument based on a method of manufacturing, made during the prosecution history of a patent, can limit the scope of an apparatus claim in the subsequently-issued patent.**

The Federal Circuit has held that "process steps can be treated as part of a product claim if the patentee has made clear that the process steps are an essential part of the claimed invention." Andersen Corp. v. Fiber Composites, LLC, 474 F.3d 1361, 1375 (Fed. Cir. 2007). In this regard, statements made in distinguishing prior art from the claimed invention can serve to limit apparatus claims to particular methods of manufacture. Id. at 1375 (limiting apparatus claim reciting "structural composite member" to exclude structures formed using a "direct extrusion" because prior art was distinguished for using that method); Ormco Tech., Inc. v. Align Tech., Inc., 498 F.3d 1307, 1315-1316 (limiting claims drawn to orthodontic methods and apparatus to those that use automatic computer determination of final tooth position because prior art was distinguished for allowing human intervention in tooth positioning); Chimie v. PPG Industries, Inc., 402 F.3d 1371, 1384 (Fed. Cir. 2005) (limiting apparatus claims reciting "atomized precipitated silica particulates" to a specific method of manufacturing that involved pulverizing a slurry mixture because prior art was distinguished for not using that process); Nystrom v. Trex Co., Inc., 424 F.3d 1136, 1144 (limiting apparatus claims reciting a "board" to structures formed using the process of cutting from a wood log because prior art was distinguished for failing to disclose boards formed through that process). The statements in the

prosecution history need not amount to an express disclaimer of claim scope; rather the claims can be limited where the patentee consistently describes the invention as incorporating the particular manufacturing process. See, e.g., Nystrom, 424 F.3d at 1144 (limiting term "board" in an apparatus claim to "wood decking materials cut from a log" regardless of whether prosecution history statements represented a clear disavowal of claim scope because "the context reflects Nystrom's consistent use of the term board to refer to wood decking materials cut from a log").

The following paragraphs briefly describe the facts of four recent Federal Circuit cases on this issue — Andersen, Chimie, Ormco, and Nystrom — and discuss how they relate to the facts of this case. Beginning with Andersen, the patents at issue dealt with composite materials made from a combination of wood fiber and a polymer and used to form "composite structural members," (e.g., deck railings). Andersen, 474 F.3d at 1375. The accused infringer in Andersen argued that the claim term "composite structural member" in the asserted apparatus claims should be limited to a particular method of manufacturing that included forming "pellets" of material as part of the manufacturing process. Id. The district court rejected that argument, ruling that the apparatus claims expressed no limitations on the method of manufacture. Id.

On appeal, the Federal Circuit reversed the district court's claim construction because — as Whitney did here — the patentee in Andersen had disclaimed certain methods of manufacturing during the prosecution history of the patent, and because — as Whitney did here — the patentee included in the patent's specification statements suggesting that the method of manufacture was important to achieving the resulting claimed structure. Id. at 1372-1374. For example, the Andersen Court relied on the fact that, in distinguishing the apparatus claims from prior art (the "Miani" reference), applicants stated that the prior art composite is "directly extruded," whereas patentee's "presently claimed composite is prepared by mixing the melted

polymer and wood pulp, forming pelletized material, cooled, then extruded." Id. at 1373 (quoting prosecution history). The Court reasoned, "[b]y distinguishing Miani in that manner, the applicants clearly disclaimed structural members made through a direct extrusion process." Id.

Similarly, in this case, during prosecution of very similar claims in the grandparent application to Whitney's '319 Patent, the Patent Office rejected apparatus claims reciting, among other elements "phase transmission grating means . . . including a plurality of sets of plateaus." Ex. U at A689, lines 5-7. The patent examiner used United States Patent No. 4,637,697 ("Freeman") (Ex. V) to reject the pending claims, pointing out that "Freeman teaches a phase grating that includes a plurality of sets of concentric plateaus." Ex. T at A582. Applicants responded — just as the patentee in the Andersen case had done — by arguing that the structure disclosed in the prior art Freeman reference was different from the claimed structure because of the way the prior art structure was manufactured. In particular, Whitney argued that Freeman's multiple-plateau structures were "manufacture[d] by a 'material cutting technology' such as a 'computer controlled lathe,'" and as a result, "could not approach the degree of resolution required since the surface aberrations in the best diamond-turned quartz element are excessive when one seeks to overcome the limitations of refractive multi-lens optical systems." Ex. T at A610.

Then, in the application that led to the '319 Patent, Whitney again confirmed that "conventional optical methods" (such as mechanical cutting) could not be used to form his claimed multi-plateau rings and that instead photofabrication techniques (e.g., microlithography) would be used:

> Because of its complexity and accuracy requirements, it *cannot be produced by conventional optical methods*, but it can be made within very manageable tolerances by the common techniques of microlithography and thin film technology.

Ex. S at A430 (emphasis added). Just like the patentee in the Andersen case, having distinguished prior art on the basis of the method of manufacturing, Whitney has disclaimed multi-plateau rings formed using mechanical cutting.

The patentee in Andersen attempted to argue — just as Whitney argues here — that because the prior art also was distinguished on several other bases, there can be no disclaimer with respect to the manufacturing based arguments. The court flatly rejected that argument, stating:

> While it is true that the applicants invoked several grounds for distinguishing Miani, that does not undercut the force of the applicants' statement that, unlike the composite of Miani, the composite used to make the applicants' claimed structural members is made from a process that includes a pelletization step. *An applicant's invocation of multiple grounds for distinguishing a prior art reference does not immunize each of them from being used to construe the claim language*. Rather, as we have made clear, *an applicant's argument that a prior art reference is distinguishable* on a particular ground *can serve as a disclaimer of claim scope* even if the applicant distinguishes the reference on other grounds as well.

Andersen, 474 F.3d at 1374 (emphasis added).

The Chimie case provides another example of limiting apparatus claims to a particular method of manufacture based on statements made during the prosecution history. In Chimie, the patentee had obtained patent claims on materials used to reinforce the strength of elastomeric products, such as automobile tires. Chimie, 402 F.3d at 1374. The apparatus claims in that case used the phrase "atomized precipitated silica particulates" to describe these materials, but did not further elaborate on how the materials were formed. Relying on the prosecution history of the

patent, the district court limited the claim phrase "atomized precipitated silica particulates" to a specific method of manufacturing; namely, one that "pulverizes a slurry" and "uses a liquid pressure nozzle." Id. at 1384.

The patentee appealed arguing that the district court erred by limiting the apparatus claims to a particular method of manufacture. Id. Like Whitney argues here, the patentee in Chimie argued on appeal that the manufacturing processes discussed in the patent and the prosecution history applied only to method claims of the patent that were not at issue in the Chimie litigation. Id. The Federal Circuit rejected that argument, noting that the patentee had used the manufacturing process as a basis to distinguish both apparatus and method claims from prior art, and had asserted that the prior art's method of manufacture would not be "capable of ultimately providing [the product] having those particular physical and chemical properties now set forth in all of applicants' newly presented claims.'" Id. (quoting prosecution history). Because the patentee distinguished its apparatus claims based on the method used to manufacture the claimed apparatus, the Chimie Court limited the apparatus claims to a particular method of manufacture. Id.[1]

Just as in the Chimie case, Whitney argued during prosecution that the Freeman prior art reference did not disclose the relevant claim limitation in the apparatus claims ("phase transmission grating means . . . including a plurality of sets of plateaus") because the prior art used a particular manufacturing process (mechanical cutting) that was alleged to be unsuitable for creating the claimed apparatus structure. Ex. T at A610. Just as in the Chimie case, the court

[1] The Chimie Court also found that the apparatus claims were limited to using liquid pressure nozzles to perform the atomization, because the patentee had distinguished prior art ("Brandt") by arguing that Brandt "does not specify the type of nozzle or spray drying technique used in its process, whereas to obtain [patentee's] 'claimed silica particulates, liquid pressure nozzle sprayers must be used.'" Id. (quoting prosecution history).

should limit Whitney's apparatus claims to exclude the disclaimed manufacturing technique (mechanical cutting). The Federal Circuit explained in Chimie the reason for this rule:

> The purpose of consulting the prosecution history in construing a claim is to "exclude any interpretation that was disclaimed during prosecution." . . . Accordingly, "where the patentee has unequivocally disavowed a certain meaning to obtain his patent, the doctrine of prosecution history disclaimer attaches and narrows the ordinary meaning of the claim congruent with the scope of surrender." . . . Such a use of the prosecution history ensures that claims are not construed one way in order to obtain their allowance and in a different way against accused infringers."

Id. (citations omitted).

The Federal Circuit's recent decision in Ormco Tech., Inc. v. Align Tech., Inc., 498 F.3d 1307 (Fed. Cir. 2007), also illustrates circumstances where arguments made in a parent patent application's prosecution history act to limit claims to particular methods of manufacture. Ormco involved a patent drawn to orthodontic methods and apparatus used to straighten teeth. All of the claims in the asserted patents requried determining the final position of teeth, but none of the claims recited that the final position of the patient's teeth must be automatically determined by a computer. Id. at 1316. The Federal Circuit, nonetheless, limited all claims to that particular method of manufacture because of statements in the patent's specification and prosecution history similar to those in Whitney's patent.

For example, in the specification, the Ormco patentee noted that the prior art had "difficulties" with developing automated methods of determining final tooth position and noted that a "primary objective of the present invention" was to provide an "*automated design* and manufacturing system and methods of *automatically designing* custom orthodontic appliances and treating patients therewith." Id. at 1313 (court's emphasis). The Ormco Court noted that the specification did not "suggest or even allow for human adjustment of the computer-calculated

tooth finish positions." Id. The Ormco Court then went on to consider the prosecution history of the parent patent to the patents in suit, and noted that "[t]he inventors thus distinguished [prior art] by emphasizing its reliance on an operator for the decision-making process." Id. at 1315. Even though this language was not directed to any particular claim langauge, the Court found these statements consistent with the way the invention had been described throughout the specification, and limited the claims to the particular method of manufacturing that required using a computer to automatically determine the finish position of the teeth. Id.

Just as the patentee in Ormco had done, Whitney disparaged prior art manufacturing techniques — ones that used mechanical cutting — in both his specification and the prosecution history. Identically to the patentee in Ormco, Whitney stated in his specification that the "invention" required structure formed through a particular fabrication process — photofabrication, as opposed to mechanical cutting. And again, just as the patentee in Ormco had done, Whitney distinguished prior art by arguing that the prior art used a different method of manufacture (mechanical cutting) to form the claimed invention. For all of these reasons, just as the Court in Ormco did, this Court should limit Whitney's claims to exclude mechanical cutting from the scope of these claims.

Finally, the Nystrom decision is important because it confirms that apparatus claims can be limited to method of manufacture even where the statements in the prosecution history do not rise to the level of explicit disclaimer, if the patent as a whole consistently identifies the method of manufacture as part of the invention. In Nystrom, the apparatus claims at issue recited the term "board." During prosecution, the patentee distinguished a prior art reference called "Yashida," stating "YOSIDA [sic] is clearly not concerned with materials made from wood . . . ." Nystrom, 424 F.3d at 1144. The Nystrom Court recognized that this statement did

not necessarily amount to an express disavowal of claim scope with respect to whether the claimed "boards" must be formed by cutting wood materials from a log. Id. at 1144. However, the court limited the apparatus claim term "board" to structures formed by cutting wood materials from a log merely because the patent's written description and its prosecution history reflected a "consistent use of the term board to refer to wood decking materials cut from a log." Id.

The facts of this case are stronger than those of Nystrom. While the patentee in Nystrom merely provided a consistent description of a "board" as something formed by a particular process, Whitney went further, explaining that the multi-plateau rings of the phase plates, according to his *invention*, were formed using a photofabrication process, not by mechanical cutting:

> Phase plates *in accordance with the present invention are fabricated* by preparing photomasks or direct writing[2] to define ring patterns of desired character for each of a succession of deposition or etching steps, preferably arrange in a binary progression.

Ex. A at A12, 5:65-6:1 (emphasis added).

Moreover, Whitney disparaged mechanical cutting in his specification, arguing that structures formed through mechanical cutting were "too rough." Id. at A10, 1:53-57. And while the patentee in Nystrom merely pointed out that the prior art used a different manufacturing method from what was described in the asserted patent's specification, Whitney went further, arguing that the different method (mechanical cutting) disclosed in the prior art Freeman reference was unacceptable when applied to his claimed invention. Ex. T at A610 (arguing that mechanical cutting "could not approach the degree of resolution required since the surface

[2] As explained below with respect to Question No. 7, both microlithographic fabrication using photomasks and direct writing are forms of photofabrication.

aberrations in the best diamond-turned quartz element are excessive when one seeks to overcome the limitations of refractive multi-lens optical systems”).

Because Whitney described his “invention” as being limited to structures formed using a process other than mechanical cutting (i.e., photofabrication), disparaged mechanical cutting in his patent specification, and explicitly disclaimed mechanical cutting in distinguishing the prior art Freeman reference during prosecution, Whitney’s claims are limited to structures formed through a method other than mechanical cutting.

**2. In defining the term "Bragg Regime" in claim 37, both parties used a variation of the phrase "into a single order." Explain the meaning of the phrase "into a single order."**

The phrase "into a single order" means "into either the transmitted or diffracted beam." The ordinary meaning of this phrase, as understood by a person with ordinary skill in the field of optics, would be based on the same references identified with respect to the discussion of the claim term "Bragg regime" in the Defendants' Responsive Brief on Claim Construction. See Defs. Brief at 38-40.

A short discussion of diffraction in diffractive gratings is helpful to understanding the phrase "into a single order." When light hits a diffractive grating, the light is diffracted in all directions. See, e.g., AX (E.G. Loewen et al., Diffraction Gratings and Applications, 1997). In many of the directions, the diffracted light from one grating groove is cancelled out when it collides with diffracted light from other grooves. See id. There are, however, a unique set of angles where the light is in phase for each diffractive grating. The grating equation identifies these unique angles:

$$\sin \theta_m = \sin \theta_i + m(\lambda/d); \text{ where } m = 0, \pm 1, \pm 2, \ldots$$ [3]

See id. In the equation above, $\theta_i$ is the angle of the incident light, $\lambda$ is the wavelength of the light, d is the separation of the grating grooves, and $\theta_m$ is the angle of the diffracted light. The variable "m" is an integer, and the diffracted angles where m is an integer are known as the diffraction orders. See id. Thus, the diffracted angle where m = 0 is known as the zero order, the diffracted angle where m = 1 is known as the first order.

The zero and first diffraction orders are of particular importance for diffractive gratings. In situations where m = 0, the grating equation mathematically simplifies to

[3] The grating equation can also be written as: $d(\sin \theta_m + \sin \theta_i) = m\lambda$; where m = 1, ±1, ±2, ....

$$\sin \theta_m = \sin \theta_i$$

indicating that the angle of the diffracted light is equal to the angle of the incident light. Since the incident and diffracted angles are identical, the light beam in a zero diffraction order is also known as the transmitted beam. See Ex. P at A188 (M.G. Moharam et al., Criteria for Raman-Nath Regime Diffraction by Phase Gratings, 32 Optics Communications 19, 20 (1980) (Moharam II)) (discussing diffraction orders in the context of Raman-Nath diffraction). The light beam in the first diffraction order is known as the diffracted beam. See id. (Moharam labels the light beam in the first diffraction order as the "fundamental diffracted beam").

In fact, the Bragg regime only applies to the first two diffractive orders. As stated by Kogelnik, only the zero and first diffraction orders – the transmitted and diffracted beams – can satisfy the Bragg condition. See Plaintiffs' Ex. 15 at 2911 (Herwig Kogelnik, Coupled Wave Theory for Thick Hologram Gratings, 48 Bell System Tech. J. 2909 (1969)) ("Only two significant light waves are assumed to be present in the grating . . . the other diffraction [waves] violated the Bragg condition strongly and are neglected."); see also id. at 2941 ("[O]nly the diffraction orders which obey the Bragg condition at least approximately are retained in the analysis. The other diffraction orders are neglected."). Similarly, in the Moharam paper cited by Plaintiffs, Moharam limits his definition of Bragg regime to the zero and first diffraction orders:

> The Bragg regime may alternatively be defined as the diffraction situation where, to within some error limit, only two waves (the transmitted and diffracted waves) are present. This may be referred to as the *Two-Wave Criterion* for Bragg regime diffraction.

See Plaintiffs' Ex. 13 at 15 (M.G. Moharam et al., Criteria for Bragg Regime Diffraction by Phase Gratings, 32 Optics Communications 14 (1980) (Moharam I)); see also Moharam II at 20

(equating the zero and first diffraction orders with the transmitted and diffracted beams, respectively). The fact that the Bragg regime only applies to the first two diffractive orders also is shown in the Clemens paper, a reference cited by the parties in support of their respective initial constructions of "Bragg regime":

> The approximate theory of Kolgelnik (1969) is extremely useful for developing intuition about how gratings with different parameters behave. Kogelnik derived closed solutions to the wave equations **retaining only the 0th and 1st transmitted orders**. His formulae yield sinusoidally modulated efficiencies with maxima **up to 100% in a single order**.

Plaintiffs' Ex. 14 at 3 (J. Christopher Clemens et al., Volume Holographic Gratings, Goodman Laboratory Technical Report) (emphasis added). Finally, as noted previously, the light beams in the zero and first diffraction orders are known as the transmitted and diffracted beams, respectively. See Ex. P at A188 (Moharam II).

Accordingly, all of the previously cited extrinsic evidence demonstrates that the ordinary meaning of "into a single order" means "into either the transmitted or diffracted beam" in this particular context.

**3. Under Plaintiffs' proposed construction of the term *"lens,"* can a *"lens"* diffract light?**

At the June 24, 2008 Claim Construction Hearing (the "Claim Construction Hearing"), Plaintiffs conceded that a "*lens*" is properly construed as: (i) being a substantially transparent piece of material; (ii) having two opposite surfaces; and (iii) having at least one curved surface. Ex. W at A846, line 16 - 89, line 24. In Plaintiffs' Opening Brief on Claim Construction, Plaintiffs characterized the surfaces of the "lens" as "*smooth*" (regular). Pl Op. Br. at 5. And Plaintiffs' sole source of evidence on the meaning of "lens" defined that term as "an optical system bounded by two or more *refracting* surfaces having a common axis." Id. at 20-21 (quoting Francis Weston Sears, Optics 1949). Defendants explicitly pointed out in their Responsive Brief on Claim Construction that Plaintiffs agreed that the opposite surfaces of the claimed "lenses" are "regular" — the lenses refract light. Def. Resp. Br. at 23. Plaintiffs' Reply Brief on Claim Construction acquiesced in that statement. Pl. Rep. Br. at 11-12.

Ignoring these admissions, Plaintiffs — for the first time and without offering any support — argued during the claim construction hearing that the opposing surfaces of the claimed refractive "lenses" need not be "regular." Through this argument, Plaintiffs seek to define the claimed "lenses" — all of which are explicitly characterized by the claims as "refractive" — as an element that diffracts, rather than refracts light.

"Diffraction" refers to the scattering of light that occurs when light passes by a sharp edge of an obstacle or through a hole in the obstacle. Ex. X at A924-925. ("In general diffraction occurs when waves pass through small openings, around obstacles, or by relatively sharp edges."). Diffraction causes light to bend around the edge of the obstacle. Id. at A925; Ex. AU at A1489 ("Diffraction refers to the bending of light around any obstacle.")




*Figure 9.3. Because of diffraction the wavefronts bend into what would otherwise be the shadow regions.*

*Figure 9.5. Single-edge diffraction.*




Id. at 116, Fig. 9.3; 117, Fig. 9.5.

By contrast, "refraction" refers to a phenomenon that occurs when light passes from one medium *into* another. Ex. X at A920; Ex. Y at A1117. As light exits the first medium and enters the second, a difference in the refractive indices[4] of the two mediums causes a change in the light's direction at their boundary. Ex. X at A922; Ex. Y at A1117.




**Figure 35.9** (a) When the light beam moves from air into glass, its path is bent toward the normal. (b) When the beam moves from glass into air, its path is bent away from the normal.

[4] The "refractive index" or "index of refraction" of a substance is a measure of how fast light travels through the medium relative to the speed of light in a vacuum. Ex. X. at A922.

Ex. X at A921, Figs. 35.9(a)-(b).[5]

Because Plaintiffs' construction of "*lens*" does not specify that the opposing surfaces are regular, it attempts to encompass structures that diffract light with irregular surfaces. But the claims require "*refractive*" optical elements (*see* Claim 42 reciting "*a plurality of* *refractive* *lenses*" and Claim 37 reciting "a number of *refractive* elements arranged as a lens system"). In the context of these claims, the term "lens" is a refractive element, not one that performs the opposite process of diffraction. The Court should reject Plaintiffs' attempt to read the word "refractive" out of these claims through an overly broad definition of "lens."

---

[5] If multiple different pieces of material (with different indcies of refraction) were aligned side-by-side, the resulting combination of materials also could diffract light, even if the surface of the combined materials were regular. The parties' construction of lens assumes *a* material (one index of refraction throughout), rather than a combination of materials with differing indicies of refraction. A single material with regular surfaces will refract, not diffract light.

**4. Under Defendants' proposed construction of the term *"lens,"* can a *"lens"* diffract light?**

Defendants' construction of the term "*lens*" is "[a] piece of transparent material with opposite *regular* surfaces either or both of which are curved, by means of which light rays are focused to form an image." Def. Resp. Br. at 23. As discussed above, the regular surfaces of the claimed "lens" allow light to pass through the lens and be refracted, as opposed to irregular surfaces which have an opposite effect of diffracting the light. Ex. X at A922; Ex. Y at A1117; Ex. X at A924.[6] Accordingly, Defendants' definition of "lens" recognizes the explicit claim requirement that the "lenses" are "*refractive,*" and properly excludes diffraction from the claimed "refractive" lenses.

Plaintiffs got it right the first time, when they conceded in their claim construction briefing that the surfaces of the claimed "lenses" are "smooth" and operate to "refract" light. See Plaintiffs' Opening Brief on Claim Construction at 5 and 19-21. In fact, the intrinsic evidence only supports Defendants' construction specifying that the element has regular surfaces through which light is refracted, not diffracted. For example, all of the figures in the '319 Patent that illustrate an element referred to as a "lens," show the lens as having two regular, smooth surfaces. Ex. A. at A2, Fig. 1 (collimating lens group 58 and objective lens group 62); A5, Fig. 7 (lenses 95); A6, Fig. 8 (lens 156, lens 164, and lens 192); A8, Fig. 12A (first lens element 234), Fig. 12B (first lens element 234 and second lens element 240), and Fig. 12C (lens elements 234 240, 242, 244, and 248 and image reduction lens set 252); A9, Fig. 14 (spherical lens 274), Figs. 15 and 16 (cylindrical lens set 286, 288). The lenses illustrated by the figures of the '319 Patent

---

[6] While it is possible for a light beam to intersect with an outer edge of a lens and experience diffraction around that outer edge, the '319 Patent deals with light passing through the body of the refractive lenses, not around its outer edges. Ex. AU at A1489.

have regular surfaces and, therefore, refract light. They do not have irregular surfaces and, therefore are incapable of diffracting light.

Indeed, the only element the '319 Patent identifies as diffracting light is "phase plate 60." See Ex. A at A11, 4:20-23 ("Wave retardation is effected by a transmission grating[7] having segments defined by multiple plateaus varying by fractional wavelength increments that provide high efficiency diffraction."); Id. at A12, 6:34-35 ("Different sets of diffractive or reflective rings are also advantageously deployed on the phase plates."). The '319 Patent repeatedly distinguishes this diffractive element from the refractive lenses included in the described systems. See, e.g., Id. at A11, 3:52-55 ("The same principles upon which high resolution optical imagery or readout can be achieved by *combinations of phase gratings and optical refractive elements* can also be used in other optical applications.") (emphasis added); A15, 11:50-54 ("The *lens assembly comprises* spherical quartz elements *while the phase plate 60 comprises* a wavelet phase delay and redirection system . . . .") (emphasis added); A16, 13:36-39 ("The phase plate 60 more specifically functions . . . in cooperative fashion with the refractive elements."); A21, 23:60-62 ("The phase plate 262 design corrects spherical aberration in the refractive elements of the optical system . . . .") (emphasis added); A21, 24:23-27 ("[T]he axicon effect can be achieved utilizing an illuminator 270 in conjunction with a phase plate 272 and a spherical lens 274 *(more than one refractive element* can be utilized if desired [i.e., "phase plate 272" is not a second refractive element]).") (emphasis added); A21, 23:2-4 ("The *phase plate* 60 is *first placed* at the critical aperture of the system so that *all of the lens elements* can *then be positioned* and centered relative to it.") (emphasis added).

---

[7] In the described systems, "phase plate 60" represents the transmission grating. See Ex. A at A15, 12:9-10 ("[A] feature of the present invention is that the transmission grating represented by the phase plate 60 . . . ").

Defendants' construction is consistent with this intrinsic evidence and is the only one that adheres to the claim language as a whole, which mandates "*refractive*" lenses — elements with *regular* surfaces that refract, rather than diffract light.

**5. Can a lens that diffracts light be used to form an image?**

As discussed with respect to Questions 3 and 4, a "*lens*," in the context of these claims refracts light, rather than diffracting it. Defendants therefore interpret this question as asking whether, more generally, an optical element that diffracts light can be used to "form an image." In response, Defendants note that an optical element that diffracts light, such as a phase plate, can be used to alter light passing through it and thereby "form an image" that is different from the light before it passed through the diffractive element. For example, the following figures illustrate an image formed by (a) light passing through an aberrated lens; and (b) light passing through the aberrated lens and a diffractive corrector plate:



(a)



(b)

Fig. 5. The image of a transparency (a) using the lens alone, and (b) using the lens and corrector plate together.

Ex. AA at A1234, Fig. 5.

As can be seen above, the image formed using only a lens (in Figure 5(a)) has a different appearance than the image formed using a combination of a lens and the diffractive element (in Figure 5(b)). As a general proposition, the diffractive element does assist in "forming" the resulting image.

### 6. Can a lens with a "negative focus" be used to form an image?

Yes, a lens with a negative focus can be used to form an image. Eyeglasses that correct nearsighted vision are one common example of lenses with a negative focus being used to form an image.

The "focal length" of a lens is the distance between the lens and an image it forms of an object located infinitely far from the lens. Ex. AB at A1241. Converging lenses (such as bi-convex and plano-convex lenses) have a positive focal length, while diverging lenses (such as bi-concave and plano-concave lenses) have a negative focal length.[8] Id. Light rays illuminating an object located infinitely far from the diverging lens will appear, to an observer on the opposite side of the lens, to originate from a point located a finite distance behind the diverging lens. Ex. AB at A1241. The focal length of a diverging lens specifies this distance, with the negative focal length simply indicating that the point will be behind the lens (i.e., on the same side as the illuminated object). Ex. AB at A1241. Thus, when light illuminating an object passes through a diverging lens, the lens forms an image of the object on the same side of the lens as the object. Ex. AB at A1241. Because it is located behind the lens, such an image is referred to as a "virtual image." Ex. AB at A1241. The illustration below shows the virtual image formed by a plano-concave lens:

[8] Because of these relationships, converging and diverging lenses are sometimes referred to as "positive" and "negative" lenses, respectively. Ex. AB at A1241.



Figure 4.5 Virtual image of a real object formed by a negative lens.

Ex. AC at A1248, Fig. 4.5.

Consequently, lenses with a negative focal length can be used to form an image by focusing light. And, contrary to Plaintiffs' assertions (e.g., Pl. Op. Br. at 20), Defendants' construction of "*lens*" does not exclude diverging lenses, as diverging lenses focus light to form a virtual image.

**7. Does the term "holographic element" refer to an element formed by a certain process, or an element possessing certain properties affecting the behavior of light? Explain both possible interpretations.**

The term holographic element describes an element that is formed by a particular process — photofabrication. Photofabrication refers to a number of techniques for fabricating optical components by exposing photosensitive material to light. In the specific case of holography, the relevant photofabrication techniques involve optically recording an interference pattern that is formed between a reference light beam and a light beam reflected from an imaged object. In the context of the '319 Patent, the resulting "phase plate comprising a holographic element" exhibits the property of having the ability to change the phase of the incoming light beam. That property, however, results from the structural characteristics of the "phase plate," not from the "holographic" process used to fabricate that structure.

The intrinsic evidence of the '319 Patent clearly indicates that "*holographic*" refers to the manner in which an optical element is made. For example, several references that were cited during prosecution of the '319 Patent indicate that the term "*holographic*" refers to the technique used to make an optical element. See Ex. V at A752, 1:39-43 ("[D]iffractive optical devices with concentric zones have received the names Fresnel Zone Plates (FZPs), Phase Zone Plates, Kinoform Lenses, Thin Film Lenses, *Holographic Optical Elements (HOEs)*; generally the name *relates to the method of manufacture*.") (emphasis added); Id. at A752, 2:11-14 ("This fundamental requirement for accuracy in the sub-micron region has generally restricted *fabrication methods* to those using optics and photo-sensitive materials *such as holography*. . . ."); Ex. I at A98 ("[T]he gratings are *made* analogically - *by holography* - allowing for the exact geometrical aberration of the lens to be corrected") (emphasis added); Id. ("The solution we used *to make* the correcting pupil again consists of a two-step *holographic*

*process* outlined in Figs. 7 and 8") (emphasis added); Ex. E at A50 ("The aberration-corrected concave diffraction gratings have heretofore been *produced by a method which is based upon the holography technology* and by a mechanical method.") (emphasis added). Because these references were cited during prosecution of the '319 Patent, they are intrinsic evidence. Kumar v. Ovonic Barrery Co., 351 F.3d 1364, 1368 (Fed. Cir. 2003); see also V-Formation, Inc. v. Benetton Broup SpA, 401 F.3d 1307, 1311-12 (Fed. Cir. 2005).

Additionally, these same references indicate, not only that "*holographic*" refers to specific fabrication processes used to form an optical element, but that these fabrication processes involve photofabrication. See Ex. V at A752, 2:11-14 ("This fundamental requirement for accuracy in the sub-micron region has generally *restricted fabrication methods to those using optics and photo-sensitive materials* such as holography . . . .") (emphasis added); Ex. I at A99 ("Figure 7 [shows] *[r]ecording of images* (*f*) and $F_0$ on auxiliary hologram $H_a$ *using double exposition holographic technique* . . . .") (emphasis added); Id. ("Second, hologram $H_a$ . . . reconstructs stigmatic ( $\Sigma_0$) and aberrating waves ( $\Sigma$), the *interference of which will be recorded on holographic plate* $H_e$ . . . .") (emphasis added). Thus, the intrinsic evidence supports a construction that limits "*holographic element*" to optical elements made by photofabrication.

Furthermore, construing "*holographic element*" in this manner is consistent with the specification, as the only techniques described for forming the multi-plateau ring patterns of the claimed "*phase plate*" are photofabrication techniques. Specifically, the specification describes two photofabrication techniques that can be used to form the described phase plate - direct writing and photolithography. Ex. A at A12, 5:65-68 ("Phase plates in accordance with the invention are fabricated by preparing photomasks or direct writing to define ring patterns . . . .").

Photolithography is a photofabrication process in which an opaque mask is placed over a photosensitive material, or "photoresist," formed on a substrate. See, generally, Ex. A at A20, 21:36-22:39; Figs. 9A-9F; Figs. 10A-10F. The mask includes a pattern of openings that leave a selected portion of the photosensitive material uncovered. *Id.* at A13, 8:1-3; A20, 22:51-54. With the mask in place, the substrate is exposed to light. *Id.* at A20, 21:53-61. Depending on whether a negative mask or a positive mask is used, either the exposed or the unexposed portions of the photoresist are removed. *Id.* at A20, 21:53-56. Material may then be deposited on (as in Figs. 9A-9F) or chemically etched[9] from (as in Figs. 10A-10F) the areas of the substrate that no longer contain photoresist. *Id.* at A20, 21:63-67; 22:18-24. By designing the mask to expose selected areas of the photoresist, light can be used to form patterns in the photoresist that are then transferred to the substrate by deposition or chemical etching. This process can be repeated as appropriate to create the multi-plateau patterns that form the phase plate. *Id.* at A20, 21:68; 22:18-24.

Similarly, direct writing is a photofabrication process in which a laser records a pattern directly on a light-sensitive layer without the use of a mask. See, generally, *Id.* at A13, 7:8-30; A17, 16:60- A20, 22:17; Fig. 8. More specifically, in the direct writing process described by the '319 Patent, a "writing laser beam" is directed at layer of photoresist formed on a substrate. *Id.* at A13, 7:8-13; A19, 20:54-57 (describing alignment of the substrate and laser after a layer of photoresist has been applied to the substrate). This substrate is then rotated relative to the laser beam, allowing the laser to write a precise pattern in the photoresist as the substrate rotates. *Id.* at A19, 20:57-66. Exposure to the laser hardens, or "fixes," the patterned photoresist. *Id.* at

[9] In photolithography, etching refers to a chemical process — not a mechanical one — for removing material. See Ex. AD at A1251.

A20, 21:4-7. Unfixed photoresist is subsequently washed from the substrate. *Id.* at A20, 21:4-7. As described above, material may then be deposited on or etched from the portions of the substrate no longer covered by the photoresist to create the multi-plateau patterns that form the phase plate. *Id.* at A20, 21:7-15.

Apart from these two photofabrication techniques, the '319 Patent describes no other process for fabricating the multi-plateau rings of a "*phase plate*." At the Claim Construction Hearing, Plaintiffs incorrectly argued that the '319 Patent supports other forms of manufacture, such as "scribing" (see Ex. W at A809, lines 7-15), but this argument is based on a misreading of the '319 Patent. The only time "scribing" or "cutting" is mentioned in the '319 Patent is in reference to the chrome "outer fiducial rings 151" or "inner fiducial rings 193," not the "multi-plateau rings 68" that form the claimed "*phase plate*." See Ex. A at A12, 6:34-39; A18, 18:7-16; A19, 19:25-28; A19, 19:25-28; A19, 20:43-45. These chrome fiducial rings are then used to align the substrate to the direct writing laser, so that the direct writing laser can form the multi-plateau rings. *Id.* at A18, 17:65-67 ("*For final precise, dynamic, positioning* the system deflects the laser beam relative to fiducial rings 151 that are located at the outer periphery of the phase plate 60.").

Thus, the '319 Patent presents scribing only as a preliminary step that may be performed to prepare a substrate for use in a photofabrication process. *Id.* at A19, 20: 41-45. ("A typical *direct writing* sequence on a phase plate 60 *commences after initial surface preparation* of the phase plate 60 and incorporation *of the outer fiducial chrome rings* 151, either by a separate photolithographic sequence or *by cutting* when on the air spindle 110.) (emphasis added). Scribing is not used to create the multi-plateau patterns that form the "*phase plate*" and is not an alternative to the described photofabrication techniques. To the contrary, the specification

explicitly indicates that the fiducial rings (although possibly scribed themselves) allow the phase plate to be accurately positioned for a photofabrication (i.e., direct writing) process that fabricates a phase plate with greater precision than could be achieved if the "multi-plateau rings 68" were formed by mechanical means, such as scribing. *Id.* at A18, 18:12-18. Thus, contrary to Plaintiffs' assertions, limiting the construction of "*holographic element*" to an element formed by a photofabrication technique is consistent with the limitations explicitly touted by the '319 Patent itself.

In addition to the intrinsic evidence noted above, several extrinsic authorities confirm that the term "*holographic*" refers to an element manufactured by photofabrication, including:

> MOEMS: Micro-opto-electro-mechanical Systems - "[Holographic optical elements] . . . can be *considered as [diffractive optical elements] fabricated by interference*." Ex. AE at A1255 (emphasis added).
>
> U.S. Pat. No. 5,892,597 - "A holographic optical element is *a diffraction grating* having a periodic structure *formed on a hologram recording material* . . . ." Ex. AF at A1277, 1:21-23 (emphasis added).
>
> U.S. Pat. No. 4,392,709 - "Holography is a *technique for recording* and later reconstructing the amplitude and phase distribution of a coherent wave disturbance. Generally, the technique utilized for providing a hologram is accomplished *by recording the pattern of interference* between an unknown wave of interest and a known wave." Ex. AG at A1288, 1:16-21 (emphasis added).
>
> Optical Holography: Principles, Techniques and Applications - "The unique characteristic of *holography* is the idea of *recording the complete wave field*, that is to say, both the phase and the amplitude of the light waves scattered by an object." Ex. AH at A1292-a (emphasis added).

Thus, the intrinsic and extrinsic evidence show that "*holographic*" refers to the process by which an optical element is made, and specifically, to a photofabrication process. As a result, "*holographic element*" is properly limited to optical elements made by a photofabrication technique.

**8. Are there multiple ways to manufacture "holographic elements?" I.e., is photofabrication the only method for creating "holographic elements?"**

While there are multiple ways to manufacture holographic elements, all of the techniques involve some form of photofabrication. For example, various different light sources (see, e.g., Ex. AH at A1293-A1298) and recording mediums (see, e.g., Id. at A1299-A1300) may be used to record a "*holographic element*." Additionally, the interference pattern used to form the "*holographic element*" may be created by generating two interfering beams of light or the interference pattern may be simulated by a computer and projected onto the recording medium. See, e.g., Ex. AJ at A1329, 1:28-38.

Nonetheless, regardless of the specifics of the particular process used, a "*holographic element*" is made by some form of photofabrication. To the extent that any of the references cited by Plaintiffs and Defendants have described a manner of making "*holographic element[s]*," they have all described photofabrication techniques. The '319 Patent, in particular, describes two photofabrication techniques, photolithography and direct writing, as the only manner of making the phase-changing patterns of a "*phase plate*." Apart from photofabrication techniques, no other processes for making "*holographic elements*" have been described in the intrinsic or extrinsic evidence submitted by either side. As a result, the extrinsic and intrinsic evidence provide no alternative methods of making "*holographic element[s]*" apart from photofabrication.

**9. Does the "phase plate comprising a holographic element" operate to change light in the same way that a "phase plate" does, as construed by Defendants?**

Yes, once fabricated, the "phase plate comprising a holographic element" operates in a similar way to other diffractive elements, including the "phase plate" as construed by Defendants. When an interference pattern is captured in an optical recording medium using holographic techniques, the holographic pattern may have features with varying heights and depths. As a result, holographic elements may change incident light in the same ways that a "*phase plate*" does, i.e., by introducing phase delay in the light.

For example, J. Upatnieks, "Correction of Lens Aberrations by Means of Holograms," describes a process for making a holographic corrector plate for an aberrated lens. Ex. AA at A1231. This process involves transmitting light through the aberrated lens onto a holographic recoding medium that is illuminated by a collimated beam. *Id.* at A1231-A1232, Fig. 1. The interference pattern created between the two beams of light forms a hologram on the holographic recording medium and, as Upatnieks indicates, "the hologram thus constructed behaves like a diffraction grating[.]" *Id.* at A1231. The holographic corrector plate can then be used to correct images produced by the lens, similar to the "*phase plate*" described by the '319 Patent. *Id.* ("Light from the object is diffracted by the hologram grating, the appropriate diffracted order is passed through the lens, and an image free from spherical aberration is formed by the combination at plane $P_4$."). Moreover, Upatnieks notes that "[t]he hologram corrector plate bears a similarity to the zone plate." *Id.* at A1233. "Indeed, if the sphericity of the two beams that produce the corrector plate do not cancel, *the hologram corrector plate* will have focal power and *will itself be a Fresnel zone plate*." *Id.* (emphasis added). Thus, a holographic

element can be formed to operate on light in the same way as a zone plate or "*phase plate*."[10] See also Ex. AM at A1350 ("[T]he optical zone plate is closely related to a hologram because *the photographic record of the interference pattern* of spherical waves and a set of plane reference waves *are forms of zone plates*.") (emphasis added).

As a result, holographic elements can introduce phase delay in a similar fashion to a "*phase plate*." Thus, if properly construed, "*phase plate comprising a holographic element*" limits the "*phase plate*" element only by adding a requirement as to the technique used to fabricate the holographic element. Moreover, a construction of "*phase plate comprising a holographic element*" that does not include a limitation as to the technique used to fabricate the element would read "*holographic element*" out of the claim.

[10] The '319 Patent indicates that a zone plate is a binary (two-level) phase plate. Ex. A at A11, 3:4-8 ("[U]sing a single thin film leads to the creation of a binary phase grating, which might also be called a 'phase reversal zone plate'. This type of grating can only function to provide alternation of phase delays between two values.").

**10. In Plaintiffs' proposed construction of "holographic element," is there any limitation as to how the "holographic element" is manufactured?**

No, Plaintiffs' proposed construction of "*holographic element*" does not limit the way in which the "*holographic element*" is manufactured. In fact, Plaintiffs' construction of "*holographic element*" results in a definition for "*phase plate comprising a holographic element*" that is essentially the same as Plaintiffs' construction of "*phase plate*." As a result, Plaintiffs' construction improperly reads "*holographic element*" out of the claim limitation.

More specifically, Plaintiffs define a "*phase plate*" as "[a] transparent plate that changes the relative phase of the incident light." Pl. Op. Brief at 23. Similarly, Plaintiffs define "*phase plate comprising a holographic element*" as "an optical plate whose optical thickness or index of refraction varies to change the phase of a beam." *Id.* at 24. Plaintiffs' construction of "*holographic element*" differs from their construction of "*phase plate*" only in that the construction of "*holographic element*" specifies the manner in which the plate changes the phase of incident light — either by varying its thickness or by varying the index of refraction. These two alternatives, however, cover the only two ways in which the plate could change the phase of incident light. See, e.g., Ex. AN at A1358 ("[T]ime delay can be introduced by making the lens out of a material that has a *different index of refraction* than the medium that the rays are traveling in, and by *varying the thickness of the lens*.") (emphasis added). Thus, Plaintiffs' construction of "*phase plate comprising a holographic element*" simply lists all the possible alternatives by which a plate could change the phase of incident light.

By ignoring the process limitations imposed by the term "holographic element" and by simply listing every possible way of changing the phase of a beam, Plaintiffs attempt to read the phrase "holographic element" out of the claims. This is improper. Every word must be given

weight in construing a claim limitation. Bicon, Inc. v. Straumann Co., 441 F.3d 945, 950 (Fed. Cir. 2006); see also Unique Concepts, Inc. v. Brown, 939 F.2d 1558, 1563 (Fed. Cir.1991) ("When the language of a claim is clear, as here, and a different interpretation would render meaningless express claim limitations, we do not resort to speculative interpretation based on claims not granted."). The Court should reject Plaintiffs' attempt to read "holographic element" out of the claims and should construe that term to require the use of a photofabrication technique for its manufacture.

**11. Define the term "asphere" (not "aspheric," "aspheric surface," "spherical," "spherical aberration," etc.). Give an example of something that is an asphere.**

Defendants respectfully submit that the term "asphere" encompasses: (1) a non-spherical surface on an optical element; and (2) the optical element containing a non-spherical surface. As demonstrated by the relevant intrinsic and extrinsic evidence, persons of skill in the art use the term for both of these objects. What remains constant, however, is that the purpose of the asphere is to correct for at least spherical aberrations.

Intrinsic and extrinsic prior art support the conclusion that "asphere" is both a non-spherical surface and an optical element with a non-spherical surface. In support of defining "asphere" as "a non-spherical surface on an optical element," U.S. Patent No. 3,910,685 to DeJager, issued October 7, 1975, claims a three-element objective lens with "aspheres" on the surfaces of the elements. See Ex. AY at A1502, 1:34-43. Similarly, U.S. Patent No. 4,105,308 to Owen et al., issued August 8, 1978, uses the term "asphere" interchangeably with "aspheric surface." See Ex. AZ at A1510, 1:63 - 2:16.

On the other hand, the Swanson patent clearly defines "asphere" as the optical element containing a non-spherical surface. The Swanson specification discloses that a lens can be turned into an asphere by creating a selected number of plateaus through photolithography on the rear surface of the lens. See Ex. G at A76, 6:10-12. As noted in the Defendants' Claim Construction Brief and during argument, the Swanson patent was cited as an anticipatory reference by the examiner against Whitney, and the patent is part of the intrinsic record. See generally Defs. Brief at 9; Ex. W at A788-89. Several other technical references use "asphere" in this way. See, e.g., Ex. AO at A1368, 4:52-55 ("This lens arrangement 21 has 31 lenses, nine of which have at least one aspheric lens surface. This type of lens is also referred to as an

asphere."); Ex. AP at A1401, 5:29-33 ("The first lens unit 14 may include at least one aspherical surface or element (i.e., an asphere). For example, in the exemplary embodiment shown in FIGS. 1-3, the lens elements 26 and 30 can be aspheres having aspheric surfaces 26A and 30A, respectively."); Ex AQ at A1422, 2:33-37 ("Aspherical lenses ('aspheres') have also been used to construct compact, high-power zoom lenses. Aspheres offer advantages in the way of aberration correction, permitting a relatively high-power zoom lens without the need for additional lens groups.").

Notably, these prior art references state that the purpose of the asphere -- whether it is a non-spherical surface or a non-spherical optical element -- is to correct, at the very least, spherical aberrations. DeJager claims that

> Incorporation of an aspheric surface is particularly useful in a high relative aperture lens, because **it permits a better correction of spherical aberration** than is otherwise obtainable. In the design of the present invention, **the improved spherical aberration correction and the reduction of other aberrations … are achieved by the use of aspheres**.

Ex. AY at A1502, 2:12-19 (emphasis added). Similarly, Owen discusses prior art aspheres at length, and acknowledges that "Ashperic surfaces … are well known in optical systems for correcting spherical aberration." Ex. AZ at A1510, 1:63-65. Swanson, while discussing the method of creating his lithographic diffractive element, notes that "[t]he disclosed technique can not only correct for spherical aberrations in imperfect optics but for chromatic aberrations as well." Ex. G at A76, 6:17-19.[11]

---

[11] See also Ex. AO at 1367, 1:48-51 ("Through the use of an asphere in the fifth lens group, which is of positive refractive power, it is possible to correct aberrations associated with a large numerical aperture, in particular spherical aberrations."); Ex. AR at A1445, 3:68-4:6 ("To provide correction for spherical aberration of the lens, the second unit preferably includes one or more aspherical surfaces. These one or more aspherical surfaces can also be used to achieve a

These statements are completely in accord with Whitney's statements in the prosecution history. In a report submitted to the examiner, Whitney states that "the phase plate can be considered to be an aspheric surface of weak power." Ex. S at A428-30. Elaborating in a later section of the report, Whitney states that the phase plate "can … completely correct the spherical aberration function." Id. at A441. These statements, together with the specification excerpts previously identified by the Defendants' in their Claim Construction Brief, demonstrate that Whitney intended "asphere" to mean a lens with a non-spherical surface that corrects spherical aberrations. See Defs. Brief at 32; Ex. A at A16, 13:36-44, 14:48-56; Ex. A at A17, 15:58-61.

Aspheres are used in high-power zoom lenses, and in the optics equipment in DVD and CD players. Aspheres can be parabolic, elliptical, and conic optical elements, such as parabolic and elliptical lenses. See, e.g., Ex. AS at A1473, 8:44-47 ("The anterior surfaces of lens elements 13 and 14 are both aspheric, with element 14 being a conic section asphere with a convex elliptical surface."); Ex. AT at A1484, 5:29-31 ("Different embodiments of aspheres for use in the present invention include all conic aspheres, including ellipses, parabolas, and hyperbolas."). Additional examples of aspheres can be found in recent promotional literature from two optics companies. See Ex. AW at A1496-98; AX at A1499. In both examples, the optics companies use the term "aspheres" to mean "non-spherical optical element," and both promote the use of aspheres to correct spherical aberration. See id.

---

high level of correction of spherical aberration . . . ."); Ex. AQ at A1422, 2:34-38 ("Aspheres offer advantages in the way of aberration correction, permitting a relatively high-power zoom lens without the need for additional lens groups.").

Accordingly, the Court should interpret “asphere” to include both: (1) a non-spherical surface on an optical element; and (2) an optical element containing a non-spherical surface. Under either definition, the function of the asphere is to correct for at least spherical aberrations.

## CONCLUSION

In light of the answers above, the disputed claim terms of the ‘319 Patent should be construed as set forth by Defendants in the Joint Claim Construction Statement, in Defendants’ Response Brief on Claim Construction, and during the Claim Construction Hearing.

Respectfully submitted,

GREGORY G. KATSAS
Assistant Attorney General

JOHN J. FARGO
Director

s/Scott Bolden________________________
SCOTT BOLDEN
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, DC 20530
Telephone: (202) 307-0262
Facsimile: (202) 307-0345

Counsel for the United States

OF COUNSEL:
KIRBY W. LEE
Attorney

Dated: August 8, 2008

Respectfully submitted,

Dated: August 8, 2008

William S. Foster, Jr.
BAKER BOTTS L.L.P.
The Warner
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2400
Tel.: (202) 639-1321
Fax: (202) 639-1185

Kevin J. Meek
Douglas M. Kubehl
BAKER BOTTS L.L.P.
2001 Ross Avenue
Dallas, Texas 75201-2980
Tel.: (214) 953-6680
Fax: (214) 661-4680

Counsel for Raytheon Company