# UNITED STATES
# COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| THEODORE WHITNEY, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Docket No.: 06-601C |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

Pages: 1 through 159

Place: Washington, D.C.

Date: June 29, 2008

**HERITAGE REPORTING CORPORATION**
*Official Reporters*
1220 L Street, N.W., Suite 600
Washington, D.C. 20005-4018
(202) 628-4888
hrc@concentric.net

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| THEODORE WHITNEY, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Docket No.: 06-601C |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

Courtroom 4, Room 501
National Courts Building
717 Madison Place NW
Washington, D.C.

Tuesday,
June 29, 2008

The parties met, pursuant to notice of the Court, at 1:03 p.m.

BEFORE: HONORABLE EDWARD J. DAMICH
Chief Judge

APPEARANCES:

For the Plaintiffs:

DAVID C. TOBIN, Esquire
Tobin O'Connor & Ewing
5335 Wisconsin Avenue, N.W., Suite 700
Washington, D.C. 20015
(202) 362-5900

Also for the Plaintiffs:

STEVEN W. HARTSELL, Esquire
EDWARD E. CASTO, JR., Esquire
Nelson Bumgardner Casto, P.C.
5601 Bridge Street, Suite 300
Fort Word, Texas 76112
(817) 377-3493

APPEARANCES: (Cont'd)

For the Defendant:

KIRBY LEE, Esquire
SCOTT BOLDEN, Esquire
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W., Room 1118
Washington, D.C. 20530
(202) 307-0262

For the Third Party Defendant Raytheon:

DOUGLAS MARK KUBEHL, Esquire
Baker Botts, LLP
2001 Rose Avenue
Dallas, Texas 75201-2980
(214) 953-6486

P R O C E E D I N G S

(1:03 p.m.)

THE CLERK: All rise. The United States Court of Federal Claims is now in session, the Honorable Edward J. Damich, Chief Judge, presiding. God save the United States and this Honorable Court.

THE COURT: Please be seated.

This is the case of Theodore Whitney, et al. v The United States, Docket No. 06-601.

Plaintiffs' counsel is Mr. Edward Casto?

MR. CASTO: Yes, Your Honor, along with Dave Tobin.

THE COURT: Oh, you're Mr. Casto?

MR. CASTO: Excuse me?

THE COURT: You're Mr. Casto?

MR. CASTO: I am.

THE COURT: Okay, great. Okay. And then we also have Mr. David Tobin.

MR. TOBIN: Correct, Your Honor.

THE COURT: That's you. Okay, thank you.

And Mr. Jonathan Souter, is there a Mr. Souter?

MR. CASTO: Mr. Souter isn't here today, Your Honor.

THE COURT: Okay.

MR. CASTO: I'll be making argument for the Plaintiffs.

THE COURT: All right. And who else is at the table?

MR. CASTO: I have with me my colleague Steven Hartsell.

MR. HARTSELL: Good afternoon, Your Honor.

THE COURT: Hey, Mr. Hartsell.

MR. CASTO: And also corporate representative for co-Plaintiff, High Resolution Optics, Ed Treska.

THE COURT: How do you do? Welcome.

And representing the United States is Mr. Kirby Lee. Mr. Lee?

MR. LEE: Good afternoon, Your Honor.

THE COURT: Hi, how are you?

MR. LEE: Just fine.

THE COURT: Good to see you. And Mr. Scott Bolden is also here?

MR. BOLDEN: Yes. Good afternoon, Your Honor.

THE COURT: Great. Hello. Good afternoon.

And I guess this is Raytheon's counsel also, Mr. William Foster?

MR. KUBEHL: Mr. Doug Kubehl, Your Honor.

Mr. Foster is not here today. I will be arguing on behalf of Raytheon.

THE COURT: Okay, that's Mr. Kubehl?

MR. KUBEHL: Yes, sir.

THE COURT: Okay. And who else do we have?

MR. CASON: This is Todd Cason, an associate.

THE COURT: Great. How are you? Welcome.

Okay, the procedure we've worked out is that the presentation will be on a term-by-term basis, and I guess there are five terms that the parties have agreed are more important. We will hear first from the Plaintiff and then from the Defendant or Defendants. Mr. Kubehl, how are we doing this? Are you going to argue, or Mr. Lee?

MR. KUBEHL: Mr. Lee and I have split up the terms among us. Collectively we will take care of the terms. I'll handle the technology overview and the first couple of terms Mr. Lee will take it from there.

THE COURT: Okay, great. Thanks.

Okay, speaking of which overview, I thought the Plaintiff was going to be doing overview. It's just the Defendant? Mr. Casto?

MR. CASTO: I think we both prepared overviews, Your Honor.

THE COURT: Oh, you did. Okay. I hope they're short.

MR. CASTO: Mine will be as brief as possible.

THE COURT: Okay, that's good. But clear and convincing, of course, so that I have no questions whatsoever.

MR. CASTO: All of them.

THE COURT: That's good. Okay, so then without ado, why don't we do that. Mr. Casto, do you want to begin?

MR. CASTO: Your Honor, before I --

THE COURT: Hold on just a second.

MR. CASTO: I'm sorry. Sorry, one more thing I have to ask. Mr. Andrew Lyons is here, who is an intern in my chambers for the summer, and he would like to observe the proceedings. Is there any problem with that, Mr. Casto?

MR. CASTO: No objection.

THE COURT: Mr. Lee?

MR. LEE: None, Your Honor.

THE COURT: Okay, Mr. Kubehl?

MR. KUBEHL: No objection, Your Honor.

THE COURT: Okay great. And the other two gentlemen, I suppose you're in the audience?

MR. CASTO: Your Honor, we have got two law students here observing today, Mr. Vernon Edwards and Mr. Lance Jensen.

THE COURT: Okay, great. All right, fine. The public is fine with me. I just want to make sure because some aspects of the case were under seal I understand, and I want to make sure that you know. If you see anybody you want thrown out, let me know.

Okay, Mr. Casto.

MR. CASTO: Your Honor, before I get started, Mr. Gardner had informed us that the Court would like notebooks with the presentation materials today.

THE COURT: That would be great. Yes, please approach.

MR. CASTO: And I'll spend a minute, just let you know how the notebook is put together. It's in two parts. It's divided. The first part you will see a tab for demonstrative exhibits. The second part is called "Record Excerpts", and what we have done, you'll see as I go through my exhibits, there will be certain cites to portions of the record, and we've cited to the tabs in this notebook for each of reference.

So if we're going forward and the Court

wants to hear directly from the record excerpt itself, we can flip there very easily.

THE COURT: Great. Thank you.

MR. CASTO: Your Honor, as you've probably seen from the briefing and everything, this is a case involving the design of optical systems. In its most general form, it deals with the behavior of light and more specifically, how when light is passed through ceratin optical elements, how that light is altered, and how you can design those elements to alter light to achieve a desired result, and we'll get into that in a little bit more detail later, but that is it in its most general essence.

The inventor of this patent is Ted Whitney.

THE COURT: Excuse me just a second. I don't see to have this on my screen.

(Pause.)

THE COURT: Sorry, Mr. Casto.

MR. CASTO: That's okay, Your Honor.

The inventor is Theodore Whitney. Mr. Whitney is an 88-year-old World War II veteran. He's not an unsophisticated inventor who came up with these ideas in his garage. He has an optics degree from the University of Rochester, Institute of Optics, that he received in 1942. He's been involved in optics for

over 60 years. He's very well versed in this field, Your Honor.

The patent issued on January 31, 1995, but it claims priority back to an earlier application in 1985, and during prosecution Mr. Whitney also showed conception of an earlier date of 1982.

There are 45 claims in this patent, five of which are asserted in this case. Independent Claim 33, dependent Claims 34 and 6, which depend from Claim 33, and independent Claims 37 and 42, and we will be focusing on terms from these claims here today.

A little background on the prosecution of this patent is important, and it will be relevant to some of the claim construction that we will address later, but the original application, and this is found at tab 2 of your record excerpts, had 110 claims. In a preliminary amendment before the Patent Office took any action, Mr. Whitney added Claims 111 through 139, and he also canceled a few claims.

When the Patent Office issued its first office action, it recognized that Mr. Whitney in its belief had claimed six separate inventions in these 139 claims, and so as you will see in tab 4, the office action, the Patent Office issued a patent -- an office action requiring or identifying the six

separate inventions and requiring Mr. Whitney to select one of these inventions to go forward with in his patent.

And importantly, out of these six categories, the Patent Office found that two of these categories went to the manufacturing of these optical elements that Mr. Whitney was claiming, the actual manufacturing processes for making these phase plates that we're going to talk about later.

The Patent Office also found that there was an invention directed to the phase plate itself or the configuration of that plate, what it looked like, not how you make it, but what it looked like, its characteristics, and also that was Category 2, and then in Category 5 the Patent Office found an invention that was directed to a system where you would use that phase plate element along with lenses, other lenses to develop an optical system that you could use in various applications.

So the Patent Office, and there were two other inventions that the Patent Office found, but they are not as relevant for what we're discussing here today.

So Mr. Whitney, in his response to the Patent Office, and this is in tab 5, Your Honor, he

elected to go forward with Group 2, his invention in Group 2, and that was the part of the invention that was directed to the configuration of the phase plate, but he also argued to the examiner that the differences between Group 2 and Group 5 weren't that substantial such that he should be able to go forward with the Group 5 part of the invention as well, and that's the system, the configuration of a system component.

And then in tab 6 you will see where the examiner agreed with Mr. Whitney and said you can go forward with Groups 2 and 5, but you're withdrawing all your other claim from consideration, and this included the manufacturing parts of the claims. So he specifically withdrew the manufacturing so he could go forward with the configuration part.

Now, of the asserted claims in this case, if you'll look at the patent, and this is tab 1, Claim 33 reads as follows. It's column 28, Your Honor. I'm sorry. It's the second to the last page from the back, or third to the last page or fourth from the back.

THE COURT: Okay, I got it.

MR. CASTO: Okay, it's an aspherical optical element for correcting the micro structure of areal

beam disposed about a central axis, comprising. This aspherical optical element comprises one thing and that is this light transmissive plate, and that is -- you know, that goes to the plate part of the invention that Mr. Whitney claimed or the Category 2 parts of his invention.

Now, if you go on down to -- let me stop right there, Your Honor. Claims 34 and Claim 36 are dependent claims that depend from Claim 33, so they are also directed to the plate itself and its configuration, and they provide different aspects of what that plate would contain or entail or how it would be configured.

But if you look at Claim 37, you will see it's an optical system, and it comprises a number of refractive elements arranged as a lens system and at least one phase plate. So it's the phase plate in conjunction with other elements to make a system, and this would go to your Part 5 or Category 5 that the Patent Office recognized, and Claim 42 does the same thing. It's a system that includes a phase plate and other elements.

Now, this is important because as you're going to see later on the Defendants have really ignored Whitney's election because they keep trying to

insert these manufacturing elements back into the claims, and that's improper just under black letter patent law, but it's especially improper in this case because Whitney was required to elect between manufacturing claims and system claims, and he chose the system claims.

And if you want to see a -- this is one of the embodiments in the patent, but it shows what is meant by a system. Now, in a system, this would be a very rudimentary type system, and this is discussed at the end of the patent in Figure 14, but there is a lens 274, and then the phase plate 274, and you can see that it shows the light coming in from this direction and then a resulting image or light passing through and in the corrected format. So you've got it coming through the lens and then the phase plate provides the function that the --- the aspheric function that's described in the claims to get the resultant, which is on the back side of the phase plate. So that's the system. It's a phase plate with other elements which can be a lens or what have you, but here it's one phase plate and one lens.

He also, you know, as I said in Claim 33, he describes the plate and in its most general form this is a figure that shows what the plate looks like.

It's all about these concentric rings that are configured into the face of the plate under the surface and if you look at Claim 33, it describes a little bit about how these are designed, and it says, "Wherein the patterns," it says, "the patterns varying in radial dimension," which would be the width, and you can see that some of these are wider than others, "and in radial position," they are in different positions out away from the center of the circle, "to introduce an aspheric function of the beam."

So the design of the plate itself has to do with the configuration of these rings on the surface, and in Claims 34 and Claim 36 further describe these rings as well as the dependent Claim 35, which is not at issue in this case, but will be relevant to our discussion later.

So that's the invention in a nutshell. We've got to aspects. We've got the plate itself. We've got the plate in a larger system.

Defendants are going to make a big issue about this Miyamoto reference, and you're going to hear a lot about it today. This isn't something that is new. Mr. Whitney, if you look at -- he spent a whole column of his patent discussing this Miyamoto reference, and the discussion starts at around the

middle of column 2, and it goes to around toward the three-quarter point of column 3.

And Miyamoto used what was called in the sixties as a Fresnel lens, and he was the first person that took a small step in this direction because he took a known commodity, which was a Fresnel lens, and recognized that it could make some -- it could have some changes to a light beam, but despite this long discussion of Miyamoto in the spec., Miyamoto was never cited by the examiner in the patent application that resulted in the 319 patent as a basis of rejection at all.

The only thing that Defendants can cite to where Miyamoto was combined with another reference, the former rejection, was two patent applications back in the chain, what they called the grandfather patent. Well, the grandfather patent was the first patent filed, but then there was an intermediate patent that was a division from the grandfather, and in the 319 patent was a division was this intermediary patent, and by their very nature a divisional application is known to claim a separate and independent invention.

So the 319 patent and the grandfather patent claim different inventions. The claims are different, and where there was a rejection of certain claims in

the grandfather patent, it's not -- it marginally relevant to the 319 patent at best because it's a division of a division.

But during the 319 patent, I just want to reemphasize, there was never a rejection of the 319 patent or any of the claims because of Miyamoto.

The Patent Office certainly knew about Miyamoto, but issued no such rejection. It's only with respect to this attenuated grandfather patent.

You will notice very quickly prior to our briefing we agreed to six constructions, and those are in our briefing. I'm just bringing it to Your Honor's attention because they are here for construction but we've agreed on the construction of these six.

And then in preparing for this hearing we also agreed to two addition terms, and here they are right here. They are in your notebook behind tab A so that you can see them later on, so the Court will be aware of them.

THE COURT: Were these part of the original of the work we are supposed to do today?

MR. CASTO: They are part of the joint claim construction statement, Your Honor. There was briefing on these, but after the briefing and before the hearing we've agreed to these.

THE COURT: So the aspheric function, yes, Claim 36, and what's the other one?

MR. CASTO: The other one is aberration, departure from a true image.

THE COURT: Okay.

MR. CASTO: These are two that we can knock off the list.

THE COURT: That's good news.

MR. CASTO: Yes. Sorry we can't knock more off.

THE COURT: Did I have aberration on my list?

MR. CASTO: It was briefed in the Plaintiffs' briefing, but in the Defendant's briefing, I believe in a footnote they conceded the definition.

THE COURT: Okay.

MR. CASTO: I don't want to misspeak. I'll let Mr. Kubehl --

THE COURT: Yes, Mr. Kubehl.

MR. KUBEHL: With respect to the term "aspheric", we can go with their definition. We think the rest of the claim terms surrounding it will resolve the issue that we had between the parties, but as to the specific term "aberration", we'll go with their definition for that specific term.

THE COURT: Okay. Thank you.

MR. CASTO: And here was -- you know, I spoke with Defendants before the hearing, and I know Your Honor mentioned earlier the five key terms. We've set forth this order that we would propose we go in. You'll see the key terms that we identified in the joint statement a week ago have asterisks. You will see that there are a couple terms out of order like, for instance, after phase plate, we have plurality of concentric patterns, which is not on that statement. But those two terms have similar issues, so it does make sense to change the order just a little bit from the joint construction statement if that's okay with the Court.

THE COURT: Yes, let me just look at this here.

MR. CASTO: And I can hand this up too if you would like to have it. Again, it's in tab A. It's after the agreed terms recently.

THE COURT: Yes, that's fine.

MR. CASTO: Okay, that's all I have on the background.

THE COURT: Okay, thanks, Mr. Casto.

Mr. Lee? Mr. Kubehl?

MR. LEE: Mr. Kubehl will be taking it.

THE COURT: Okay, Mr. Kubehl.

MR. KUBEHL: Thanks, Your Honor.

Your Honor, may I approach?

THE COURT: Yes.

(Pause.)

MR. KUBEHL: May I proceed, Your Honor?

THE COURT: Please.

MR. KUBEHL: Your Honor, as Mr. Casto mentioned, the 319 patent in this case is the third, in fact, it's the last of a series of patents by Mr. Whitney. The original patent application was filed back in October 1987, and we've got a series of three patents. They all have the same disclosure, the same drawings. They have slightly different claims. So we're focusing today on the last one, the 319 patent.

The basic problem that was to be solved in the 319 patent was how to cure what are called aberrations, and we've talked about aberrations briefly here this morning. Defects in an image. When you have light that passes through optical elements you can get defects in the resulting image, and the 20,000-foot view of sort of the problem to be solved was how do we deal with these problems in the images.

To sort of set the stage for the 319 patent, I just want to real briefly go back through a couple

of ways that the prior art knew about of fixing that image.

One way was, and here we're looking at the 319 patent, one was if you've got a series of refractive lenses -- let's take one step back because we haven't talked about refraction yet.

Two concepts: refraction and diffraction, two different concepts in optics. Refraction refers to an optical beam passing through one medium like air and then coming into contact with a surface of another medium that has a different density. Now, when that beam hits the surface of the medium with different density, it's going to change its velocity and it's going to tend to bend the whole beam.

So a beam is coming in, it hits a smooth surface of different object that has a different density and it tends to bend the beam. That's why if you sort of stick a stick into water, the stick will appear to bend as it's under water because the image under the water is experiencing refraction.

Diffraction is a little bit different. Diffraction is when a beam hits an obstacle, and instead of the whole beam bending or turning, it scatters, and so it scatters into what's called wavelet components. Those wavelet components can be

going at different angles. They can experience what's called different phase, and depending on the object that they interfered with, they can come back together in various efficiency degrees.

So when the patent talks about changing the phase of light, it's talking about diffraction, not refraction. So two different concepts there.

What we're starting out with here is you've got a refractive lens system, so these lens are operating on the refractive concept, and if you have a problem with a refractive system, you're getting aberrations, maybe the image is blurry, one way to fix that is just to add more refractive lenses. If you've got a problem with the image coming out of two lenses, maybe if you add a third one with special shape, you can fix that, and the result will be a better image. That was prior art. That was known. Mr. Whitney acknowledged that.

The problem with that as he told us in his patent is that can result in heavy, complex to design system with lots and lots of lenses. He talks about a system that had over 20 lenses. So he was looking for a way to do it other than adding refractive lenses.

There was another prior art way of fixing aberrations, and you heard Mr. Casto reference the

Miyamoto reference, and that's absolutely true. Mr. Whitney knew about the Miyamoto reference, and he told the Patent Office about it.

The Miyamoto reference used the concept of diffraction to try to fix these images. It used what was called a phased grating to introduce a phase change to the incoming light and to try to fix the image by using diffraction instead of refraction.

So here we're looking at from the patent. Anytime you see an Exhibit A, that's Exhibit A to our brief, that's the patent, and we're looking at column 2 here where he talks about Miyamoto, and he acknowledges that Miyamoto has got his idea called a phased Fresnel lens. The phased Fresnel lens was a diffractive element, and what it would do is it would compensate for spherical aberration. Mr. Whitney acknowledged that.

Here we're looking at the actual Miyamoto reference, and if you're paging through the slides, I'm no Slide No. 6. Here you will see an Exhibit S sticker. Anytime you see  Exhibit S that's the prosecution history of the 319 patent itself. Exhibit T is the prosecution history of the grandparent.

But the Federal Circuit law is real clear on this, that when a parent or grandparent application

uses the same claim term that you're talking about in the child, the statements about that same claim term from the grandparent or parent apply with equal force in the patent at issue.

Okay, so we're talking about the Miyamoto reference here, and again this is part of the prosecution history that we're looking at of the 319. What you see pop up in the upper right-hand corner is a circular grating. This one might look like a compact disk with a series of rings formed on the compact disk. This particular diagram you won't find it in Miyamoto, but he says here he's using a circular grating, and he shows sort of a different view of his particular circular grating and we will get to that in just a second.

But I want to just point out here that Miyamoto clearly had the idea of introduce a phase change to the beam to improve the image quality and specifically what he tells us is this phased Fresnel lends can active as a aspheric lens and it can improve spherical aberration.

Here you see he showed you could use it to correct aberrations in one lens like Figure A, or you could use it to correct aberrations in a lens system like B. He has a lens on either side of what he calls

the phased Fresnel lens. That's his phase grating in the middle.

So he can correct these things called spherical aberrations, and spherical aberrations are aberrations that are caused by light generally not specific to wavelength, but light generally hitting a spherical lens and depending on where it hits on the spherical surface, imperfections in the surface might cause it to converge at different location, causing a blurriness. That's a spherical aberration.

So we know that Miyamoto could correct that, but he could also correct what's called color aberrations. Color aberrations happen when different colors of wavelengths -- white light is made up of all different colors of wavelengths. And when white light hits an element, it can experience dispersion causing some colors to converge at one place past the lens and some colors to converge at other place. That's one of the claim concepts, one of the concepts that's addressed in Mr. Whitney's patent. It's also addressed by Mr. Miyamoto.

Just real quickly here, the blue line is the uncorrected. That's the problem with the lens. If you could get that line to be straight across zero, you wouldn't have any color aberrations at all, so he

shows once he adds his phase grating, the red line shows up, and you can see how the big curve on the blue line turns into a much softer curve on the red line. That's his color correction for Miyamoto.

Okay, so here's the structure that Miyamoto taught. This is what he called his phase Fresnel lens. This is a bit exaggerated, but it's exaggerated so that you can see the structure. Again, this is from the Miyamoto reference.

The lower left-hand circular grating is if you took a compact disk and you sort of just looked at it on the shiny side, now if you flipped it on its edge, and you cut it in half, that's what that diagrams is there. It's showing you the cross-section of his phase Fresnel lens. you can see that his phase Fresnel lens, as we've shown in green here, it has a plurality of concentric rings. Those concentric rings have different radial positions, in other words, some are out further on the circle than others. They have different radial dimensions. Some are wider than others.

Through the placement and the sizing of those radial rings, he told us that he could introduce a different phase delays in the beam and he could make a better image.

THE COURT: The Fresnel lens is used in lighthouses, isn't it?

MR. KUBEHL: Well, there is a different between Fresnel lenses and the phase Fresnel lens. The Fresnel lens acts on refraction. The phase Fresnel lens acts on diffraction. So this is a phase Fresnel lens acting on diffraction.

Okay, so Mr. Whitney before he filed this patent application knew that Miyamoto exists and Mr. Casto told us he spent the better part of a column talking about it, so he knew that the concept of using a phase grating to correct for spherical aberrations, to correct for color aberrations was known. He knew that to use that with one lens or to use that with multiple lenses was known. So what was left for Mr. Whitney to claim?

Well, Mr. Whitney said, and this is under the summary of the invention portion of his patent, under that portion he says, "The phase plate," he calls his invention the phase plate, "is a light transmissive element. It has a plurality of concentric rings," but the kicker his phase plating has rings that each have multiple plateaus.

He says, "Phase plates in accordance with the invention," this is again under the summary of the

invention he characterizes, "In accordance with the invention are fabricated by preparing photomasks or direct writing to define these ring patterns for each of succession of deposition and etching steps."

What he is saying there is -- I'm not sure if the Court has had experience before with semiconductor fabrication processes. Sometimes semiconductors are called mud pies because what you do is you might put a layer down, etch away what you don't want on that layer; put another layer down, so you form these series of layers through deposition, or you might do it the other way where you start with a top layers, and you etch away and you etch away and you etch away and you get what you want.

So by this series of depositions, or series of etching what you get in Mr. Whitney's patent is this stair-step effect, this multiple plateau on his rings, and he says in the summary of the invention that through that fabrication that's exactly what he gets, rings with varying radii with successive plateau levels.

Here is a picture of -- this is what you see on the front cover of the patent, and again this is a cross-section of the phase plate. This one is taken if you were to flip it on its edge, cut it in half,

and then if you only looked from the center in, so the right side of the picture is the center of the disk, and then it goes out from there, and each one of the sort of highest peaks marks the end of another ring, and each ring, we've show one of them in red here, is a series of plateaus.

And from the Plaintiffs' opening brief, you see the Plaintiff says the 319 patent teaches a phase plate. That's a series of concentric ring patterns whereby each ring consists of various series of plateaus. That's the Whitney way to go.

So it was mentioned in the patent in the grandparent application, looked at the Miyamoto patent, and he looked at claims that Mr. Whitney had submitted, and those claims that Mr. Whitney had submitted explicitly called out multiple plateaus, and the Patent Office said, well, there is a difference between what Mr. Whitney has claimed and these claims, and what Mr. Whitney has claimed in the Miyamoto reference in particular it's that Miyamoto fails to teach multiple plateaus.

So what the Patent Office found, again we had the Miyamoto reference that had this triangular profiled rings. Mr. Whitney's had the multiple plateaus. The Patent Office said that's different.

The Patent Office didn't stop there. It said what I could do is I could combine Miyamoto's systems of correcting in a multi-lens system. Even though he doesn't have the right structure to do that, I could add another reference called Freeman.

Freeman teaches the right structure, although it doesn't show multiple lenses, the Patent Office said, so I could get this overall system of correcting and multiple lenses like Mr. Whitney has claimed, and I could get the right structure if I just added the structure that Freeman teaches. Let me just briefly show you the Freeman patent.

The Freeman patent is Patent 4637697, and you see again Freeman teaches this circular grating, and each of his rings are made up of multiple sets of plateaus. In red, we've seen the multi-plateau structure of Freeman.

So back in the grandfather patent we had Miyamoto with the wrong structure doing the right thing. We had Freeman with the right structure. He said, I'm going to combine those.

The response that he got from the patentee was that you can't use Freeman to reject these claims because Freeman, even though it has multiple plateaus, was formed by mechanical cutting. The Freeman

reference, we're looking at Exhibit T here on slide 18, he explains that the Freeman reference was made by material cutting technology such as a computer-controlled lathe, and because of that he said, obviously, this could not approach the degree of resolution required since the surface aberrations in the best diamond-turned quartz element are excessive.

Now, diamond turning is one way of mechanical cutting. So what we see here is he's saying even the very best mechanical cutting gives excessive aberrations when you're trying to overcome the limitations of a refractive multi-lens system.

So if you're trying to do what Miyamoto was doing, which is correct aberrations in a multi-lens system, he says you can't use Freeman's device because that was made with mechanical cutting.

Mr. Casto mentioned that the patent examiner when it came to the claims of the current application, the current 319 patent didn't use Miyamoto anymore, and he didn't use Miyamoto anymore because Miyamoto, as he already acknowledged, doesn't show the multi-plateau structure. Not surprising that he didn't use it. He tried to use it in the first one. It was distinguished.

What he did do was he came up with another

patent, Mr. Swanson. Mr. Swanson had a circular grating and his circular grating had multiple plateaus on each ring. It corrected for color aberrations. It corrected for spiracle aberrations. It was formed through a method of photofabrication, this direct writing or photomasking, the same processes that are described in Whitney's patent.

Mr. Whitney didn't distinguish himself from this patent. Instead, the tack he took was to say, I'm the one who invited that concept, and he submitted a declaration with supporting documentation where he said here is the documentation that proves that I'm the one that invented the concept that Mr. Swanson is talking about, and we'll talk about some of that documentation later in the specific claim terms.

But at the end of the day where we are is Mr. Whitney confirms in his summary of the invention that his invention is called a phase plate. The phase plate has rings that each have multiple plateaus. That's what made him different than Miyamoto. The phase plate in the invention is fabricated by the photofabrication techniques of either direct writing or using photomasks, and as a result of that fabrication technique he gets these stair steps, these plateaus, that was Mr. Whitney's claimed invention,

and with that we're ready to proceed to the terms, Your Honor.

THE COURT: Okay, thanks.

Mr. Casto, do you have anything that you want to add at this point?

MR. CASTO: I would like to just rebut a few points, Your Honor, very briefly. I know we're pressed for time, but the thing I would point out to the Court, I've got -- the claims in the grandparent patent were different claims, and I've got Claim 1 right here, and I'll try to zoom this in as much as possible. But here it is, here is Claim 1.

But more importantly, if you look at the rest of Claim 1, and I am going to read it to you Your Honor, and this is in the record. "It specifically as a limitation sets forth `a plurality of sets of plateaus,'" and further on in the same claim, "sets of plateaus". So this claim specifically claimed that limitation, the plateau limitation.

So that was one point of distinction. But then Mr. Whitney went further and this is something that's not addressed by Defendants. In that same document where I just read from the claim he says, "Applicant is not claiming a phase grating alone." In other words, you saw what Miyamoto looked like. You

saw what Freeman looked like. He wasn't claiming the grating alone. He says, "Whether of the type described by Miyamoto or the type described by Freeman, but a co-active system in which distributed light in a particular character is used in such manner as to", and this is important, "as to introduce incrementally varying phase retardation to provide a non-linear correction of a composite away from," and it goes on.

Now, that's a lot of technical speak, Your Honor, but when you look at Claim 33, for example, you know, and none of the claims we are going to discuss here today does the word "plateau" appear. It doesn't appear in any of these claims. But for instance right here in Claim 33, "wherein the patterns each introduce progressively varying optical pathly in the beam." That's the distinction that he claimed in this patent, Your Honor, and that's why the patent examiner recognized that and didn't cite Miyamoto against him.

It's the concept of using these rings, Miyamoto was using a set Fresnel lens, but what Whitney went further and taught is that you can change the spacing and the width and the heights of the rings to achieve a desired effect, and you see that in Claim 33 where he talks about the language I just said, and

he says "the patterns varying in radial dimension and radial position." Then in Claim 34, "Wherein the patterns each have progressively varying heights, redirecting wavelength components." And then in Claim 35 that's not at issue here, a dependent claim from Claim 33, he says, "Wherein the patterns are defined by tracks of incrementally varying heights," and these tracks I'm going to show you later, he uses as synonymous with plateaus.

So he doesn't specifically quote or cite plateaus as being part of the claim until he gets down to the dependent claim, and it's improper as the Court know to read a limitation from a dependent claim upstream into an independent claim. But we'll get into that in more detail as we discuss the claim terms themselves.

With that, Your Honor, unless you have any questions about the background, I'll move on into the terms.

THE COURT: No, although I have just kind of a curiosity about the -- let me see. What is an areal beam, A-R-E-A-L? What does that mean?

MR. CASTO: It's a beam that has a cross-sectional area.

THE COURT: Oh, I see. Okay. So it's a

areal beam is what it means? Comes from area?

MR. CASTO: Yes.

THE COURT: Okay.

MR. CASTO: Right. That's my understanding of the term, Your Honor.

THE COURT: Anything different on that side? Mr. Kubehl, do you agree with that?

MR. KUBEHL: That's fine with me, Your Honor.

THE COURT: Okay. All right. Since we're not going to define it.

Yes, I think that was it. I want to take a break because I want to see if I can get someone to fix my screen.

MR. CASTO: Okay.

THE COURT: So let's take a break until 2:00. We'll be in recess until then.

THE CLERK: All rise.

(Whereupon, a short recess was taken.)

THE CLERK: All rise.

THE COURT: Please be seated. Good. Mr. Casto, first term is plate.

MR. CASTO: Everybody be seated except for me, Your Honor.

THE COURT: Pardon?

MR. CASTO: Everybody be seated except for me.

THE COURT: That's right.

MR. CASTO: Okay. Well, the first term that we've got on our list is the term "plate". And before we get started I'm sure the Court is aware of the principles of claim construction, but I just wanted to kind of highlight a few that are going to be very relevant as we go forward.

And the first is the claims are important, Your Honor. They provide substantial guidance. The claims have to be constructed in context, and we're going to take issue with some of the proposed constructions by Defendants later on because we feel like they are trying to construe these claims out of context and in a vacuum.

You know, specification and file histories are important, Your Honor, but they are not overriding, and that leads us to the fourth point. Just because preferred embodiment or embodiment is described in a certain way, that doesn't mean that you're allowed to import that limitation into the claims, and like I say, we will be addressing these as we get into the various terms.

You know, the term "plate", we have two --

the two proposed constructions here. The Plaintiffs argue that we believe that this term should be construed to mean a surface that can alter a beam of light, and we believe that this stays true to the claim language that I'll show in a minute, whereas Defendants have inserted the substantially flat limitation that we believe is extraneous.

When you look at the term "plate" in context, you see that the term "plate" by itself appears in Claim 33, but then it also appears as a phase plate in Claims 34 and 42. We're going to construe phase plate separately, so what I've done here is provided some context for what a plate is and what Claim 33 describes it as being, and it describes it as, you know, light transmissive plate having this plurality of concentric patterns thereon, and it goes on and says about the plate, it's being disposed in the beam path, and it says introduce progressively varying optical path delay in the beam.

In other words, this plate is being used to alter the beam in some manner, and that's what its function is. So we've brought that up in the definition.

Now, as to our selection of the term "surface", if you look at Figure 2, you know, you see

these concentric patterns, and again this is just a drawing of -- it describes part of the preferred embodiment, but it provides some background here. You see that these rings are configured on the surface of this element, and so that's why we chose it's the surface that alters the beam of light, and we believe this --

THE COURT: What bothers me, as you just said, the surface of this element, because I'm at this point attracted to the Defendant's contention that the plate is, and it can't just be a surface, you can point to many objects in the room and say that has various surfaces. You didn't use the word -- "surface" was not used, but the word "plate", which is an object as opposed to an aspect of the thing.

MR. CASTO: Okay. Well, we believe that the plate would have a surface, Your Honor, but --

THE COURT: Of course it has a surface but the question is it's more than just a surface because many things have surfaces, but the word here used is "plate", and plate, I don't think, is synonymous with surface. Certainly it's not in the plain meaning. In English we don't use plate and surface as the same thing. We can say a plate has a surface.

MR. CASTO: Okay.

THE COURT: So if you could --

MR. CASTO: I concede that, Your Honor.

THE COURT: -- persuade me that I should not look upon plate as an object but just as this more abstract things called surface, then now is your chance.

MR. CASTO: Well, you know, like I said, I think the plate is described in terms of what's happening on the surface of the plate. But if the Court were inclined to adopt the optical element part of Defendant's construction, I still don't believe it would be appropriate to adopt the substantially flat limitation, and the reason is is it's contrary to the claim language itself. Nowhere in Claim 33 does it talk about substantially flat plate.

And when you look at, and you compare the other claims in the patent you see that when the patentee wanted to claim a plate that was substantially flat he knew how to do that in Claim 1, and I've provided the quote right here, and he also did something similar in Claim 10. He claimed a plate for use in a optical system, and he said this plate comprising, and it's a substantially flat light transmissive substrate.

So he's describing, when he wants to use the

terminology "substantially flat", he knows how to use it, but this language is conspicuously absent from Claim 33. He chose not to use this limitation Claim 33 and it would be wrong to just insert it here.

And so, Your Honor, we would still contend that the plate should incorporate a discussion about the surface as we propose, but if the Court were to construe it as an optical element, we do not believe the substantially flat extraneous limitation should be included.

THE COURT: Okay, Thank you, Mr. Casto. Mr. Kubehl.

MR. KUBEHL: Your Honor, as Mr. Casto mentioned, the same term "plate" appears in all the asserted claims that we're looking at. It has the same meaning in each of the claims. The meaning that we are proposing comes from the ordinary meaning, the meaning that's confirmed by all the intrinsic evidence and the meeting that's confirmed by dictionaries.

What we're looking at here is Exhibit B. This is a dictionary that Whitney submitted to define the very term that you asked about, Your Honor, earlier, the areal beam, a technical term in optics. He submitted it to the Patent Office saying here is how you could define it, look at this dictionary.

It's true, he never used this dictionary for plate. He never used it for lens, but it's the dictionary he used. We think it's relevant. That dictionary says it's a flat piece of material. Another contemporaneous dictionary, a plate is a flat body of material.

Every plate that's shown or described in this patent is flat. We're looking here at Figure 1. There is a phase plate 60, it's flat. Figure 12, again the phase plate 60 are flat. There is another plate called and aperture plate 230 and 238, flat. Figures 14, 15, and 16, more phase plates 272 and 282, flat, flat bodies not just surfaces. Everyone is a flat body.

What we're looking at here --

THE COURT: Can we use the diagram though to narrow the claim of a patent or the term of a patent?

MR. KUBEHL: No, sir. We're not asking you to narrow the claim of the patent but to recognize that the diagrams are all consistent with the ordinary meaning of the term "plate", and what I'd like to look at now is from the prosecution history of the 319 patent. We touched on this earlier.

This is the document that Mr. Whitney submitted to the Patent Office to say, I invented the

claimed invention before September 21, 1987, and here is now I can prove that. Those claimed concepts are in the following documents. It says for plate look at pages 3-1 to 3-6 and also 3-13 to 3-16. If we look at the first of those pages, on 3-1 he says, "The phase plate looks very much like a compact audio disk." Helpful to the layperson, that's a flat element.

The other page he cites, 3-13, the phase plate comprises of fused silicon plate which is basically flat, and he shows a picture of his substantially flat plate.

Another page from the same document, the phase plate will have a plain base that will specify a nearly zero curvature for this phase plate.

You can look at the plates he shows which are all flat bodies, and compare it to the curved lenses. He knows how to draw a curved surface and he does it on his lenses. The plates are flat.

The patent examiner in the grandparent application this is recognized that there were some claims drawn to similar concepts but they used different terminology. Some of the claims said a plate. Some of the claims said a phase transmission grating, other of the claims just said a grating structure, and the Patent Office said it would clarify

issues if you could just use one consistent term, or if there is a difference, tell me what that is.

And Mr. Whitney responded by saying there is a difference. It is correct. I have used grating, I have used plate, I have used structure, and I'm picking up about four lines down, he says, "The applicant is entitled to proper protection consistent with the scope of the invention. Different terminology should be usable so that it is not critical as to whether the structure is blazed, a grating, a plate or a grating structure. Even though the primary example is a plate, it's not at all clear that the principles of the invention may not be utilized in some other version."

Mr. Whitney recognizes that he was limiting himself to a particular structure when he recited plate. A plate is different than any old grating structure. It's different than any old phase transmission grating. He wanted to be able to use different terms so that he wasn't limited to plate when he didn't want to be. But when he used the word "plate", he knew that he was talking about his primary example in the patent. Plate has an ordinary meaning. It's a flat body. So we think all the intrinsic evidence confirms this ordinary meaning.

I want to touch on the Plaintiff's construction, a surface that can alter a beam of light. Your Honor has touched on the surface aspect of it. This is an overbroad construction. If I take a glass sphere, something that no layperson, no person of ordinary skill in the art would consider a plate, well, that would be a plate under Plaintiff's definition.

If I took my lunch sack and crumpled it up, that would be a plate under this definition. It's a surface and it can alter a beam of light. It's an overbroad definition. It's not the right definition.

The claim differentiation argument, real simple point here. So Claim 1 uses the term "substantially flat" to modify the term "substrate". Okay. This is a plate and it has several elements. One of them is a substantially flat light transmissive substrate. Not all substrates are light transmissive, so he's specified that this one is. Not all substrates are substantially flat. A substrate is just a structure underlying another structure. Not all substrates are flat. He specified that this one is.

What you won't find in this patent is a claim that says a substantially flat plate. When he

says "plate", he just says "plate" because that's flat. That is what it is. That's the ordinary meaning. There is no claim differentiation argument here. Substantially flat modifies substrate, not plate, and this claim in any case adds different limitations beyond Claim 33. For example, we've got the 10 micron limitation at the end of this claim, adding a whole new limitation outside of whether plates are flat or otherwise. So the claim differentiation doctrine just doesn't apply here.

The Anderson case we've cited in our brief where the written description and the prosecution history, as in this case, is clear. Those control. No claim differentiation guideline can override that clear intrinsic evidence, and again that's the Anderson case, 474 F. 3d 1361.

Your Honor, that concluded the plate for us.

THE COURT: Okay, let me summarize it. Then what you're arguing is that once the Court accepts the normal definition of a plate that incorporated therein in the concept of expressed by the definition of plate is that it is substantially flat, is that --

MR. KUBEHL: Yes, sir.

THE COURT: Okay.

MR. KUBEHL: The word "plate" carries with

it the inherent characteristic that it's substantially flat.

THE COURT: Okay. And also I guess the other argument from the dependent claims was that substantially flat when it was used, it was not used to differentiate a plate but was used to differentiate a substrate and therefore the argument of the Plaintiff that when the inventor wanted to distinguish substantially flat, it said so, and it didn't say so with regard to the plate. You pointed out the substrate versus plate as the noun being modified by substantially flat. Is that correct?

MR. KUBEHL: That is correct. If you look at Claim 33, he modifies plate with the word "substantially transmissive" just like he did on substrate here because not all plates are substantially transmissive, not all substrates are.

When he uses the word "plate", he doesn't have to use substantially flat because that's what a plate is. Not all substrates are substantially flat, so he specified it in this case.

THE COURT: Okay. Thank you.

Let me ask Mr. Casto if you can just address that last point about the claim differentiation and the fact that --

MR. CASTO: Okay, Your Honor.

THE COURT: -- the modification really is not to the word "plate". Can you talk about that claim differentiation?

MR. CASTO: Yes, Your Honor. Claim 1 describes a plate, Your Honor, and it says the substrate. So if the plate itself, if Mr. Whitney knew by just using the term "plate" that that was flat, then he would have just said a light transmissive substrate. He wouldn't have had to have defined the substrate as being substantially flat because the substrate would be part of the plate.

THE COURT: But isn't it possible that on the plate would be a surface and a substrate, and there would be a difference between the characteristics of the surface versus the substrate?

MR. CASTO: Well, he's talking about this film transmission grating, so he's talking about a film. I don't think he's talking about bubble throughout the patent.

THE COURT: You think if skin though. I mean, there is the exterior of the skin --

MR. CASTO: Yes.

THE COURT: -- and then there is another layer below that. And it has different

characteristics so that it seems to me as if to say "substantially flat" with regard to a substrate, you know, doesn't necessarily mean that it's necessary to describe the plate or the surface as being substantially flat as well.

MR. CASTO: But if it lays over the surface, Your Honor, it would have the same shape or characteristic of the underlying surface, which would be the plate.

For instance, my skin, if it's on my bone, I don't have to say that my skin is substantially flat or substantially parallel to my bone, it lays on the surface, and if the surface is flat in and of itself, why do you then have to have a substantially flat modifier for what's laying on top if it? It should take the same shape or characteristic as to what it's laying upon.

THE COURT: Okay.

MR. CASTO: So it is talking about substantially flat with respect to the plate in Claim 1, so we think it is relevant and nowhere in the spec. or anywhere did Mr. Whitney specifically say a plate is substantially flat or flat. We're just using examples here.

THE COURT: Okay. The next term is "phase

plate", is that correct?

MR. CASTO: That is correct, Your Honor.

THE COURT: Okay. I have a different order than you have, that's why I'm asking you.

MR. CASTO: Okay.

THE COURT: And this is in Claims 37 and 42?

MR. CASTO: That is correct, Your Honor, and if you look at the proposed constructions, if you look at the words in black, you know, there is not a lot of disagreement. When the Plaintiffs propose a transparent plate that changes the relative phase of incident light and the Defendants say it's a plate that changes the phase of a beam.

The real issue here, Your Honor, are the extraneous limitations that I've denoted as No. 1 and No. 2, you know, this mechanical cutting limitation and then the second one is this number of plateaus limitation, and I'll address these separately.

Now, on the mechanical cutting, there is nowhere in Claims 37 or 42 where the term "mechanical cutting" is used or any kind of cutting or any other word that you could tie this mechanical cutting limitation to. So it's an extraneous limitation. It should be rejected for that reason.

Furthermore, it's contrary to the file

history. As you remember earlier, I walked the Court through how Mr. Whitney was required to elect what he wanted to go forward with in his application, and he specifically elected the system components and not the manufacturing techniques. So it would be wrong to bring manufacturing techniques back into these claims now.

The third point is the Defendants talk about that Mr. Whitney somehow disclaimed mechanical cutting in the specification or in the prosecution of the grandparent patent. Well, we've address the irrelevance or very minor relevance, if any, of the grandparent application earlier. But if you look at the part of the specification that they cite to, this is tab 1 at column 1, what you see here is Mr. Whitney, he says, "There are also an inherent limitations on manufacture when dealing with this order of precision. For example, the best diamond-turning procedures still leave optical surfaces too rough for operation in a short wavelength," and he's discussing the background here about certain limitations in the art at that time, but he doesn't' say that his invention cannot ever be used by mechanical cutting. He's just saying that what he knows doesn't allow him to have a level of precision

that he needs.

The doctrine of prosecution history disclaimer requires that a disavow be expressed. The patentee has to expressly disclaim a ceratin feature from his invention, and Mr. Whitney did not do that here.

And more importantly, Your Honor, if you look further down in the specification at column 6, lines 37 to 39, Mr. Whitney talks about how the rings could be manufactured by scribing, and scribing is where you take an implement and you cut into the surface of a -- in this case an optical element. So scribing is a mechanical cutting process, so it's not like Mr. Whitney didn't recognize mechanical cutting processes at all.

Lastly, Your Honor, when the examiner found that there were six different inventions, the reason why he found the manufacturing inventions to be separate from the actual phase plate limitations, he said because the phase plate that Mr. Whitney was claiming could be made by other methods other than the ones that he was claiming, which are these photofabrication techniques.

The examiner specifically found that the rings could be made by lathing. Lathing, again, is a

cutting end of the surface, and it's a mechanical cutting technique. So for all of these reasons it would be wrong to bring in this process other than mechanical cutting limitation into the claims.

And then on the plateaus, you know, again this is an extraneous limitation. You know, Claims 37 and 42 -- Claim 37 discusses a phase plate comprising, and it goes on to describe it. Claim 42 describes a correcting phase plate defining, and it goes on to define the phase plate. Nowhere do these claim mention that it has this plateau, this concentric rings with a selected number of plateaus. This is something that Defendants are bringing from a discussion of the preferred embodiment forward into the claims, and that's not correct.

Lastly, Your Honor, again the patentee knew how to claim this feature when he wanted to. If you look at Claim 35, and this is talking about the concentric patterns in Claim 33, and I know that's not at issue here, but you're going to see that Defendants are trying to read these exact same limitations into Claim 33 with respect to a different term, but in Claim 35 he talks about the patterns being defined by tracks of incrementally varying heights.

And if you look at column 12 of the patent

at line 38, you will see he talks about multiple plateaus or tracks. So he's equating plateau with tracks. So when he's wanting to claim plateaus, he is defining them as tracks in Claim 35. So if he had wanted to bring that limitation forward into Claims 37 or Claim 42, again, he would have done so, and it's inappropriate to bring it forward as an extraneous limitation.

THE COURT: Okay, thank you.

Mr. Kubehl.

MR. KUBEHL: Your Honor, I want to address the two points raised. First, that the term "phase plate" and the term "plurality of concentric patterns", both of those terms require concentric rings with a selected number of plateaus. I want to address that first, and both of those terms require that the plateaus, the things that introduce the phase delay, those plateaus cannot be formed by mechanical cutting. So let me first start with the concentric rings with a selected number of patterns.

What I want to do is go back to the restriction requirement first that Mr. Casto talked about. This is in the 319 patent. This is the patent examiner dividing the various claims into different groups, and there was a Group 2, which Ms. Casto has

talked about. That group specifically claimed multi-plateaus. Those were the multi-plateau claims.

Group 5 claimed, that had Claim 33, which is the concentric patterns, and it had Claim 37, which recites a phase plate. Let's just look at those claims real briefly. Here is a Group 2 claim specifically calling out multi-plateau rings, the plateau is varying within the rings, and a progressive sequence. That's a Group 2 claim.

Then there was the Group 5 claims. This is Claim 33. This is what issued as patent Claim 33. Here he says instead of multi-plateaus, he calls it a plurality of concentric patterns, and just like the plateaus in the last claim introduced the varying optical delay here, it's the patterns that introduce the progressively varying optical path delay. In Claim 37, he uses the shorthand term "phase plate".

Okay, what I want to do is to look at the applicant's statement on how he characterized that language to the patent examiner. What the applicant did, I guess, just to sort of take a step back, the patent examiner had issued a restriction requirement and the restriction requirement says essentially you've paid for one invention for me to search for prior art for, and you've got lots of different claims

here, I'm going to split those out into different groups, and I'm going to search for prior art relative to one of the inventions. You pick which one you want me to search for.

So Mr. Whitney, instead of just picking one, he argued, I think Groups 2 and 5 should be together because they are really the same thing, and here is where he said that. Here he acknowledges, yes, I've used other terms like phase plate in Group 5, but the mere characterization of the element with different but appropriate technology does not --

THE COURT: Terminology.

MR. KUBEHL: Terminology does not change the field of the search or entail a different analysis.

In other words, the search for subject matter of Group 2, that was the multi-plateau ring claims, should inherently cover the subject matter of Group 5 as well, and Group 5 was the patterns and the phase plate language.

So what he's telling the examiner here is you're going to do a search for Group 2, that's the multi-plateau rings claims, and when you do a search and you find all the prior art that can apply to the multi-plateau rings, well, you found all the prior art that can apply to patterns and phase plate because

inherently these claims in Group 5 that claim it in terms of patterns and phase plates, inherently they are within the same search as the multi-plateau ring search. The only way that can be true is that if the concentric patterns and the phase plates necessarily have multiple plateau rings.

If the examiner has done a search and all he has found is multi-plateau ring art, and inherently that search covers the claims reciting concentric patterns and the phase plates, the only way that representation can be true is that he's telling the patent office you don't have to look for anymore prior art on patterns and phase plates because you've find it all. When you found the multi-plateau stuff, you found it all because that's the characteristic that inherently patterns and phase plates have.

That's the representation he gave to the Patent Office. The Patent Office accepted that representation. He said, yep, I'm going to treat them together based on your representation, and as Mr. Casto pointed out, you don't see a rejection based on Miyamoto in this patent. And what was the one thing that Miyamoto was missing? It didn't have the multi-plateaus.

Of course the examiner didn't apply Miyamoto

in this case because it was represented to the examiner that phase plates and patterns of -- I'm sorry -- concentric patterns inherently have multi-plateaus. That's why he didn't apply Miyamoto.

Now, what the Patent Office did apply was the Swanson reference, and the Swanson was again a multi-plateau reference. If you remember the Swanson reference from the technology tutorial, that was the one he swore behind. It was the Swanson 059 patent and it had rings, each with a plurality of plateaus formed through a microlithographic process or through a photofabrication process. Didn't say it was any different than that. There he said, I get my patent because I invented that concept. That's my concept, and here is the date when I invented it.

There is more. The statements in the specification that describe an embodiment as the invention are limiting statements. This isn't a case where there were two or three, anymore than one different embodiment in the patent. This is a case where phase plate having plurality of concentric rings where the rings had multi-plateaus, that was it. That was his structure, and it was characterized as the invention. Again, summary of the invention. He says the invention, the phase plate has a plurality of

concentric rings, each having multiple plateaus. That's his invention.

According to the -- I'm sorry, I misread. Phase plates in accordance with the invention are fabricated by preparing photomasks or direct writing to define these ring patterns of a desired character for each of a succession of deposition or etching steps. That creates the plateaus.

Again under the summary of the invention, the phase plate is fabricated by these microlithographic techniques to provide rings of varying radii with successive plateau levels within each ring. These are statements defining the invention, the only embodiment. The thing that was represented to the Patent Office as the thing that made him different than the prior art that was represented as being an inherent characteristic of phase plates, and that's where that limitation comes from.

We haven't yet got to the patterns argument so I will skip over these slides and let Mr. Casto make his arguments about patterns. I don't think you've made your pattern arguments yet.

MR. CASTO: No, I haven't.

MR. KUBEHL: Okay. I'll skip to the cutting

arguments. We talked in the technology tutorial about the statements that were made by Mr. Whitney in response to the Freeman reference. The Freeman reference was a reference that the Patent Office had used as a source of potential non-patentability.

The argument went from the Patent Office's side that I've got this Miyamoto reference and it shows correcting aberrations in a multi-lens system, but from the Patent Office's perspective, it couldn't use Miyamoto because it couldn't apply that to a multi-plateau system. So that's where Freeman comes in. Freeman is a multi-plateau structure, and he says, I'm going to use that structure in your multi-lens system to say that you're not patentable.

Again the response that Mr. Whitney gave was that you can't do that because Freeman is made by a material cutting technology such as computer-controlled lathing, and as a result of that, because it was made that way it's too rough. It has surface aberrations. He said those surface aberrations are excessive when you're trying to use it in my claimed application which is in a multi-lens system.

I want to address real briefly the comment he made about the restriction requirement and how the examiner made a comment about using different methods

of manufacture for just the element itself.

So the examiner recognized with respect to the Claim 2 group, those were the claims that were not reciting a system. They were just talking about the diffraction grating itself. The examiner noted that you can make a diffraction grating using mechanical cutting. That's know. Freeman shows us that. No dispute about that.

The distinction that's drawn here by the applicant is that you can't use the mechanical cut phase grating or what he called the phase plate, you can't use something mechanically cut to be a phase plate that corrects for aberrations in a multi-lens system. That's what he was claiming in the claims that are asserted here today. That's what he disclaimed. It's a clear disclaimer.

This is from the conception document. Again this is where he said, Your Honor, here's my invention as claimed, and here is how I can prove it. He points to pages 3-1 through 3-6 for the phase plate, and on page 3-3 he says, it is referring to the phase plate here, the phase plate cannot be produced by conventional optical methods; not that it would be better to use something else, not that it wouldn't be so good, it cannot be produced by conventional optical

methods, one of which is mechanical cutting as we've seen from Freeman, but it can be made within very manageable tolerances by the common technologies of microlithography and thin film technology. Those are the photofabrication methods that he disclosed in the specification as being the invention.

He says flat out it cannot be produced with conventional methods, but it can be produced using a photofabrication method.

When we turn to the specification again, here is the statement that Mr. Casto read us. In the background of the invention he explains to the Patent Office that we're talking about the prior art here and other ways of manufacturing. Diamond turning is mechanical cutting. He says the best diamond-turning procedures leave the optical surface too rough, but in contrast when he gets to the summary of the invention, he says the phase plates -- not that one of my inventions is a method, but he says the phase plate, the structure, the phase plate in accordance with the invention, phase plates are fabricated by preparing photomasks and direct writing, and then he talks about this succession of deposition and matching steps, this photofabrication technique.

That's the invention, the phase plates using

that particular method of fabrication because the mechanical cutting he viewed as not good enough. You head Mr. Casto say he didn't know of a way to do it with mechanical cutting. Certainly didn't provide any enabling disclosure for that claim scope. He says his invention is using the photofabrication technique, and as a result of using that technique he ends up with the multi-plateau structures.

There are a number of cases on point that deal with limiting apparatus claims to particular methods of manufacture. We've cited one here, the Chimie v. PPG Industry case, 402 F. 3d 1371. There are a couple more that we've cited in our brief. The Anderson v. Fiber Composites case, it's 474 F. 3d 1361. That was a case that involved making sort of artificial decking materials, and there was nothing in the claim -- it was an apparatus claim. There is nothing in the claim that said that the material had to be formed through a process called "pelletization" but the claims were limited to that process because of statements they made in the prosecution history distinguishing themselves from prior art that didn't use the pelletization process.

So it's a proper thing to do in cases like this where you've got disclaimer. You've got no

enabling disclosure for the other way of doing it. In fact, you've got statements that the other way of doing it cannot be used. It's a proper thing to do, to limit the claims to the specific method of manufacture that was recited in the patent as described as being the invention.

THE COURT: Would you distinguish between the prosecution history and the specification? In other words, the specification is supposed to tell you how to practice the invention so that you might expect something in the specification regardless of, you know, the language "but in accordance with the invention," et cetera, that would tell you how to manufacture the phase plate.

There is something bothering me about when you have a product patent that we should be able to import the method on how to make the particular product when that really is not claimed, if you look at the actual claim terms.

So the prosection history bothers me in this particular claim because of the fact that, you know, from what you argue it seems to distinguish prior art, and therefore I think, gee, well, this has to be necessary, but I would expect in a spec. that there would be language on how to make it which wouldn't

necessarily mean that should be imported into the definition of a particular term.

MR. KUBEHL: Well, Your Honor's right that if he had intended -- if in fact the claims cover a scope broad enough to be beyond -- to cover mechanical cutting, there has to be an enabling disclosure in the specification to support that, and we don't have that here. In fact, we've heard the opposite, that Mr. Whitney didn't know how to do that. That was something he didn't know how to do it and he thought it couldn't be done. He thought it wasn't a way to do it. Stay away from the mechanical cutting he says in the prosecution history. You can't use that.

So we've got a couple of additional law points here. This is on slide 29. I won't put them into the record here, but the Lizard Tech case, the AK Steel case, the Tranzo case, all cases where if the claims are construed such that the scope is broader than the enabling disclosure, you've got invalidity problems, and I'm not here to argue invalidity but I appreciate Your Honor would like 112 issues brought up as soon as possible.

If we were to have a construction here where mechanical cutting was covered, I think we've got written description and enablement problems here

because we don't have a written description that would enable the full scope of those claims.

Have I answered Your Honor's question about the specification? I'm not sure.

THE COURT: I was wondering about the invalidity issue to tell you the truth, you know, why that didn't surface to --

MR. KUBEHL: I don't think it needs to surface because properly construed, I think the claims are limited to not cover mechanical cutting, but it will surface if the claims are construed to broadly cover that.

THE COURT: Okay. I guess maybe my question was in the absence of the evidence that you have pointed to in the prosecution history, if we just had the language in the specification, you know, would that be enough?

MR. KUBEHL: Well, what we have in the specification is criticizing prior art techniques saying the best diamond-turning procedures leave the optical surface too rough. I think there is precedent that we could hang our hats on and limit the claims based on that and based on the other statement. What helps us here is we've got the summary of the invention saying that in accordance with the invention

a phase plate is something that's fabricated using this technique.

So we've got sort of a Pincer move happening form both directions. We've got the prior art is bad, don't use this method. The invention is this, must use this method. So I think based on the specification alone these claims should properly be limited to excluding mechanical cutting. I think the prosecution history is the icing on the cake in this case.

THE COURT: It's very frustrating that the patent examiner would simply allow a very broad phrase like "phase plate" to be the actual claim, and then you know, as you say, asking the Court to have to read all of this into it, including how the thing is manufactured. But you do have some, at least, on the surface authority from the Federal Circuit that seems to suggest the Court could do that.

MR. KUBEHL: And it's not a case -- I think it's a little bit more than just making the Court sort of weed through and put the puzzle together. I think in this case we've got the applicant has put the puzzle together, has said that a phase plate inherently has these characteristics. So I think we've got that link here. We're not just asking the

Court to sort of put this big puzzle together. I think the applicant has done that work for us.

Just real quickly on the point about scribing.

THE COURT: I was going to ask you about that.

MR. KUBEHL: Yes, absolutely true. The patent does recognize that scribing is a technique that you can form a ring with, and what's real important here is let's be clear about what rings we're talking about.

In Figure 2, you can see there is a bunch of different rings. The red ones on the bottom are the ones that they are talking about. Similar ones exist on the very edge. What those are those are called fiducial rings. Those are not the multi-plateau rings that introduce the phase delay.

What those are are rings that you put on before you make the multi-plateau rings so that you can fix the disk and make sure it's in the right location. It's just a reflective ring that's used to position the disk. Then you go on and use your photofabrication techniques to make the multi-plateau rings. Those are the rings we care about here. The claim constructions reflect that, that it's those

rings that can't be made with mechanical cutting. The other ones, the fiducial rings, if you're not talking about the rings that do what the claim says, which is introducing the phase delay, I don't think we have a problem with something else being formed by a mechanical cutting, but it's the rings that form the multi-plateau patterns that we're worried about.

Any other questions, Your Honor?

THE COURT: No, thank you, Mr. Kubehl.

MR. CASTO: Your Honor.

THE COURT: Yes, Mr. Casto. First tell me about the law of the Federal Circuit that was cited by the Defendant. What am I supposed to do?

MR. CASTO: Well, the Chimie case was much more restrictive than what we have here, Your Honor. In the Chimie case, the patentee described his invention and said it could be obtained only by applying liquid pressure, nozzle sprayers to a pulverized slurry. It was the use of the word "only" that the Patent Office -- that the Federal Circuit focused on here. That is a clear disavow. That's where you say there is only one way to make it.

In our case, what Mr. Whitney described was that mechanical cutting at the time in the eighties for certain applications it didn't provide a smooth

enough surface, but he didn't say that mechanical cutting couldn't be used at all. It's not a clear disavow. You know, he doesn't say it could be obtained only through a method other than mechanical cutting. He doesn't say that. He just recognizes the state of the art at the time, but nowhere does he disclaim that mechanical cutting could be used. He just recognizes a problem with the procedure at the time in the art. It's not a clear disavow.

And Federal case law, and this is very clear, there has to be a clear disavow. You can't parse together statements out of context from the grandparent patent. Again, all this prosecution history, all this discussion of Miyamoto, none of it happened in the file history of this patent. It was this grandparent patent that is two patents up the chain that is a divisional with separate and independent claims, and the issue there was over the claim.

Your Honor, there are many inaccuracies in these statements. You know, again, the specification in 319 patent, let's remember, it had six different inventions that the Patent Office saw, two of which were manufacturing limitations. A specification was written to cover those manufacturing claims. And when

those claims were withdrawn from the application, the specification wasn't changed to remove those manufacturing discussions because they were still there as support for the manufacturing claims that were no longer going forward. So it's not this clear picture that Defendants would try to have the Court believe.

Defendants said one thing that I would like to address, another thing. They talked about parsing together the file history from the grandparent patent, and statements out of context from the specification regarding the preferred embodiment, and they say this defines the invention.

Well, that flies in the face of caselaw as well, Your Honor. The claims define the invention, not the discussion of the preferred embodiment. The claims define the invention.

And you know, one other point I'd like to address is the Court comments that it's interesting they would use a broad phrase like "phase plate" to define this invention, but that's not what the claims do, Your Honor. The claims, it describes a face plate that has different characteristics. The claim goes on to define what this phase plate has, and it has a holographic -- in Claim 37, this holographic element

that functions as an a sphere. In Claim 42, it goes on. It has a transmission grade having a positive-based power curvature, opposing but substantially matching the chromatic dispersion of the refractive elements. The claims define what the face plate it. We don't need to read extraneous limitations in there to further define it because the claims themselves define it.

This discussion of Miyamoto, Defendants keep going back and saying the only distinction over Miyamoto are the plateaus. That's not true. Nowhere in Miyamoto does it discuss a phase plate having a holographic element or operating in a Bragg Regime or having a positive base curvature. Again, this is Mr. Whitney telling people skilled in the art how to change the phase plate to accomplish these desired effects, and Miyamoto does not discuss any of this.

Lastly, Your Honor, the Defendants keep saying that the Patent Office and the grandparent patent, they say something to the effect that the Patent Office recognized that the transmissive phase plate has plateaus, and I think they put a quote up, and that's not true.

I'd like to just direct the Court's attention to tab 4, and this is a very important

point, and it's page A-376. And if you look at Roman Numeral II there is no discussion whatsoever of plateaus. The Patent Office didn't recognize that the phase plate was synonymous with plateaus.

Claim 5, no discussion of plateaus. What Defendants have done is gone back into the claims that were actually -- some of the claims that were involved, and those claims had the word, specifically had the word "plateau", but Mr. Whitney, with respect to other claims, chose not to specifically include that limitation, and so it would be improper to read this extraneous limitation into the claims.

I think I've addressed most of their points. If you have any further questions.

THE COURT: Well, the only one is describing in the fiducial lines or whatever that was called, is that correct, what Mr. Kubehl said?

MR. CASTO: Let me take a quick look at the language in context before I comment. I don't see it in there, Your Honor. If I direct your attention to tab 1, column 6, lines 34 to 39. I don't see where that limitation is in the spec.

THE COURT: I guess in 55 this ring serves as a fiducial reference.

MR. CASTO: Yes, but this goes down and

talks about a second set of reflective rings, and then it goes on. It looks like it's discussing something different, and that's far removed.

THE COURT: Let me ask Mr. Kubehl. Mr. Kubehl, is that the reference you're talking about here where it says about 53 or so, this ring serves as a fiducial reference?

MR. KUBEHL: Your Honor, that's one of the references. Specifically, the figure shows, for example, item 193, and item 193 is described later in the specification at column 19, and at column 19 it talks about inter-fiducial rings 151 and 193, respectively, and also the outer-fiducial rings, and that passage there in column 19 discusses how those are locating rings, and I think there is some additional language there about how those in fact could be scribed.

But what you won't find is any reference to those rings -- I'm sorry -- to the multi-plateau rings that are used to adjust the phase, those being scribed. Those are always formed by the photofabrication devices.

THE COURT: My initial inclination would be that if in -- what is it, approximately 37 or so, 38 -- you have a reference to scribing. The rings are

defined by scribing during rotational by photo etch techniques and it talks about the rings, as if it were all of them, and then later on we have some reference to fiducial. It doesn't seem to me initially at least that scribing then has to be limited to fiducial rings.

MR. KUBEHL: Right, it starts off by saying "different sets of diffractive or reflective rings are also deployed."

THE COURT: Yes.

MR. KUBEHL: So it's talking about different sets different than the multi-plateau rings that are the ones that introduce the phase delay.

THE COURT: What does that refer to about --

MR. KUBEHL: Do you see the paragraph above where it starts, line 24? There it's talking about 16 plateau heights. So there it's talking about the multi-plateau rings. Then it goes on in the paragraph starting on 34, different sets of diffractive or reflective rings. That's where it's talking about the scribing. Those are different rings. Those are the positioning rings.

MR. CASTO: Your Honor, it still does not limit scribing to any type of ring. It says "the rings", and there is nothing in the sentence that says

it's limited to the different sets of rings or the previous rings.

THE COURT: Okay. I'm not going to take the time to make a decision right now. I just wanted to have the material so I can pull it all together and make a decision.

MR. CASTO: But, Your Honor, again, it's not a clear disavow under the caselaw.

Have we beat this horse enough, Your Honor?

THE COURT: I think so. Thank you.

MR. CASTO: Do we want to move on to the next? This is the related -- well, it's really not related. Defendants try to relate it, but it's the plurality of concentric patterns language now in Claim 33.

THE COURT: Okay, hold on. Claim 33. Okay, you may proceed.

MR. CASTO: And here you've got to look at this claim term again in context and -- well, let me back up, Your Honor.

If you look again, we've both got two different proposed constructions here, but if you look at the partial construction black, they are in agreement. The Plaintiffs say that it means more than one concentric ring, the Defendants say concentric

rings. There is no real dispute there that it's a plural term.

The issue here is the same issue we just discussed, and it's the inclusion of this plateau language --

THE COURT: Oh, I see.

MR. CASTO: -- and this formed by process other than mechanical cutting limitation, and first of all, you know, these are different claims, and yet they are trying to attach the same meaning to different terms, but the inclusion of these extraneous limitations are as improper here as they were for Claims 37 and 42, except here you will see that the term actually appears in Claim 33, and then if you go down to Claim 35, which depends from Claim 33, it reads that the patterns are defined by tracks of incrementally varying heights.

And what Defendants are trying to do is read the limitations in this dependent claim up into the independent claim, and that's another reason why these extraneous limitations should not be included into the construction of the term "plurality of concentric patterns" in Claim 33.

Unless the Court wants me to go back through the same arguments, I think --

THE COURT: I think you know the answer to that one.

(Laughter.)

THE COURT: Thank you. Who is next? Mr. Kubehl.

MR. KUBEHL: Your Honor, while we are waiting for the slide to come up, there is pretty ample Federal Circuit precedent for the concept that different terms or phrases in separate claims can be construed to cover the same subject matter where the written description and prosecution history indicate that such a reading of the terms or phrases is proper.

I've just read a quote from the Nystrom case, which is cited in our brief. That's not a unique concept to that case, and just if I may just before I launch into the patterns, the Nystrom case is a case that I would definitely point to for this concept of the process limitation being a limitation of the claim.

The Nystrom case was the one where Federal Circuit took one look at whether -- the issue was "board", the word "board", could that be limited to the process of a board made by cutting it from a log. And when the Federal Circuit first looked at that it said, ordinarily, you know, process limitation doesn't

attach to an apparatus claim, and there is no explicit disclaimer, so no, not in this case.

After Phillips, the Federal Circuit went back in Nystrom II and looked at the issue again, and after Phillips, even though there wasn't an explicit disclaimer, which I think in this case there is, but in Nystrom even though there wasn't an explicit disclaimer the Federal Circuit found that the word "board" was limited to materials that were cut from a log, and it was because of the consistent way it was described in the specification, it was the only embodiment described.

We've got that situation here as well. It's the only way that the phase plate is described. It's the only way that the plurality of concentric patterns are described.

So as to patterns, again the arguments that I made with respect to phase plate on how there was a representation made to the Patent Office, that plurality of concentric patterns inherently had multiple plateaus. I won't re-argue that, but the same arguments apply there.

Here we're looking at the claim language, plurality of concentric patterns. Again it comes from Claim 33. And the Plaintiffs' construction is more

than one concentric ring. More than one, plurality of, I don't think anyone disagrees that a plurality of is more than one. No special definition for concentric, and again this is Plaintiffs' construction, that each ring is one of the patterns. That was the original construction, that's what appeared in the joint claim construction statement. That's what they argued in their opening brief.

We pointed out that a ring, just a flat top ring is not a pattern. For a pattern, you need some sequence of structures, and the sequence of structures in this case is the multi-plateaus.

Well, in their reply brief they have kind of backed off the original construction, and they have recognized that pattern does require some sequence of structure, some series of structures. They are not agreeing with us that it's the series of plateaus. They say that the sequence of structures is a sequence of rings. So now they are saying, contrary to their original construction, that pattern means a series of rings taken together, and I think the intrinsic evidence pushes against that. I think it supports the fact that the concentric patterns in fact are the multiple plateaus.

This is from the specification at column 22.

Here we see, and I think Mr. Casto cited this, the tracks define individual plateaus. So an individual plateau within a ring is called a track, and it's the multi-plateaus that are the patterns in the multi-plateau patterns.

This is Claim 33, and the things that these patterns do is they introduce progressively varying optical path delay. That's what the patterns in the claims do. And when you look to the specification to say, well, is there some structure that does that? And the structure that does that is the multi-plateau phase plate with its finely divided rings, and its minutely divided plateaus.

It's the plateaus that add this lengths of optical path or the optical path delay. It's the plateaus that do that. The plateaus are the patterns. It's the sequence of plateaus that are the patterns, more accurately.

Here is a statement from Plaintiffs' opening brief. They recognize that as well. The phase plate taught by the 319 patent consists of a series of concentric ring patterns whereby each ring consists of varying series of plateaus that compensate for aberrations in the lens system. The plateaus, the series of plateaus are the patterns. That's what

compensations for the aberration. That's what introduces the path delay in Claim 33.

They pointed to Claim 35. Not surprising probably, we think that Claim 35 supports the Defendant's construction, not the Plaintiffs'. They make a claim differentiation argument, and they say, well, Claim 35 has to be different than Claim 33, and since 35 says the patterns are defined by tracks, and they sort of stop there, that's the big difference, right?

The difference between 35 and 33 is that where independent Claim 33 says that the patterns progressively vary, in other words, one plateau might be one unit high, next one three, next one nine, next one 35, progressively varying.

In 35, there is a specific variation. They have to vary incrementally, one unit, two units, three units, four units. That's the difference between 35 and 33, incrementally varying heights. Thirty-five just further confirms though that the patterns are defined by the tracks or the plateaus. It's not a further limitation. It's a re-recitation of the definition, the patterns are defined by tracks. Of course, it's in this claim because we need something to set up the fact that these tracks, that these

tracks incrementally vary.

So incrementally varying is the difference here. This claim only further defines that it's the tracks or plateaus that are the patterns, not a series of rings that are the patterns.

They rely in their reply brief on Claim 8. We haven't heard anything about that today. Claim 8, I guess they're look at this phrase, "the transmissive ring pattern" to suggest that that means multiple rings is what the pattern is. But when you go back to the base claim, Claim 1, Claim 1 talks about the rings being -- there is a typo in the patent, it should be "defined", the rings being defined by a succession of plateaus.

So the ring patter than Claim 8 talks about is talking about the multi-plateau ring in the base claim, Claim 1. Again, I think that supports Defendant's construction that the concentric patterns are multi-plateau rings. That's what the concentric patterns are.

Any questions, Your Honor?

THE COURT: Yes. I think in the briefing you cited to the examiner's statements, I guess, in the prosecution history, and what is the Court supposed to do with an examiner's statement in the

prosecution history? Does that have any authority?

MR. KUBEHL: I will be honest that I'm not -- it's not coming to mind what examiner statements.

THE COURT: Well, just in general, should the Court be concerned about examiner statements?

MR. KUBEHL: I think there is caselaw, there is certainly caselaw that if an examiner gives reasons for allowance and the applicant doesn't respond to them, that by not responding they are not deemed to have acquiesced, so we've sort of got that line of caselaw. But the examiner taking a certain view of a claim term is certainly relevant to what one of ordinary skill in the art would think of that claim term.

THE COURT: Okay. Let me just see if I can find this. Yes, I do have it here. This is in your response brief at three to four.

MR. KUBEHL: Page 34 did you say, Your Honor?

THE COURT: It's three to four.

MR. KUBEHL: Thank you, Your Honor.

THE COURT: I have my notes here. The government points out that the examiner distinguished prior art during prosecution and allowed the claims based upon the use of plateaus, and then there is a

quote. "Miyamoto teaches that a phase grating may be added to a lens system to compensate for aberrations produced by the lens' elements. Miyamoto fails to teach a phase grating that includes a plurality of sets of plateaus." And that was a statement of the examiner.

MR. KUBEHL: Right. And I think the significance of that, Your Honor, is that when the examiner was looking at claims and as counsel has pointed out, those claims explicitly said multiple plateaus, that the examiner found a difference between Miyamoto and those claims to be that Miyamoto didn't teach the multiple plateaus.

When we look at the claims that we've got in front of us now, we've seen the mating of the claim language now to the multi-plateau language, how inherently the phase plate and the patterns are necessarily include the multiple plateaus.

And so the significance here is that it is proper, it is the thing we need to do to construe these claims so as not to cover the prior art if we can do so. We can't change what the claims say if they read on the prior art. If they do, they do. But if there is ambiguity at all, then what we have to do is look at the prior art, and the examiner construed

these claims one way to make them different than the prior art, multi-plateau is different than the prior art, and if that makes these claims also different than the prior art, and that's a fair reading of the claims, that's what we need to do so that we're not reading on the prior art.

THE COURT: Okay. Thank you.

Mr. Casto?

MR. CASTO: Your Honor, we keep going back to this grandparent patent, and I'll just point out that what Defendants state was a disavow in that exchange with the Patent Office was actually just a discussion as to why the -- the patentee was discussing why one wouldn't be inclined to combine the Miyamoto and the Freeman references. It wasn't any kind of disavowal of mechanical cutting.

THE COURT: Okay.

MR. CASTO: And Your Honor, the Defendants keep coming back and trying to define these terms in a vacuum, out of context, you know. I heard counsel say that, you know, plurality of concentric patterns. Well, that has no meaning by itself. Well, it doesn't have to have meaning. It doesn't have to describe the entire invention by itself because the claim goes on, and it talks about how the plate is disposed in the

beam path.

The claim goes on to describe how the plate is disposed in the beam path, and it says, "with the patterns concentric with the central axis." Again, that refers to the rings, Your Honor, because when you look at Figure 2, I mean, he's describing these rings that are concentric with the center of the circle. And then the patent continues to go on, and it further describes what these rings have.

The patterns varying in radial dimension, that's means the rings have different spacing between each other, and then radial position, they are in different places out from the center. So the claim itself describes in Claim 33 what the rings entail. there is no need to bring extraneous limitations up under the guise of plurality of concentric patterns to add even more limitations, and especially when you go down and talk about the patterns being further defined by the tracks.

Well, that's talking about the structure of the pattern itself, not the -- Claim 33 talks about the plurality of concentric patterns. Well, the patterns are the rings. But then in the preferred embodiment, the patentee describes that within the structure of each ring he taught in the preferred

embodiment using these plateaus, but he didn't claim that in Claim 33. He just claimed rings that vary in radial dimension and a radial position, and then he goes on and Claims 34 and 35 to further limit or describe limitations that you could add into the rings and their structure.

THE COURT: Okay, great. Thanks. What's next?

MR. CASTO: Lens. Your Honor, the real issue we have with Defendant's definition here, I have to go with whether or not a lens has to be focusing or not, and we would prefer that we talk about the light rays being altered. Defendants would say that the light rays are focused to form an image, and this "with opposite regular surfaces" language. And adding in the focusing language, Your Honor, it's overly restrictive but not all lenses focus light.

We will concede that lenses alter light in some way, but not all lenses focus light or an image, and we've provided an example in our brief, and here it is on your screen. There are what you call divergent or negative lenses, and they actually have the opposite effect. Rather than focus the image, they actually -- the light is actually spread, and you know, based on the result that the practitioners want

to achieve, they may use a lens like this, and the word "lens" in the claims doesn't have any modifiers. It's just the words "lens", so it would be improper to read it to exclude certain types of lenses.

Your Honor, the other part is this opposite regular surfaces language, and we'll have to concede we don't know exactly what they mean by that. It appears from their brief that they would mean that the lens would be cylindrical about a vertical axis. So if you look at this figure, this is Figure 16 from the patent, you will see at the bottom this refers to cylindrical lens set 286 and 288, so numbers 286 and 288 would be separate lenses in this embodiment.

If you draw a vertical line through either of these --

THE COURT: You kind of lost me here. I thought the government was arguing just that one of the surfaces had to be curved. Is that what you're talking about?

MR. CASTO: Well, we don't have an issue with either or both being curved.

THE COURT: Why do I have something different then. I have here the government says a piece of transparent material with opposite regular surfaces --

MR. CASTO: Either or both --

THE COURT: -- either or both of which are curved, right?

MR. CASTO: Correct. What we don't understand is what they mean by "opposite regular surfaces".

THE COURT: Oh, I see. Okay. All right, now I'm oriented. Mr. Kubehl is standing up.

MR. KUBEHL: Your Honor, I think in the briefing it has been disputed whether at least one surface is curved and we may be able to take that off the table if there is no dispute about that.

THE COURT: Oh, that's good.

MR. CASTO: We do not dispute whether or not either or both of which are curved, and I think probably there has been a misunderstanding of what it means by "opposite regular surfaces".

THE COURT: Okay, good.

MR. CASTO: And maybe I --

THE COURT: I understand because I was expecting an argument about one of the surfaces being curved or not. So you're talking about this opposite regular surfaces. All right.

MR. CASTO: Right. Again, if it means that if you draw a vertical line through a lens like 286,

well, obviously element 286 is not symmetrical in a vertical position, and neither is 288, and you can also look at Figure 14 of the patent. It shows a lens that has one curve surface and one flat surface. So we don't know what they mean by opposite regular surfaces, and here is Figure 14, element 274 is a lens. It's not symmetrical about a vertical access, so maybe I'll leave it at that and hear from the Defendants argue with respect to that specific term, and then I can rebut it.

THE COURT: Okay, that sounds good. Mr. Kubehl.

MR. KUBEHL: Your Honor, we started this process. I promised you would get to have Mr. Lee give some of these terms and he's up next, so I apologize if I'm overstaying my welcome here.

The lens slides.

THE COURT: So what do you mean by that opposite regular surface?

MR. KUBEHL: Okay. First of all, I guess I'd take issue with them bringing this up for the first time now. They didn't take issue with opposite regular surfaces in their opening brief. We specifically pointed out in our response brief that the parties agreed on that point. In their reply

brief, they said nothing about opposite regular surfaces. This is the first time we've heard about this, and so we would object to this argument being made at this point.

But what we do mean by opposite regular surfaces is the same thing that their own dictionary means, the same thing that their own references that they rely on for lens show. Let me start with our definition, again this comes from the dictionary that they gave the Patent Office during the prosecution history, and so this has got all the elements of our claim construction here.

It's a piece of transparent material. No dispute about that. This is from the dictionary. Two opposite regular surfaces either or both of which are curved -- now there is no dispute about the curved -- to form a image by focusing rays of light -- I'll get to that in a minute, but let's talk about Your Honor's question, the two opposite regular surfaces.

It is wrong to say that there is no qualifier on these claimed lenses. Claim 42, these are refractive lenses. Claim 37, refractive optical elements. They are elements that refract light. And as we talked about in the beginning in the technical tutorial, when a surface refracts light it bends the

light. When it diffracts the light it scatters the light.

Their definition, just altering a light ray, well, that covers diffraction and refraction. It doesn't distinguish between the two but the claims do. The claims call for refractive lenses, refractive elements.

What we're looking at at the bottom of slide 5 here is the citation from Plaintiffs' own exhibit, this is the exhibit that they rely on for the definition of lens, mounted by two or more refracting surfaces. We say regular surfaces because that's what the dictionary said. They said refracting surfaces. We're talking about a smooth not irregular surface, because an irregular surface would cause a diffraction effect.

So their own definition, our dictionary which they used in the prosecution, everybody agrees their is two opposing surfaces. We seem to be hung up on regular, it means smooth; not irregular. Their document uses the word "refracting". So there isn't confusion here over what regular means.

The business about focusing light rays to form an image, we pointed out in our response brief that a convergent lens imparts a positive focus. The

light rays converge. A divergent lens imparts a negative focus. The light rays diverse. But a diffractive element scatters light, and we want to make sure we distinguish between a diffractive element and a lens here, in particular, a refractive lens as claimed in this patent.

So we said, as the dictionary did, light rays are focused to form an image. That's the dictionary's definition. Whether it's a positive focus or a negative focus, the definition doesn't restrict to a positive or a negative focus, but it does --

THE COURT: I'm supposed to define just the word "lens" though, and if there is such a thing as a negative focus diffraction and a positive focus, which is focused, why can't we use the word "alter" to encompass both of them?

MR. KUBEHL: Because "alter" would cover diffraction, and diffraction is the scattering of light. It is not refraction. It is not what these lenses --

THE COURT: But the word is just "lens", right? It's not all -- are all lenses refractive?

MR. KUBEHL: Yes.

THE COURT: Oh, so inherent in the word

"lens" is refraction only?

MR. KUBEHL: Well, in these claims the lenses are refractive. These are claimed as refractive lenses.

THE COURT: But I'm not being asked to define refractive lens. I'm asked to define lens.

MR. KUBEHL: Okay. I guess part of the problem there is then that if you define lens as just altering an image, we've got refractive lenses, and then when we come to the sort of infringement part of this case, they point to a diffractive element and say, well, that's a lens because it alters the image.

And then we say, but it's not a refractive lens. Well, that doesn't have to be. It just a lens is all it has to be. So that's why we are trying to nip that in the bud right now, and in this case a refractive lens or a refractive element is one that will focus light. It's not going to scatter the light. It's not going to diffract the light.

THE COURT: So you are arguing that as used in the patent the word "lens" actually means a refractive lens?

MR. KUBEHL: That's the only way it's used in this patent, and it's specifically claimed that way.

THE COURT: Okay. But outside of the patent if you're just talking about lenses in general --

MR. KUBEHL: Outside of the patent we've got --

THE COURT: -- then "alter" would be all right because it includes negative focus and positive focus in your definition.

MR. KUBEHL: I think it also includes other phenomenon which are not characteristic to lenses. I don't think diffraction is a phenomenon that's characteristic to lenses.

THE COURT: But is it incorrect then to say that all lenses alter light rays?

MR. KUBEHL: I think that's -- yes, if you draw a diagram, among the things they do is altering, they alter it in a specific way. They refract the light. They focus it.

THE COURT: Now you confused me. I thought you said that the lens would do both. It would refract and diffract, just a lens as opposed to a refractive lens.

MR. KUBEHL: I apologize. I apologize. I don't think that a lens can diffract. I think a lens can refract, but I'm not aware of a diffractive lens.

THE COURT: Okay. When it refracts, does it

focus negatively as well as positively?

MR. KUBEHL: Yes, sir.

THE COURT: Okay. So the negative and positive focus is both within the concept of a refractive lens?

MR. KUBEHL: That is correct, sir.

THE COURT: Okay. But I can't use, it's incorrect for me to use this negative and positive focus on a refractive lens in terms of light being altered?

MR. KUBEHL: I don't think you can use negative and positive focus to describe diffraction, and diffraction is altering --

THE COURT: Is an alteration. Okay. All right. Now I understand, at least what you're saying. I may not be --

MR. KUBEHL: It took us that long to get there.

THE COURT: -- physics but I understand what you're saying. All right, thank you.

Mr. Casto?

MR. CASTO: Yes, Your Honor.

MR. KUBEHL: Your Honor?

THE COURT: Mr. Kubehl.

MR. KUBEHL: May I just make one more

statement about the lenses? Just to be clear on where we are here, I think we've got agreement that we have to have two opposing surfaces. We've got agreement that at least one has to be curved. We've got agreement that it's transparent. I think all of those need to be part of the construction.

I understand there is a dispute over whether the surfaces are regular or not, and then the focus issue are the two areas of dispute.

THE COURT: Yes, that's my understanding too. Is that correct, Mr. Costa?

MR. KUBEHL: Those other elements should be part of the construction.

THE COURT: Okay.

MR. CASTO: And Your Honor, as Mr. Kubehl said earlier, I mean, refraction is the bending of light. It doesn't mean it has to be bent to focus the light, and we've shown you an example of a lens that actually --

THE COURT: You say diffraction is not bending light?

MR. CASTO: No, refraction is the bending of light.

THE COURT: What about diffraction, is that bending light?

MR. CASTO: Refraction is the bending of light around an object, and the way to think about this is refraction goes through a lens and the light is bend about, as he explained earlier, going from one medium into another.

Diffraction is, and the way it was explained to me is, and to use the water and a stick analogy, is if you've got a running stream and you stick a stick in there, you see the water curves around the stick.

THE COURT: Yes, that's how I understood it too.

MR. CASTO: And that's how the diffraction is used. And so diffraction is more the light rays are scattered because there is some sort of opposition that causes them to scatter. Like for instance if you stick the stick in a running stream, the water comes in smooth here and then it goes around the stick.

THE COURT: Lenses don't cause diffraction?

MR. CASTO: Well, it's interesting, Your Honor, because Defendants rely so heavily on Miyamoto, and he discloses a diffractive element, and he calls it a phase Fresnel lens. So that is contrary to this notion that a lens can't be a diffractive element.

Now, there is a modifier in this case. It does say diffractive lenses.

THE COURT: So you say that a lens then can refract and diffract, is that correct?

MR. CASTO: That's the way it appears to me when I look at Miyamoto, and here it is right here. That's the title of the paper right here.

THE COURT: No, I'm talking about in reality as a scientific term as opposed to what Mr. Miyamoto may have said.

MR. CASTO: Well, it would seem that those of skill in the art would refer to it -- have referred to diffractive elements as a lenses.

THE COURT: Okay.

MR. CASTO: And he's certain --

THE COURT: Mr. Kubehl is jumping up for some reason. Mr. Kubehl, what's the matter?

MR. KUBEHL: I just wanted to circle this back to the point you made earlier.

THE COURT: Yes.

MR. KUBEHL: And you were absolutely right that a Fresnel lens is a refractive element, and what he's done here is he is saying, I'm going to use something like the Fresnel lens, but I'm going to change it to make a diffractive element. So he calls it a phase Fresnel lens. Phase meaning it's a diffractive element Fresnel lens because that's the

term that we sort of are familiar with for where the idea came from.

THE COURT: Okay. Mr. Casto.

MR. CASTO: So we believe it should be altering, and I don't know have we -- I didn't understand completely. When you say "regular", do you mean smooth?

MR. KUBEHL: Yes, if you want --

THE COURT: Yes, that's my understanding is what I heard Mr. Kubehl say.

MR. CASTO: Well, we wouldn't agree with that, and if we didn't address that in our brief, it's because it wasn't apparent to us exactly what this term meant. But again this phase Fresnel lens has a non-smooth surface and a person of skill in the art has referred to that as being a lens. But those of skill in the art do not necessarily think that a lens has to be smooth on both sides, and I'll note that the dictionary definitions we have seen are all general purpose dictionaries. You know, Webster's and thinks of that ilk, you know, the example of the negative lens that we showed you, that's from a paper in the field of optics.

You know, obviously this phase Fresnel lens paper is an article within the field of optics, so you

know, Phillips cautions against using general purpose dictionaries to define terms.

THE COURT: Unless that was the one used by the inventor, right?

MR. CASTO: Well, he used it for other terms. He didn't use it for this term.

THE COURT: Okay.

MR. CASTO: And that was also pre-Phillips, Your Honor. This patent was prosecuted pre-Phillips.

Now that leaves us with the next term, unless you have any other questions on lens.

THE COURT: Hold on a second.

(Pause.)

THE COURT: Is it possible to have a lens that diffracts but doesn't refract?

MR. CASTO: Your Honor.

THE COURT: He's looking over there at his experts. You're only a lawyer.

MR. CASTO: I can't answer that question, Your Honor.

THE COURT: Okay. What about on the other side? Does Defendants have a view?

MR. KUBEHL: My own personal knowledge, I think lenses refract. If it's a diffracted element, it's not a lens, but I don't have any authority for

you on that.

THE COURT: Okay. All right. As they used to say on the old Saturday Night Live, "Never mind."

(Laughter.)

MR. CASTO: As a mere mechanical engineer, Your Honor, I have to disclaim knowing that term.

THE COURT: Okay. What are we going to now?

MR. CASTO: The next term is "functioning as an asphere".

THE COURT: All right. Hold on.

MR. CASTO: And this appears in Claim 37.

THE COURT: Okay, Claim 37. All right. Okay, proceed.

MR. CASTO: And we are completely at odds on this definition. You know, we believe the word "functioning" has meaning. Basically, what we've tried to do is recognize, it says "functioning as an asphere" and we've tried to give meaning to both the term "functioning" and "asphere".

We believe Defendants have incorrectly tried to recast this as just a function, correcting aspherical aberrations, and I'll show you just a little bit more as we go along.

The first part is, you know, we believe the word "functioning" is clear. If we try this case, it

will be a bench trial. I believe that the Court understand what the word "functioning" means, but it's more important here because if you look at this claim term in context in Claim 37 you will see it's functioning as an asphere, got it underlined here, but it's followed by an antecedent clause, Your Honor, and the antecedent clause tells us what the function is.

The function is to compensate for residual aberration in the refractive elements. So in other words, we don't have to go back and give a separate meaning to the word "functioning" out of context because the claim itself defines what the function is, and the function is not to correct, as suggested by Defendants, it's to compensate, and it's clearly defined in the claim language.

So when you define this term, it would be our position that the Court would not need to add any additional or different meaning to the word "functioning".

So then that would leave the term "asphere", and we found definitions that said that "an aspheric optical surface or element are those whose shapes are not constrained to be spheric or flat," and that's been explained to me as it's a non-spherical lens. A spherical lens is known to add certain aberrations

into a light source, and so we would argue that combining those two together, that functioning as an asphere just means functioning as a non-spherical lens. And then when you put that in context, and you still have the antecedent clause, functioning as a non-spherical lens to compensate for residual aberration in the refractive elements.

THE COURT: And what is the residual aberration then? Is that spherical aberration?

MR. CASTO: As discussed in the spec., and I'll get to that in just a second. In the spec., the spec. discussed aberrations, and that includes aspherical aberrations and what's called chromaticity or chromatic aberrations. Asperical aberrations are distortions in an image that makes it look fuzzy. Chromatic aberrations are aberrations that cause the colors to bleed together, and the patent discusses correcting or compensating for both of these types of aberrations, and that's in the spec, and that's in the slide 5 that's in your notebook. If you would want to look at it later too --

THE COURT: So the important thing is that your definition then would say that the residual aberrations can be spherical or chromatic. Is that --

MR. CASTO: That is correct, and that's

borne out by the claim language, Your Honor.

THE COURT: Okay.

MR. CASTO: Because we have dependent claims that depend from this claim as well. If you look at Claim 39, it further defines what these aberrations are, and it defines them as spherical type aberrations. It says "and non-spherical aberrations". So it recognizes both types.

And then you go down to Claim 40, and it specifies that the non-spherical aberrations can comprise chromatic aberration. So the dependent claims provide the limiting or the specific types of aberrations, but Claim 37 does not. It does not specify spherical aberration anywhere. It only discusses this residual aberration, which is a more general term.

THE COURT: What is the reason why in the antecedent clause as you point out uses the word "asphere", and then the residual aberration follows that, why is it logical to make a connection between the two and say if it's functioning as an asphere and what it's correcting -- what it means in residual aberration, aspherical aberration?

MR. CASTO: The way it's been explained to me by those of skill in the art is spherical lenses

are known to -- or regular lenses are known to introduce different aberrations into an image as its transferred -- the light is transferred to the lenses. And so when you say that something has an aspherical quality or is an asphere, it's the opposite of that. It corrects for those types of limitations.

THE COURT: Okay.

MR. CASTO: And so when he says "functioning as an asphere" here, and he follows it up "to compensate for the residual aberration and the other elements" he is saying that this non-spherical lens compensates for what is introduced by the other elements.

THE COURT: Okay.

MR. CASTO: Do you have any other questions?

THE COURT: No. Thanks.

Mr. Lee.

MR. LEE: Thank you, Your Honor.

While we wait for the Powerpoint presentation to show up, the correct construction offered by Defendants for functioning as an asphere is correcting for at least spherical aberrations.

THE COURT: Why is it not centered on my screen?

(Pause.)

THE COURT: Oh, there we go. Not entirely. We are having an aberration right here on the screen.

(Laughter.)

THE COURT: I'll just look over there. That's all right. I'll just have to put up with it. All right. I'll look over there. Thanks, Mr. Lee.

MR. LEE: Thank you, Your Honor.

Defendant's construction is proper because the inventor used the term "asphere" and "aspheric" to refer to spherical, correcting spherical aberrations throughout the intrinsic evidence

Now, this is first supported by an ordinary meaning; that is, no spherical aberration. In the Webster's Dictionary spheric is defined as "free from spherical aberration". Now this is confirmed in the prosection history when the inventor made his declaration, swearing behind Swanson, and he refers to very specific passages, and we'll refer to those pages next.

He explicitly relied in the statements to describe the term "functioning as an asphere", and for example, on page A-453 he made the unequivocal statement that "The phase plate is in the optical system solely to remove spherical aberrations."

Next on other pages that he specifically

directed the patent examiner's attention to the statement was made that "the phase plate completely corrects the spherical aberration", and also that "all of the residual spherical aberration is gathered up and corrected by the microcontour which is applied to the phase plate." So again tying the phase plate and its aspheric characteristic to the correction of spherical aberrations.

Now, other statements made in that same report cited by the inventor to the patent examiner corroborate this. Again, "The spherical aberrations are eliminated by the aspheric phase plate."

I'm sorry, and one final statement in that same report, "The aspheric Fresnel phase lens cancels entirely the spherical aberrations."

So these several instances in the prosecution history we see where the inventor has tied the term or characteristic of being aspheric to correction of spherical aberrations, and this is confirmed again in the specification as well, and this is located at column 13, lines 36 to 42 where phase plate more specifically functions as an asphere, and the following sentence is very clear. "As a consequence of the aspheric characteristic, the residual spherical aberration is compensated."

Other detail in this specification include columns 11, lines 64 to 68, as well as column 14, lines 48 to 56, in which the aspheric characteristic is tied to correction of at least spherical aberrations.

Now, Plaintiffs rely on what appears to be a claim differentiation argument, citing later claims that depend from the claim in which function as an asphere appears, but that's incorrect because claim differentiation is most clear when there is a limitation that is present in a dependent claim, and the Federal Circuit has advised that the presumption is it is not present in the independent claim from which it depends.

In this case, Your Honor, there are more than one additional limitations. We have in Claim 39, for example, spherical type aberrations as well as non-spherical aberrations. So the claim differentiation argument falls apart because it is not inconsistent in the independent claim to say "correcting for at least spherical aberration" when the dependent claim is narrow because it adds to the second limitation of non-spherical aberrations as well.

Moving on to why the constructions offered

by Plaintiffs are overboard, if we construction functioning as asphere, functioning as a non-spherical lens, it doesn't advance the meaning to one of ordinary skill in the art meaningfully. It fails to define what it means to function as a non-spherical lens.

Federal Circuit case law helps us in that the Federal Circuit has stated, "Claims are interpreted with an eye toward giving full meaning to each of the claim terms." And so in Defendant's suggested definition, it breathes full meaning and gives effect to the term "asphere" or "aspheric".

And so with that, Defendants submit that the proper construction for "functioning as an asphere" is correcting at least spherical aberrations because the inventor has used throughout the intrinsic evidence asphere/aspheric in connection with correcting spherical aberrations.

We will revisit many of these same arguments for introducing an aspheric function. It should not come as a surprise that the two terms might share similar or the same meaning. Three of the four terms are virtually identical. Again, there is caselaw as cited by Mr. Kubehl and Nystrom that different terms appearing in different claims may mean the same thing,

and with that unless the Court has any further questions.

THE COURT: I guess I'm not sure that -- the difference between the two here is not all that apparent to me. I mean, it seems that if an asphere or functioning as an asphere means to correct at least spherical aberrations, doesn't that leave the door open then to also correcting chromatic aberrations?

MR. LEE: That is possible, and in fact in the Plaintiffs' reply brief we had the impression that there was some misunderstanding whether it was only -- correcting for only spherical aberrations whereas Defendant's suggested definition is correcting at least or at minimum spherical aberrations.

So that is not inconsistent then that other aberrations may be corrected for, and in fact it doesn't matter whether there is other correction of other aberrations in this case. The Defendant's definition is correcting at least spherical aberrations such that the phase plate is in the invention to correct for spherical aberrations.

Whether it does anything else might be just extraneous or additional benefit gain from the phase plate. But what it does is allow the designer of an optical system some freedom to again correct for the

spherical aberrations with the one phase plate. Any other aberrations which it may or may not correct can be attributed to other optical elements in that lens systems.

THE COURT: Oh, I see. In other words, the patent wouldn't cover -- if there was a correction for a chromatic aberrations, then the patent wouldn't cover it. That would be your argument?

MR. LEE: No, Your Honor.

THE COURT: Oh, all right.

MR. LEE: The argument is that the phase plate or what functioning as a means is that it corrects at least spherical aberrations. Whether it corrects other types of aberrations is not important, but at minimum what is does is correct spherical aberrations.

THE COURT: Okay. All right. Thanks. Let me ask Mr. Casto's view of that.

MR. CASTO: Well, Your Honor, the claim doesn't recite residual spherical aberrations and they point to that in the spec. as the telling part, and again the claims define the invention, not the specification or the preferred embodiment.

So the claim does not recite residual spherical aberrations. It says residual aberration,

and you see where this -- if we were to insert -- Mr. Gardner, would you mind switching this over. Thank you.

If you inserted their meaning in here, and perhaps this is too small, but it would say "correcting at least spherical aberrations to compensate for residual aberration." And I would contend that would be nonsensical notwithstanding the fact that, you know, as I said earlier, the claim already describes the function, and there is no need to add additional meaning into the word "function".

So unless you have any other questions on that term, I'll move on to the next one.

THE COURT: Yes. Let me ask you the same question I asked Mr. Lee, and that is, it's hard for me to see what the significance of the Defendant's construction here is vis-a-vis the Plaintiffs' if the government's construction leaves open the possibility of correcting for chromatic aberrations as well.

MR. CASTO: We're saying that in a system where the design was only to correct for chromatic aberrations, that that would not be an infringing situation.

THE COURT: Okay. All right. That's actually what I thought from what Mr. Lee said. Is

that right, Mr. Lee?

MR. LEE: I think that would be consistent with our definition.

THE COURT: All right, great. Okay, thank you.

MR. CASTO: And the next term, and we do have to construe it separately, it is a different term, and this is in Claim 33 whereas "functioning as an asphere" is in Claim 37, but we have different --

THE COURT: Which one is this?

MR. CASTO: This is "introduce an aspheric function".

THE COURT: All right, hold on. My chart here is in the way it was in the brief so I have to adjust.

MR. CASTO: And we apologize for springing that on you, Your Honor.

THE COURT: Oh, that's all right. Okay, proceed, Mr. Casto.

MR. CASTO: Again, Defendants contend this has the exact same meaning as functioning as an asphere, Claim 37, but our biggest issue here is, or issues are two, introduce does not mean correcting, Your Honor. I'm not aware of any dictionary definition anywhere that states that the word

"introduce" means correcting as constructed by the Defendants.

Actually, I think the word "introduce" is quite clear as to what it means, and what it means here. It introduces an aspheric function, and as we spent a lot of time discussing earlier, you know, an aspheric function is correcting residual aberrations or correcting aberrations that are introduced by refractive elements in a system, and to limit that to just spherical aberrations is wrong here for many, if not all, the same reasons as it was earlier.

THE COURT: Okay, thanks. Mr. Lee.

MR. LEE: Thank you, Your Honor.

The slide that we have to present it indicates that the Plaintiffs' construction is overly broad, and we've heard Mr. Casto with the adage that you shouldn't read limitations from the spec. into the claim in equally persuasive, and in this case more compelling argument is that claim limitations should not be read out of claims; that is, to vitiate the limitation entirely, otherwise it would render the limitation meaningless, and one would wonder why the terms were in the claim to begin with.

So for Plaintiffs to construe "introduce an aspheric function" as merely introduce the ability to

alter aberrations, there is no meaning given, no effect given to the term "asphere" or "aspheric" when we have, and earlier we pointed to strong statements tying the aspheric quality of the phase plate to correction of spherical aberrations.

In this case it improperly reads out aspheric from the claims and renders it somewhat meaningless in light of that, and again, we just repeat that the Federal Circuit has instructed that all terms should be given effect, and full meaning should be given to every word in the entire claim term, and these are guiding principles that we think are very relevant to the construction of both "introduce an aspheric function" as well as "functioning as an asphere".

THE COURT: Okay.

MR. LEE: Thank you, Your Honor.

THE COURT: Let me ask you one question. What is it about Mr. Casto's pointing to the word "introduce" the ability to alter aberrations? Are you really -- is your complaint here that it should actually read "introduce the ability to correct at least spherical aberrations"?

MR. LEE: That would be an equally satisfying claim construction.

THE COURT: Okay.

MR. LEE: And I don't think our real dispute is over what introduce means and whether that is equivalent to correcting. I think we're focusing on aspheric function, and giving full effect to the term "aspheric" and its connection to spherical aberrations in this case.

THE COURT: Okay, thank you, Mr. Lee.

MR. LEE: Thank you, Your Honor.,

MR. CASTO: Your Honor, I would just address one point. We do define the term "aspheric function". In our view and it's discussed in our briefing is that it means the ability to alter aberrations, and that's consistent with the function. I know it's not the same claim, but you know, functioning as an asphere in Claim 37 is talking about compensating for aberrations, and so we've provided support for what we believe is an aspheric function as that term will be read in the context of Claim 33, is the ability to alter aberrations, so we have given meaning to that term.

THE COURT: Okay, thanks. Hold on just a second. Okay, next term.

MR. CASTO: Negative chromatic dispersion.

THE COURT: Okay.

MR. CASTO: And this is part of Claim 42, Your Honor.

THE COURT: Okay. Got it. Go ahead.

MR. CASTO: This is where we are at complete opposites. There is no part of this claim that we really agree on. I think the only thing we agree on is that chromatic dispersion has to do with where certain colors of light focus, and really our argument --

THE COURT: Negative versus positive thing?

MR. CASTO: Correct.

THE COURT: Yes.

MR. CASTO: And our argument here is a matter of convention. It's really the way you look at where these different colors of light focus. You know, Defendants may disagree with this, but as we provide in our brief a natural occurrence of light passing through a optical element is that the blue wavelengths, which are shorter wavelengths, converge closer to the optical element than the red wavelengths, and I don't know that we necessarily have a dispute that light -- that the different colors of light focus at different points.

I guess the question is what is meant by negative, and we've provided it's a matter of

convention. As I said, Mr. Whitney has been practicing optics for a long time, and we've provided support in our brief that shows that at least some practitioners, they look at this from the context of the red focal point so that the distance to the blue focal point is to the left, and we know from normal mathematics that when you go to the left that's a negative number.

So when Mr. Whitney described negative chromatic dispersion, that is what he was referring to is that distance from red to blue.

THE COURT: So is it a really a matter of convention or are you saying that his own lexicographer here if the convention should turn out to be otherwise?

MR. CASTO: No, he was not his own lexicographer.

THE COURT: Okay.

MR. CASTO: It is a matter of convention, Your Honor, and they provided some support. It's my understanding that the convention has changed at some point over the last couple of years, but Mr. Whitney described this as negative chromatic dispersion, and this definition that negative chromatic dispersion means a property that causes shorter wavelengths to

converge closer than lower wavelengths is the only one that could be operational in the system that's described in Claim 42, because what he is discussing here is a plurality refractive lenses having in combination a negative chromatic dispersion, and the natural behavior of light going through such lenses is for the blue to converse closer than the red.

Defendants are going to show you some slides that you can overcorrect the chromatic dispersion. You can take corrective steps to bend the light to actually make the blue converge further than the red, so you can have the opposite effect, but that is -- you have to artificially change -- do some artificial limitations to the system to make that happen. It's not the way the light naturally travels through the system.

That's why when you look at this in context and you have this plurality of refractive lenses the natural occurrence of that is what we have put as our definition.

THE COURT: Okay. The one question I have here is that in the briefs I think you argued what you just said, but in the Plaintiffs' briefs, here you have some formulas from textbooks.

MR. CASTO: Correct.

THE COURT: The slight edge that I currently have in my mind with the government is that they actually cited -- they have citations that actually use the term "negative chromatic dispersion" and I didn't see that in your brief. Am I right in that?

MR. CASTO: I don't think our references specifically call that negative chromatic dispersion, but what they are describing is the chromatic dispersion, that is, the natural occurrence, and they show it as a negative number, and that's where we get negative chromatic dispersion.

Your Honor, the law is that, as Mr. Kubehl mentioned earlier, where you have competing constructions either of which could be correct one of the overriding factors is to construe the claim to preserve validity, and construing it pursuant to our definition is the only way you preserve the operability of this claim. This claim is not operable under the Defendant's definition.

THE COURT: How interesting. Thanks.

Now, Mr. Lee.

MR. LEE: Thank you, Your Honor.

Negative chromatic dispersion is a claim term that appears in Claim 42, and the specific limitations reads, "A plurality of refractive lenses

having in combination a negative chromatic dispersion."

The correct construction is a property that causes longer wavelengths; that is, on the red end of the spectrum, for example, to converse closer to the lens element than shorter wavelengths, for example, the violet end of the spectrum.

Now, chromatic dispersion is a property, as Mr. Casto has described, of an element that causes different wavelengths of light to focus at different distances. Positive chromatic dispersion is where shorter wavelengths focus at shorter distances. Here we've depicted shorter wavelengths, for example, the violet end of the spectrum, focusing closer to the lens element than longer, that is, on the red end of the spectrum, and conversely, negative chromatic dispersion is the property in which longer wavelengths, red, would focus at shorter distances than shorter wavelengths, and we deem this term as overcorrected and is supported in some of the references that we will revisit here very shortly.

Back one slide, the positive chromatic dispersion is undercorrectedness.

Now, Mr. Casto said this is a matter of convention and I think what that I would agree because

all the references that we have cited to the Court uses the term "negative dispersion" or "negative chromatic dispersion", and uses that term very consistently.

Negative dispersion is where longer wavelengths focus shorter distances, and in the Hartemann publication, which is Exhibit L, a 2001 publication, the term is used "negative dispersion focusing optics", and the characteristic described is where long wavelengths are focused first; that is, on the red end of the spectrum red light is focused closer to the lens element than shorter wavelengths, for example, violet.

In the Shirasaki paper, which is Defendant's Exhibit No, we use the term very explicitly, "negative chromatic dispersion", and the behavior tied to that term is longer wavelengths focusing at a shorter distance, again red, closer to the lens element and longer for shorter wavelengths, for example, violet, again consistent use by the references.

Now going back even to the Nineteenth Century, the Lardner paper, Defendant's Exhibit M, published in 1856, uses the following terminology. "The violet image is nearest to the lens and the red most distant," and that is the characteristic known as

"positive chromatic aberration".

Conversely, when the red image is nearest and the violet most distant from the lens, that is negative chromatic dispersion, or I'm sorry, in this case the article uses the term "aberration".

So the term in italics there is "overcorrectedness", and overcorrectedness is a term attributed there to negative chromatic aberration, and conversely, positive chromatic aberration is the characteristic of being undercorrected, in which case we see from Plaintiffs own cited exhibit, and we pull up the figure that Mr. Casto had indicated, the caption on that figure is "A Simple Positive Lens Has Undercorrected Longitudinal Chromatic Aberration", where the violet end of the spectrum, shorter wavelengths appear closer to the lens element than the longer, and in this case it supports that this is positive chromatic dispersion attributed to that undercorrectedness.

So all the cited technical references agree and I think it's been shown from Defendant's references that this is a matter of convention. Negative chromatic dispersion causes longer wavelengths to focus as shorter distances.

Now we turn to Plaintiffs' argument that was

raised for the first time in its reply brief of inoperability, or if that equates to physical impossibility. Defendant submits that the evidence contradicts Plaintiffs' intention. That is, in the Lardner paper, Exhibit M, both positive chromatic aberration and negative chromatic aberration are defined, and explicitly detailed in that passage of text that we cited before.

In addition, Plaintiffs own claims seem to contradict this argument as well. In the 319 patent, the patent at issue here, the term is "negative chromatic dispersion", so again a plurality of refractive lenses having in combination a negative chromatic dispersion.

However, when we look at Plaintiffs' grandparent patent, the 665, and turn to Claim 27, it seems to indicate that a series of refractive lens elements with accumulative chromatic dispersion being positive. So Plaintiffs cannot advance this argument without some contradiction in its own claims from its own patents.

Regardless, there is Federal Circuit caselaw, Chef America, a recent case in 2004, that instructs that "Courts may not redraft claims, whether to make them operable or sustain validity," and so

that even a nonsensical result does not require the Court to redraft patents to save them, and with that, unless the Court has any further questions.

THE COURT: No, thanks, Mr. Lee.

MR. LEE: Thank you.

THE COURT: Mr. Casto.

MR. CASTO: Your Honor, the key part of these definitions is the use of "overcorrection" versus "undercorrection". Again, when you look at Claim 42, there is no discussion of overcorrecting anything. It just talks about the natural occurrence of light through these refractive lenses. There is no correction or overcorrection that would lead to this phenomenon where the blue light would focus at differently than it would in a natural occurrence, and that's why we say that it would render the claim inoperable.

Another thing, there is a discussion of another claim, and I'll note that that claim discusses positive chromatic dispersion, but it talks about it being precisely compensated. I would contend that this would be an overcorrected situation that would lead to that type of positive chromatic dispersion, so it would be consistent with what we're saying here today.

THE COURT: Okay.

MR. CASTO: If there aren't any further questions, I'll go into the next term.

THE COURT: Let me see.

MR. CASTO: A number of refractive elements arranged as a lens system.

THE COURT: Hold on just a second.

MR. CASTO: Your Honor, I would also like to point out that it is a matter of convention, and I think the arguments by Defendants also bear that out.

THE COURT: And where are we going now?

MR. CASTO: A number of refractive elements arranged as a lens system.

THE COURT: All right. Hold on. Okay.

MR. CASTO: And we have two big issues here. If you look at the last long clause here, and I put it in brackets on each of our definitions, they are exactly the same, so the only real differences is whether or not the word "lens" or "lenses" should be substituted for the word "elements" and then whether or not a number means one or more or two or more.

And on the first issue about the elements and lens issue, you know, Defendant's substitution of the word "lenses" for "elements" ignores the plain language of the claim. Many times in here today

Defendants have told the Court how much different claims in a patent should have different meanings, but yet when we get to this element, when the preamble specifically says "a number of refractive elements arranged as a lens system" Defendants want to substitute the word "lens" for "elements" and basically say that the two terms have the exact same meaning, and that's contrary to the law they've cited here today.

We cite in our brief elements is a broader term than lens, and the patentee has talked about a number of refractive elements that can be arranged as a lens system, and it would be improper to insert the word "lens" for the word "elements".

THE COURT: Okay.

MR. CASTO: And that leaves us with what does "a number of" mean. Your Honor, we would contend that a number of refractive elements is very clear. I mean, one is a number, so is two, so is three, and when the patentee describe a number of refractive elements, he is talking about one or more. This is especially true because when the patentee wanted to claim a plurality of something he knew how to do that too. He did it in Claim 33 where he talked about the plurality of concentric patterns.

We concede that a plurality of something is plural, more than one. It would be two or more. But the word "a number" we would contend can mean one or more, and it is borne out by one of the embodiments in the patent, and I'll take you back to Figure 14, which is an embodiment of the patent, and this is a simple embodiment of the invention, and you will see there is one lens and there is one phase plate.

But more importantly, after the discussion of the lens 274 in parentheses, it says, "More than one refractive element can be utilized if desired." So the patentee clearly showed here that he anticipated that you could use one more or more lenses in these types of systems, and it's another principle of claim construction that the Court should try to construe the claims to read on the embodiments and the specification.

THE COURT: Yes, that's interesting. My first inclination is that "a number of refractive elements", because you're right about one is a number, but when it's "a number of refractive elements", I would think that it meant more than one. But this evidence that you just point out casts some doubt on that.

MR. CASTO: Your Honor, using refractive

elements is just good grammar. He wouldn't say one or more refractive element. That wouldn't sound right.

THE COURT: No, that's why I think the number cannot -- although in the abstract can mean one, in this phrase suggests more than one. But as I say, this evidence here that you point out is troubling.

Are you going to address the system, the word "system"? No? Because it seems to me that even if I say "a number of refractive elements," I agree with you can mean one or more, as soon as you say "system", system suggests to me that you have to have more than one component to a system.

MR. CASTO: Sure, Your Honor. A number of refractive elements arranged as a lens system has all the elements. A system could be just one element. I don't see why.

THE COURT: I can't see that.

MR. CASTO: Well, the system --

THE COURT: How do you have a system with only one thing?

MR. CASTO: Well, this discusses a system in accordance with the invention, and this is what it says Figure 14 is, and if you look at Claim 37, it says, "It's an optical system comprising a number of

refractive elements or rings as a lens system."

THE COURT: Yes.

MR. CASTO: And you're focusing on the term "lens system".

THE COURT: Yes, because that might even bolster my initial reaction to the phrase "a number of refractive elements" by meaning that it has to be more than one.

MR. CASTO: But you've got an embodiment here that clearly talks about using one spherical lens and more than one, if desired, and that would be the system that is referred to in the claim.

THE COURT: In the abstract though, doesn't system suggest to you more than one element or component?

MR. CASTO: Well, I think this lens system, there are more components than just the lens. I mean, you have the light that is passing through the lens, or the image that you're trying to project through the lens, so there are other components other than the lens.

THE COURT: But it's a lens system.

MR. CASTO: Yes, but a lens system without these other components. You're not going to use it to, you know, manufacture this beam of light, and it

doesn't have any real function by itself.

THE COURT: Okay, thank you.

Mr. Kubehl.

MR. KUBEHL: Thanks, Your Honor.

I want to address first the issue of the number of refractive elements and whether that's one or more or two or more, and Your Honor has pointed out that the phrase "a number of" is not the only phrase in this claim. We have a number of elements, in the plural. Mr. Casto points out, well, one is a number. Well, zero is a number too, and we can't have zero refractive elements. It's an affirmatively recited limitation here.

We have a number of elements in the plural, and we don't have just that. We have a number of elements arranged as a lens system. A single element is not arranged. And as Your Honor has pointed out, a lens system just by the plain, ordinary meaning of those words is a system of lenses. We have more in the claim. For some reason my slides aren't going forward. Here we go.

We have more in the claim. We have that this plurality of refractive elements as a residual aberration. The elements, in the plural, have a residual aberration. A single optical element may

have an aberration, but it doesn't have a residual aberration. A residual aberration comes when you combine the effects of two or more elements, and there is something left over. There is something residual.

And so what we have here is a residual aberration, something left over from two or more of these refractive elements operating in conjunction. So the plain meaning of the claim language is specifically setting out more than one refractive elements.

The Tivo case and the Free Motion case were mentioned in the briefs, and the sort of simple answer there is those cases deal with when a claim is recited as "an element", "a widget", that doesn't necessarily mean just one. It could mean one or more. But those cases don't apply here where you've got explicitly recited plurality of elements, a number of elements. When you've recited multiple elements, you can't use those cases to go the other way to say, well, maybe it just means one. Those cases stand for the "a" can mean more than one, but they don't flow back the other way.

In terms of the claim language that we have here to make those cases work, what you would have to do is get rid of the language that we've talked about

here. If it said "a refractive element having aberration", then maybe we would have something to talk about here. Maybe that could be one more refractive elements, but the fact is we do have this explicit claim language, a number of elements in the plural, arranged as a lens system, having a residual aberration. All of those terms telling us that this is more than one element.

I want to turn to the evidence that Mr. Casto brought up which the Court characterized as troubling, and if I could flip to the Elmo for this, Mr. Gardner. Thank you. Okay.

So here's the slide we saw, and he points to Figure 14. Now the claim language is "a lens system", and what's a bit troubling here is the ellipses here. Figure 14 dot dot dot is a dot dot dot system. While there is an ellipses there perhaps because Figure 14 doesn't show a lens system. We're looking at Figure 8, this is the actual language of the patent that was recited there.

Figure 14 is a side schematic view of an axicon-type system, not a lens system, an axicon-type system. Look directly below that, Figure 15 is a lens system. Figure 15 is a lens system. So what does Figure 15 look like? Here is Figure 15. That's

described as a lens system. It's described as having lens set 286 and 288, multiple lenses. Figure 14 is an axicon-type system, not described as a lens system.

So we've got a number of these refractive elements and they are arranged as a lens system, and as Your Honor has pointed out, what else could a lens system be made from but lenses. Plain from the claim language. Arranged as a lens system, you've got to have lenses in the lens system.

Here is another example of something in the patent that's called a lens system. This is from the patent at column 11, line 33. It's describing -- I believe that's from Figure 1, from Figure 1. We've got an except from Figure 1. It talks about the lens system, and it uses lens and refractive element interchangeable. It's a combination of refractive elements. It has refractive lens elements. They form a lens group 58, and these lens groups 58 with a lens group 62 form a lens system in which this phase plate is positions at what's called an aperture stop.

again multiple lenses made up a lens system. Lenses are the only thing this patent shows as being in the lens system. The lens system necessarily is a system. It's more than one element. It's made up of lenses.

Now, we're not, Your Honor, saying that you can't have more than the multiple lenses in the system. You could have other elements as well. But the lens system does require multiple lenses.

We've got a couple other citations where I think Mr. Casto brought this up. I think this supports us. It directly equates a spherical lens with a refractive element, interchangeable use of those terms, refractive element and spherical lens.

Again, these are the figures. You will see this upper left-hand corner is Figure 1. Multiple lenses in that lens system. Figure 12, you will see 12A shows just one lens. What's that is showing is if you read the text that accompanies it, it describes a process where you can use the phase plate to precisely precision lenses in the optical system. So Figure 12A is the first step. I've now positioned one lens. Now I'm going to go on and I'm going to position another lens, and then finally in Figure 12C I've got my whole system complete. So Figure 12A is not showing the lens system. It's building the lens system.

We've talked about Figure 14, and of course 15 and 16 show multiple lenses in what's called the lens system.

Plaintiffs' construction is overbroad.

Their construction is "One or more elements that each operate to alter lightwave by changing its velocity when it passes from one medium into another of a different index of refraction." We've got sort of a piece of quartz that's pulled out of the ground here, and presumably this would meet their definition. If you just had a piece of quartz, that might be a lens system in their system.

I guess the point is when you look at that construction, they could have a lens system with no lenses at all. "One or more elements that each operate to alter lightwave by changing its velocity when it passes from one medium into another of a different index of refraction" Presumably that could not include any lenses at all.

So we think the right construction is two or more lenses, and then the rest of the construction has been agreed to by the party.

THE COURT: Great. Thank you.

Mr. Casto.

MR. CASTO: Your Honor, if you would look at column 24 where Mr. Whitney is introduce this axicon embodiment. I mean, he cites to this paper and he says, "There is describe a conical surface lens system." So he's recognizing that this is an

embodiment of his invention and that he's referring to it as a lens system.

THE COURT: Okay.

MR. CASTO: One other point I'd like to close this term out with, Your Honor, is again the fact that the claim says "a number of refractive elements", plural, shouldn't be determinative here. Again, it would be bad grammar to say "a number of refractive element" in the singular, just as it would be wrong when we say "one or more", we wouldn't say "one or more refractive element," we say "one or more refractive elements", but that wouldn't mean there can't be one element. I just don't think proper grammar there would have allowed the patentee to say "a number of refractive element arranged as a lens system."

THE COURT: Okay.

MR. CASTO: Shall we move on to the next term, Your Honor?

THE COURT: Yes. We better.

MR. CASTO: Yes.

THE COURT: I have to leave promptly at five.

MR. CASTO: Base plate comprising a holographic element.

THE COURT: Okay.

MR. CASTO: How many terms do we have left? This one and one more. So we have two left.

THE COURT: Go ahead.

MR. CASTO: I'll try to be brief, Your Honor.

Here we're talking about again the language is "a phase plate comprising a holographic element", and we've tried to give meaning to this term and all the different facets, but what Defendants are trying to do is basically just define it in terms of its manufacturing technique, and I'll show that to you in another slide.

We believe that the Plaintiffs' construction is correct because, first of all, it's consistent with the specification. The term "holographic" is referred to several times in the spec. and it's referred to as a "holographic phase plate element", which is consistent with the way it's claimed. It talks about a holographic wave front adjusting means, a holographic really, or really as Your Honor pointed out earlier, distributed transmissive grating element. So it's talking about this grating element or these concentric rings that Mr. Whitney has described in the specification and in his other claims.

So when we went out to try to define this further, we found a term called "phase hologram" in a sentence and it referred to it being a "phased modulation as introduced by a surface relief profile," again changes in thickness which refer to the rings with varying heights that Mr. Whitney described in his patent.

So that's what led us to say it's an optical plate, whose optical thickness or index of refraction varies to change the phase of the beam, because that's what it -- as we looked at how the term is used in the spec. along with the plain ordinary meaning we felt that this is what gave it the best meaning is this optical thickness and index or refraction varying.

THE COURT: I'm sorry. Specifically the holographic element is what?

MR. CASTO: Well, the whole term, you've got to remember we have the term "phase plate".

THE COURT: Yes.

MR. CASTO: And it comprises a holographic element, so the holographic element be a plate whose optical thickness or index of refraction varies to change the phase of a beam.

THE COURT: So this definition is that of a holographic element?

MR. CASTO: No, it's referred to as a phase hologram, and I have this in tab 13 in the notebook we've relied upon, and again it's the fact that it's this phase plate. It's this holographic phase plate element as described in the spec. It's described as a hologram that makes up a phase plate. So we brought into this definition a phase hologram because it appeared to be the most applicable.

THE COURT: Interesting. Okay, are you done?

MR. CASTO: No. Now, I'll point out that in Defendant's brief when they cite to the specification, none of the parts of the specification they cite to have any mention of the term "holographic".

Second of all, you know, their proposed construction is contrary to the claim language. It talks about a phase plate comprising a holographic element. It doesn't correspond to a phase plate formed using a photofabrication technique. It's not a method of manufacture. It's a holographic element, and again it has this phase concept. It doesn't go to the method of manufacture.

And then, you know, Defendants, not having anything in the spec. that they cite to that contains the word "holographic", they go and start reading the

patents that are cited in the -- the other patents that are cited in the patent to try to use those to give meaning to this term as if they are relevant to what Mr. Whitney was claiming here, and one of these patents actually discusses forming this mechanical method, which would be contrary to this photofabrication technique.

So again it's an attempt to limit the claim to a specific manufacturing method, and we've discussed about the decisions that were made by the patentee and the file history. It would be wrong for that reason as well.

THE COURT: Okay, thank you.

Mr. Kubehl.

MR. KUBEHL: Your Honor, just briefly, the issue of the number of refractive elements. It was pointed out a statement in the specification referring to a paper by Mr. McLeod, and I can't -- I don't know if the McLeod paper is actually in the record or not, but I would like to offer it as an exhibit in the record. We got a copy from the prosecution history of the McLeod paper.

And the point I want to make here today is that in the McLeod paper, the McLeod paper shows a system with multiple lenses, Figure A. There is a

conical lens and there is a spherical lens, multiple lenses. That is a lens system. Not surprising that Mr. Whitney would say that this discloses a lens system because it has multiple lenses.

THE COURT: What his this paper? This was mentioned in the patent?

MR. KUBEHL: This the paper mentioned in the patent as describing axicons, and it specifically shows multiple lenses in these axicons. They would be lens systems. They are multiple lens systems. I would like to offer this is an exhibit to supplement the record if I could.

THE COURT: Is there an objection, Mr. Casto?

MR. CASTO: Your Honor, I won't object but I will make a note that when we tried to add some additional references in during the negotiation and preparation of the joint claim construction statement, Defendants made a big issue about us adding additional references at that time. But with that said, I won't object.

THE COURT: Okay.

MR. KUBEHL: Your Honor, I think we've used the references that they've supplemented with to show that our constructions are right, so we don't have any

objections to what they have added to the record, and this comes in direct response to something we got for the first time in a slide last night from them, and something they've argued here today to suggest that the McLeod paper showed only a one lens system and called that a lens system, and that's not right.

THE COURT: Okay. Well, accommodation is always a good thing though in litigation, so just remember that, Mr. Kubehl.

MR. KUBEHL: Absolutely. I think we pointed out, Your Honor, that we had adhered to the rules of when we were supposed to identify evidence. We didn't feel that everyone had done that, but we withdraw any objections to their exhibits.

THE COURT: Okay, great. Okay.

MR. CASTO: No objections here, Your Honor.

THE COURT: All right, good. It's admitted.

MR. KUBEHL: May I approach, Your Honor?

THE COURT: Yes, why don't you give it to my law clerk. And what about the holographic element? The holographic element, are we going to do that?

MR. KUBEHL: Yes, sir. Yes, sir.

Mr. Gardner, would you please bring the slides up? Thank you.

Holographic optical element, the word

"holographic" refers to a particular method of fabrication. In this case, it's a photofabrication technique, so we've got points here that holographic is a particular process, and that process is a photofabrication technique. It's much like, Your Honor, if the claim read "a photographic image", well, that image would be limited to a particular process of having formed it. That's different than, for example, a hand-drawn image. Here we've got a holographic element.

We've been criticized here for looking to the patents cited by the examiner and used by the examiner to define these terms, and that is a completely appropriate thing to do. The Federal Circuit tells us, for example, in the Kumar case that prior art cited in a patent or cited in the prosecution history is intrinsic evidence. This is intrinsic evidence every bit as a specification is.

So to the extent we have relevant definitions in these cited prior art references, they are intrinsic evidence. They need to be looked at. What we see here, here are several references that were cited in the prosecution history, talking about holographic optical element. I want to touch on just a couple of them.

One of them is the Majheedi Zulbani reference, nice one to end the day with. The Majheedi Zulbani reference confirms, he talks about holographic elements. These are elements that are made by holography, elements that are made by holography. That's a process. And what is that process? He tells us the process is illumination to record on a holographic plate.

So you use a light source to optically record to make a holographic element. That's the holographic technique. In particular in the patent the way they do it is either by using photomasks and then illuminating the material through the photomask, or they use a laser to directly write in the material, both photofabrication techniques, both optical recording techniques. That's what holographic optical elements are.

The Keeta reference, this is the reference that was just discussed, the Keeta reference is actually even more helpful because it distinguishes the holographic method from the mechanical method. Recognizes that in fact there are different methods that you can make diffractive gratings. Diffractive gratings being a larger category than the subspecies holographic elements.

Holographic elements are those forms through an optical recording process as opposed to elements, other diffractive gratings that are formed through a mechanical process. So the Keeta reference distinguishes between the two different methods and lets us know that the holographic process involves a recording laser beam that converts into rugged patterns of photosensitive emulsion -- obviously I'm not reading this very well -- it involves a laser beam to invoke the recording process. That's what the holographic technique is, confirmed again by Keeta.

So in the patent we have, again going back to the summary of the invention, that the phase plates in accordance with the invention are formed either by photomasks or direct writing, for example, with a laser. These are holographic techniques. That's how the phase plates are formed. That's what the phase plates are. They are elements formed in that way.

In this particular claim we explicitly call it out, not only are they not -- not only do they not cover mechanical cutting, they are specifically limited in this claim to those formed by the holographic process.

This is the exhibit that they rely on, the Buralli reference. They make a reference to

kinoforms. This is focusing on the term "kinoform", not holographic elements. The relevant portion of this reference is where it confirms that HOEs, holographic optical elements are optically recorded. That's what an HOE is, and that's their own reference.

So the intrinsic evidence, these patents that we've looked at that were cited by the Patent Office, intrinsic evidence, all confirm that holographic optical elements refer to a particular species of elements that are formed through the holographic process.

Any questions, Your Honor?

THE COURT: No. Thanks.

Mr. Casto?

MR. CASTO: Your Honor, just two quick points. The first is, you know, while the cited references might be referred to as intrinsic evidence, it would be as improper and probably more improper to import limitations from a cited reference into the claims than it would be from the specification itself.

Also I just want to point out that all of this evidence that Defendants are using to define what a holographic element is, it says here, "Holographic refers to the process of making." Well, the two definitions they're referring to, none of them refer

to a holographic element, the element itself. What they refer to is "holography". Well, that could be seen as the process of making, or a "holographic process". Well, clearly, the holographic process would be defined as the process. But neither of these refer to a holographic element, which is what we're trying to define here.

THE COURT: Okay.

MR. CASTO: And that brings us to the last term, which is Bragg Regime.

THE COURT: This is the one I really wanted to know about.

MR. CASTO: Boy.

THE COURT: I found a reference to Bragg, Bragg's Rule and Bragg's Law, but not Bragg Regime.

MR. CASTO: We have a paper that I'm going to show you a quote from here, Your Honor, and hopefully it will help clear it up.

THE COURT: Okay.

MR. CASTO: So I'm going to mention in a little bit. In looking at Defendant's definition, the real problem we had with their definition is twofold, and I'm going to describe that in the context of a paper that we've cited in our brief. It's really this trying to define Kogelnik's equation as the be all and

end all of Bragg Regime, and also where they use the word "where" here, you're going to see that the definition actually says that there should be an "or" there. So I'm going to show that to you in the last slide and offer a potential compromise here.

The references that are cited by both parties, the Defendants cite a Clemens Paper. It is true that we had that on our initial list. But after we looked at the paper more closely we saw that it made references to 1999, and that time frame, and so it was clearly probably 2000 or later, and it wasn't contemporaneous with the patent, so it's untimely, and it has very little relevance.

Also, there are two articles by Moharam, they are cited in the parties' briefs. One of them -- they both discuss a different regime of diffraction. One is called a Roman-Nath Regime, and we would contend that that paper has very little relevance because it's not directed to the Bragg Regime.

But the other paper, which is timely and relevant, is the Moharam paper, and it's entitled "Criteria for Bragg Regime Diffraction by Phase Gratings", and based on all of what we've discussed here today that is the paper that would be relevant to our discussion because it discusses what Bragg Regime

diffraction is with these phase gratings, which is what this patent is directed to.

And from that paper it state that a "Bragg Regime is usually taken as being synonymous with two things." It says, "with thick grating diffraction or the presence of only a single diffractive wave and a single transmitted wave".

So if we were to stay with that definition, we could agree with Defendant's construction if it were edited a bit, and that would be we could live with the thick grating diffraction, or thick grating in Defendant's definition if we took out the Kogelnik reference, and if we inserted the word "or" so it would give meaning to the second part of the Moharam definition where almost all of the incident power is diffracted into a single order, and that would give meaning to both partes of this Moharam definition, and we standby the definition that we provided initially, but in an effort to give meaning to both parties of the Moharam definition, we could, you know, propose something like this as an alternative.

THE COURT: Okay, thank you.

So, Mr. Lee, do you buy the alternative?

MR. LEE: I don't believe so, Your Honor, and I wish it could be that simple at 4:40 in the

afternoon.

The correct construction as we've seen is "a condition in a thick grating built to satisfy Kogelnik's equation," and we'll show why Plaintiffs' construction here is overly broad. In a nutshell, Plaintiffs' construction would include diffraction that occurs in regimes outside the Bragg Regime, and would not be exclusive to Bragg Regime as well.

But first we turn to the Clemens article from which Defendants derive essentially their definition, virtually verbatim. "Gratings built to satisfy Equation 2," which we can show later to be equivalent to Kogelnik's equation, "operate in what Gaylord and Moharam refer to as the Bragg Regime which almost all of the incident power is transmitted into a single order." This is on page 4 of that reference.

And the equation that is at issue here is derived from Kogelnik. It's surrounded by references to Kogelnik's 1969 paper, and this equation specifically appears at page 3 of the Clemens reference.

Now, Defendants do not need to rely exclusively on Clemens, and we submit that Moharam, his first two papers, as well as Kogelnik's own 1969 paper support the definition of Bragg Regime that

Defendants offer at this time.

In the Moharam paper, he cites Kogelnik's work directly, and he defines Bragg Regime as synonymous with thick grating diffraction.

Plaintiffs reference to Moharam I, its definition of Bragg Regime is only a partial view of the entire scheme that Moharam referred to in his second paper, and we see from a larger view of this diagram that the Bragg Regime, which we've highlighted as a region to the right, is satisfaction of Kogelnik's equation in its entirely, and we see Moharam's definition, or a characterization of this, as a thick grating.

Now, Mr. Casto has cited the first line of that reference in Moharam as usually as taken as being synonymous. However, the sentence immediately following that, and this is Defendant's Exhibit -- I'm sorry, this is Plaintiffs' Exhibit 13 -- the sentence immediately following that is also telling and provides further explanation to one of skill in the art.

The sentence following says, "Thick gratings may be defined in terms of the parameter Q-prime or Q," and again these refer to the equations that Moharam derived directly from Kogelnik's equations.

So the sentence following what Mr. Casto has cited from Moharam directly attribute these equations to Kogelnik's work. For example, Moharam's Equation No. 1, which is the first equation we see here listed, is equivalent to Kogelnik's Equation No. 75, and these are detailed in more detail at our response brief at Footnote 12, the equivalence of these equations, as well Moharam derives his second equation to Equation No. 45 from Kogelnik, again detailed in our Footnote 12 in our response brief.

Because of Moharam's use and reliance on Kogelnik's equations and his derivation of those equations, Defendants submit that the proper construction and one that one of ordinary skill in the art would understand Bragg Regime to mean is reliance on first a thick grating as well as one built to satisfy Kogelnik's equation.

The importance, Your Honor, of the thick grating versus thin grating is that -- going back to this chart -- in the Bragg Regime a thick grating, thick is relative to the light that is passing through the diffractive element. So that diffraction occurring in a Bragg Regime is occurring within the grating itself because the grating in thick relative to the wave length of that light.

On the other hand, the Raman-Nath Regime, which is the second paper, deals with the other side of the curve so of course it is very relevant because in thin gratings diffracting -- diffraction is occurring either on the surface or outside the grating itself, but not within the grating because it is thin relative to the wavelength of that light.

Now, this chart, the Raman-Nath article, this is relevant because Plaintiffs' construction is overbroad. Diffraction in which the power is transmitted into a single order, that can occur in Raman-Nath Regime, in the intermediate regime, as well as the Bragg Regime. So it's akin to saying that a sphere is something that can roll downhill. It is certainly a properly of a sphere, but all things that roll downhill are not necessarily sphere.

With that, Defendants ar happy to rely on our brief unless the Court has further questions on Bragg Regime.

THE COURT: No. I love that saying about all things that roll downhill are not spheres, so I'm trying to put that into a sampler or something. Thank you.

Mr. Casto?

MR. CASTO: Your Honor, very briefly. First

of all, I note that one of the slides said Kogelnik is useful in describing Bragg Regime, but it's not the be all and end all. There is a difference between being useful and being included in a claim construction in this patent.

I would also point out that Kogelnik imposed many assumptions in the problem he was trying to solve in developing his equations.

And lastly, you know, these were Moharam's equations that were in the Moharam paper. They weren't Kogelnik's equations, but yet we're somehow saying that there's got to be a thick grating built to satisfy Kogelnik's Equation, and you would have to -- how do we know that those were actually derived from Kogelnik. I think we would have to have an advanced math degree to make that derivation here.

And I said lastly, but I would like to point out one last thing, Your Honor. Bragg Regime can be taken as being synonymous to a thick grating diffraction or, and this "or" is an important part because it has the second way that it can be defined, and it's this concept of where almost all of the incident power is diffracted into a single order, and that's where we put in this definition that we propose here today, and you can see that here "or the presence

of only a single diffracted wave and a single transmitted wave."

It would be wrong to give meaning to the thick grating diffraction part of this definition at the beginning and not to the last part, and that's what Defendants are trying to do.

THE COURT: Great. Thanks very much.

MR. CASTO: That's all I have.

THE COURT: Mr. Lee?

MR. LEE: Your Honor, very briefly if I may respond to one thing.

THE COURT: Then I have to let him respond so hurry up.

MR. LEE: Certainly. These papers are written by scientists and mathematicians for scientists and mathematicians, so words like "usually" and "may" are not intended for courts and judges and lawyers to argue about certitude. So when there are approximations or assumptions made, they may not mean the same thing as legal assumptions, and so for that reason paper taken in context, I think, shows that one of already skilled in the art, a physicist or a mathematician would understand that limitation.

THE COURT: Thank you, Mr. Lee.

Mr. Casto?

MR. CASTO: Your Honor, I'm going to surprise you. I have no further comment.

THE COURT: Okay, thank you very much.

MR. CASTO: Thank you.

THE COURT: We did it, I guess. That's super. I congratulate all of you, and thank you very much for your argumentation which I thought was very high quality. Hopefully the claim construction opinion will be of similar quality.

Let me just ask if I have anything else that we have to do.

(Pause.)

THE COURT: Taking a cue from my body language, we are in fact finished, so Court is adjourned.

THE CLERK: All rise.

(Whereupon, at 4:50 p.m., the hearing in the above-entitled matter was concluded.)

//

//

//

//

//

//

//

REPORTER'S CERTIFICATE

DOCKET NO.: 06-601C

CASE TITLE: Theodore Whitney v. United States

HEARING DATE: June 29, 2008

LOCATION: Washington, D.C.

I hereby certify that the proceedings and evidence are contained fully and accurately on the tapes and notes reported by me at the hearing in the above case before the United States Court of Federal Claims.

Date: June 29, 2008

Kyle Patrick Johnson
Official Reporter
Heritage Reporting Corporation
Suite 600
1220 L Street, N.W.
Washington, D.C. 20005-4108